UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

CELLCO PARTNERSHIP D/B/A VERIZON
WIRELESS,

Plaintiff,

v.

CITY OF ROCHESTER,

Defendant.

DOCKET NO.:

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Cellco Partnership d/b/a Verizon Wireless ("Verizon Wireless" or "Plaintiff"), by and for its Complaint against defendant City of Rochester ("Defendant" or the "City"), respectfully alleges as follows.

1.  This action arises from Defendant's adoption of a city ordinance that violates, and is preempted by, federal law.  In particular, the City has adopted provisions applicable to wireless network infrastructure[1] deployment within Sections 106-1 through 106-42 of the Telecommunications Code of the City of Rochester, New York (the "Code") that violate Section 253 of the Federal Communications Act of 1934, as amended (the "Communications Act"), 47

---

[1] "Wireless network infrastructure," as used herein, includes, without limitation, Small Wireless Facilities (*see* 47 C.F.R. § 1.6002(l) (defining "Small Wireless Facilities")) and other wireless transmission and reception facilities and wireline (fiber) facilities connecting these wireless facilities with networking equipment, which are deployed underground or aerially (on poles). Small Wireless Facilities are characterized in these rules by features such as limits on the maximum size of the antenna (no more than three cubic feet in volume) and the structure to which they are attached (*e.g.*, 50 feet or less in height and no more than 10 percent taller than other adjacent structures).

U.S.C. § 253 ("Section 253").   Section 253 bars local governments from imposing statutes, regulations, or requirements that prohibit or have the effect of prohibiting the provision of telecommunications services.[2]   In interpreting and implementing Section 253, the Federal Communications Commission ("FCC") has recognized "that a . . . local legal requirement constitutes an effective prohibition [in violation of Section 253] if it 'materially limits or inhibits the ability of any competitor or potential competitor to compete in a fair and balanced legal and regulatory environment.'"   *Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Investment et al.*, WT Docket No. 17-79, FCC 18-133, 33 FCC Rcd 9088, 9102 ¶ 35 (Sep. 27, 2018) (the "*FCC Ruling/Order*").   And the FCC has confirmed that a local government's imposition of the following fees constitute just such a material limitation or inhibition on providers' ability to compete, in violation of Section 253: (a) fees that do not reflect a reasonable approximation of a state or local government's objectively reasonable costs of maintaining the rights-of-way used or occupied by a telecommunications service provider, maintaining a structure within the rights-of-way used or occupied by a telecommunications service provider, or processing an application or permit by a telecommunication services provider or (b) fees that are discriminatory.   *Id.* at 9104 ¶ 37; *id.* at 9112 ¶ 50; *id.* at 9125 ¶ 72.   Here, the Code violates Section 253 by, among other things, imposing upon wireless providers non-cost-based fees on the deployment and maintenance of Small Wireless Facilities and wireline facilities connecting Small Wireless Facilities with network equipment that are deployed underground or aerially in the public rights-of-way, into an operational network.

---

[2] *See* 47 U.S.C. § 153(53) (defining telecommunications service).

2.      Verizon Wireless thus seeks declaratory relief that various provisions of the Code violate, and are preempted by, Section 253 and injunctive relief prohibiting Defendant from enforcing those provisions of the Code.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this is a civil action that presents federal questions arising under the Communications Act.

4.      This Court has authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201, 2202.

5.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the claims stated herein arose in the judicial district for the United States District Court, Western District of New York, and Defendant resides in this district.

## THE PARTIES

6.      Plaintiff Verizon Wireless is a Delaware general partnership, with a primary corporate address at One Verizon Way, Basking Ridge, New Jersey 07920.  Verizon Wireless constructs and deploys wireless and other facilities for the provision of telecommunications services to the public as that term is defined and used in Sections 153 and 253 of the Communications Act.

7.      Defendant City of Rochester is a municipal corporation organized under the laws of the State of New York, with its principal place of business located at City Hall, Rochester, New York.

## RELEVANT BACKGROUND

## I.      THE NEED TO DEPLOY 5G AND OTHER NEXT-GENERATION WIRELESS NETWORK INFRASTRUCTURE TO PROVIDE TELECOMMUNICATIONS SERVICES IN ROCHESTER

3

8.      There are more than 400 million connections to wireless network infrastructure in the United States—far more than the total population—over which telecommunications and ancillary services are offered, and the number of such connections grows annually.

9.      Connections to wireless network infrastructure, and the telecommunications and ancillary services offered over them, are a critical means by which Americans engage with each other, reach 911 emergency services, and obtain broadband data access to the Internet and a multitude of smartphone applications.  In 2017, mobile wireless data usage per smartphone rose to an average of 5.1 GB per subscriber per month, an increase of over 30% from the prior year.[3] This upward trend is expected to continue and accelerate.

10.      Consumers everywhere rely on wireless network infrastructure, and their increasing use of such infrastructure has created urgent and unprecedented pressure on providers like Verizon Wireless to expand network capacity and capabilities to meet the rising demand.  Verizon Wireless is accomplishing this, in part, by "densifying" its wireless network infrastructure with Small Wireless Facilities, by deploying the next-generation technology—known as "Fifth Generation" or "5G" —and by installing fiber optic cable to connect Small Wireless Facilities to their wireless networks.

11.      Densification of wireless network infrastructure to support next-generation services requires the deployment of substantially larger numbers of Small Wireless Facilities within a given area than current wireless networks.  These new wireless facilities are smaller, operate closer to the ground, and use less power than current wireless facilities, which we refer to herein as "Macro

---

[3] *See Communications Marketplace Report*, GN Docket No. 18-231, WT Docket No. 18-203, MB Docket No. 17-214, MB Docket No. 18-227, IB Docket No. 18-251, FCC 18-181, 11 ¶ 12 (Dec. 26, 2018).

Cells."[4]  Like Macro Cell wireless facilities, each Small Wireless Facility must be connected to the wireless provider's other network equipment so that phone calls and other services (*e.g.*, access to the Internet) can be completed.  While wireless calls and other wireless services may start or end with a wireless device sending or receiving a wireless signal to or from Macro Cells or Small Wireless Facilities, those calls and services typically are carried over wireline facilities in between those wireless facilities.  So, for example, when a wireless phone user places a call to another wireless phone user, the signal is transmitted from the user wirelessly to the nearest wireless facility and then is carried via wireline facilities to the Macro Cell or Small Wireless Facility closest to the call recipient, where it then is transmitted wirelessly to the recipient's wireless phone. For a call between a wireline phone user and a wireless phone user, but for the connection between the wireless phone user and the Macro Cell or Small Wireless Facility, the entire call may be carried over wireline facilities, including such facilities of the wireless carrier.  That connection and carriage of traffic from and/or to the wireless network over the core wireline network is referred to as "backhaul."  Backhaul for modern wireless networks is typically provided by fiber cables, often located in public rights-of-way.[5]  And because a Small Wireless Facility will not operate unless it is connected to the larger network, fiber backhaul is crucial for achieving the full benefits of 5G.

12.     5G networks are up to 100 times faster than 4G networks and have very low latency (transmission delay), which permits the offering of a wide range of innovative services.  According

---

[4] Prior to densification to support 5G and enhanced 4G technologies and services, the wireless network infrastructure of Verizon Wireless and many other wireless service providers has been predominated by "Macro Cells," which use larger antennas mounted on taller antenna structures with greater power to serve larger areas than Small Wireless Facilities.

[5] Wireless providers can provide backhaul over fiber that they or affiliated entities own or, in some cases, they may pay a third party to provide backhaul for them.

to the FCC, "[t]hese new services can unleash a new wave of entrepreneurship, innovation, and economic opportunity for communities across the country."[6] Wireless providers are projected to invest $275 billion over the next decade in next-generation wireless infrastructure deployments, which should generate three million new jobs and boost the nation's GDP by half a trillion dollars.[7] As the FCC has explained:

> Supporting the deployment of 5G and other next-generation wireless services through smart infrastructure policy is critical. Indeed, upgrading to these new services will, in many ways, represent a more fundamental change than the transition to prior generations of wireless service. 5G can enable increased competition for a range of services—including broadband—support new healthcare and Internet of Things applications, speed the transition to life-saving connected car technologies, and create jobs.[8]

## II. THE COMMUNICATIONS ACT PROHIBITS MUNICIPALITIES FROM ACTING, OR FAILING TO ACT, IN SUCH A MANNER AS TO PROHIBIT OR HAVE THE EFFECT OF PROHIBITING THE PROVISION OF TELECOMMUNICATIONS SERVICES

13. The Communications Act "makes clear Congress's commitment to a competitive telecommunications marketplace unhindered by unnecessary regulations, explicitly directing the FCC to 'promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies.'"[9]

14. Reflecting that commitment, Section 253(a) provides that "[n]o State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of

---

[6] *FCC Ruling/Order* at 9089 ¶ 1.

[7] *See id.* at 9089 ¶ 2.

[8] *Id.*

[9] *Id.* at 9092 ¶ 14 (quoting Preamble, Telecommunications Act of 1996, P.L. 104-104, 110 Stat. 56 (1996)).

prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service."[10]

15.     Courts have acknowledged that Section 253 represents a "broad preemption of laws that inhibit competition."[11]

16.     When applying Section 253, the Second Circuit considers the combined effect of the individual provisions challenged to avoid "neglect[ing] the possibility that a town could effectively prohibit telecommunications services through a combination of individually non-objectionable provisions."[12]

17.     Courts have recognized that the FCC has authority to interpret Section 253 to establish parameters for what types of local legal requirements run afoul of the Communications Act.[13]

18.     Soon after the enactment of Section 253, the FCC offered guidance for determining whether local laws "have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service," directing courts to consider "whether the ordinance materially inhibits or limits the ability of any competitor or potential competitor to compete in a fair and balanced legal and regulatory environment."[14]

---

[10] 47 U.S.C. § 253(a).

[11] *FCC Ruling/Order* at 9092 ¶ 15 (quoting *Puerto Rico Tel. Co. v. Telecomm. Reg. Bd. of Puerto Rico*, 189 F.3d 1, 11 n.7 (1st Cir. 1999)).

[12] *TCG New York, Inc. v. City of White Plains*, 305 F.3d 67, 77 (2d Cir. 2002).

[13] *See FCC Ruling/Order* at 9095 ¶ 21 (citing *City of Arlington, Tex. v. F.C.C.*, 668 F.3d 229, 253–54 (5th Cir. 2012); *Sprint Telephony PCS, L.P. v. Cty. of San Diego*, 543 F.3d 571, 578 (9th Cir. 2008); *RT Commc'ns, Inc. v. F.C.C.*, 201 F.3d 1264, 1268 (10th Cir. 2000)).

[14] *California Payphone Ass'n*, 12 FCC Rcd 14191, 14206 ¶ 31 (1997).

19.     The Second Circuit embraced the FCC's "materially inhibit" standard for determining whether a local law operates as a prohibition or effective prohibition in violation of the Communications Act.[15]

20.     Last year, the FCC acted to reduce regulatory barriers to expedite 5G infrastructure investment and deployment of Small Wireless Facilities[16] in rights-of-way controlled by local governments and confirmed that the "materially inhibit" standard is appropriate for determining whether a local law operates as a prohibition or effective prohibition violating Section 253.[17]

21.     It is well settled that a local legal requirement can "materially inhibit" the provision of telecommunications services even if it is not a complete or insurmountable barrier as long as it "impedes" the provision of telecommunications service.[18]

22.     The FCC has explained further that discriminatory regulations likewise prohibit or have the effect of prohibiting the provision of telecommunications service, clarifying that "[a] regulatory structure that gives an advantage to particular services or facilities has a prohibitory

---

[15] *City of White Plains*, 305 F.3d at 76.

[16] The requirements and limitations in Section 253 apply to providers' ability to offer telecommunications services generally. As such, the *FCC Ruling/Order* interpreting Section 253 applies to any network infrastructure that a provider uses to offer telecommunications services, regardless of whether it is a Small Wireless Facility, other wireless network infrastructure, or wireline network infrastructure. Similarly, a State or local government statute, regulation, or legal requirement that violates Section 253 invalidates that statute, regulation, or requirement generally as to all network infrastructures to which the action or requirement applies.

[17] *See FCC Ruling/Order* at 9100 ¶ 31.

[18] *See id.* at 9102 ¶ 35; *id.* at 9108–09 ¶¶ 41–42; *Verizon Commc'ns, Inc. v. F.C.C.*, 535 U.S. 467, 491 (2002) (describing Section 253(a) as "prohibit[ing] state and local regulation that *impedes* the provision of 'telecommunications service'" (emphasis added)); *Puerto Rico Tel. Co. v. Municipality Of Guayanilla*, 450 F.3d 9, 18 (1st Cir. 2006) ("Courts have also noted that 'a prohibition does not need to be complete or "insurmountable" to run afoul of § 253(a).'" (quoting *City of White Plains*, 305 F.3d at 76)); *City of White Plains*, 305 F.3d at 76 (acknowledging "Courts have held that 'a prohibition does not need to be complete or "insurmountable" to run afoul of § 253(a)'" and "agree[ing] with these precedents"); *Qwest Corp. v. City of Santa Fe, New Mexico*, 380 F.3d 1258, 1269 (10th Cir. 2004) ("A regulation need not erect an absolute barrier to entry in order to be found prohibitive.").

effect, even if there are no express barriers to entry in the state or local code; the greater the discriminatory effect, the more certain it is that entities providing service using the disfavored facilities will experience prohibition."[19]

23.     In its *FCC Ruling/Order*, the FCC found that numerous courts have long recognized that local fees and other charges associated with the deployment of wireless network infrastructure that are inconsistent with Section 253 can effectively prohibit the provision of telecommunications service, violating the Communications Act.[20]

24.     To be sure, Section 253 provides that "[n]othing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government."[21]  But the FCC has made clear that the phrase "fair and reasonable compensation" only allows state or local governments to charge fees that recover a reasonable approximation of the state or local governments' actual and reasonable costs, where the costs being passed on are themselves objectively reasonable for maintaining the right-of-way, maintaining a structure within the right-of-way, or processing an application or permit.[22]

25.     In the *FCC Ruling/Order*, the FCC found that, to be consistent with Section 253, fees imposed by local governments for the attachment of Small Wireless Facilities in the public rights-of-way must meet the following requirements: (1) be a reasonable approximation of the

---

[19] *FCC Ruling/Order* at 9106 ¶ 39.
[20] *See discussion at id.* at 9100 ¶ 32; *id.* at 9110 ¶ 43.
[21] 47 U.S.C. § 253(c).
[22] *FCC Ruling/Order* at 9125 ¶ 72.

local government's costs in connection with a provider's use of the right-of-way to deploy facilities; (2) only include objectively reasonable costs; and (3) be non-discriminatory.[23]

26.     Non-cost-based fees violate the Communications Act.[24]  Fees are non-cost-based, for example, when they recover costs for functions not caused the provider's "use" of the public right-of-way or are "designed to subsidize local government costs in another geographic area or accomplish some public policy objective beyond the providers' use of the [right-of-way]."[25] Likewise, unreasonably high costs, including excessive or arbitrary fees charged by third parties to a local government, may not be passed on to the provider using the public right-of-way through fees because, although they may be an actual cost to the locality, they are not objectively reasonable.[26]

27.     While the fees local governments charge for attaching wireless facilities generally must be based on actual costs to the government, the FCC has presumed that a fee of $270 per Small Wireless Facility attachment per year for all recurring fees would be "fair and reasonable compensation" and not prohibited by Section 253.[27]

---

[23] *See id.* at 9112–13 ¶ 50; *see also id.* at 9100 ¶ 32 (explaining "fees are only permitted to the extent that they represent a reasonable approximation of the local government's objectively reasonable costs, and are non-discriminatory"); *id.* at 9124 ¶ 69 ("The requirement that compensation be limited to a reasonable approximation of objectively reasonable costs and be non-discriminatory applies to all state and local government fees paid in connection with a provider's use of the [right-of-way] to deploy Small Wireless Facilities.").

[24] *See id.* at 9125–27 ¶ 73.

[25] *See id.* at 9128 ¶ 76.

[26] *See id.*; *id.* at 9124–25 ¶ 70; *id* at 9115 ¶ 55; *id.* at 9121–22 ¶ 64 (agreeing with comments received from smaller municipalities urging the FCC to establish common-sense, cost-based standards governing fees to prevent the "excessive and arbitrary fees" consultants have recommended to larger municipalities, which might preclude infrastructure deployment in other regions).

[27] *See id.* at 9129 ¶ 79.

28.     The FCC has cautioned courts, when facing claims that fees violate Section 253, not to focus narrowly on the barrier erected by the jurisdiction imposing the legal requirement. Rather, courts should be mindful of "the serious effects that flow through in other jurisdictions as a result, including harms to regional or national deployment efforts," recognizing that fees imposed beyond recovery of a locality's reasonable costs materially inhibit plans to deploy service in both that locality and other localities across the country due to regulatory uncertainty and finite resources—"diminish[ing] deployment of Small Wireless Facilities critical for wireless service and building out 5G networks."[28]

29.     Over the next three to four years, an estimated 300,000 Small Wireless Facilities will need to be deployed by Verizon Wireless and other providers, and connected to other wireless network infrastructure, which is approximately double the number of "macro cells" built over the last thirty years to support 4G and other prior generations of wireless technology.[29] This significant increase in wireless network infrastructure "will magnify per-facility fees charged to providers," making such fees more likely to materially inhibit service when they exceed the actual and objectively reasonable costs incurred by the local government.[30]

30.     A local government regulation also may materially inhibit a service provider's ability to provide telecommunications services in other ways, including by limiting the ability of

---

[28] *Id.* at 9110 ¶ 42; *id.* at 9122–23 ¶ 65; s*ee also, e.g.*, *id.* at 9118–19 ¶ 60; *id.* at 9110 ¶ 43; *id.* at 9119–20 ¶ 61 (stating "[t]he record is replete with evidence that providers have limited capital budgets that are constrained by state and local fees" and agreeing with Verizon Wireless, as well as other providers, that "[w]hen providers are forced to spend more to deploy infrastructure in one locality, there is less money to spend in others"); *see also Puerto Rico Tel. Co.*, 450 F.3d at 18–19 (considering wider impact of gross revenue fee on provider's provision of telecommunications services across municipalities in concluding Section 253 preempted local ordinance).
[29] *See FCC Ruling/Order* at 9111–12 ¶ 47.
[30] *Id.* at 9112 ¶ 48.

a provider to fill in coverage gaps, densify a wireless network, introduce new services, or otherwise improve existing service capabilities.[31]

31.     The *FCC Ruling/Order* took effect on January 14, 2019.

## III.    PROVISIONS OF THE CODE PROHIBIT OR HAVE THE EFFECT OF PROHIBITING THE PROVISION OF TELECOMMUNICATIONS SERVICES

32.     Defendant was aware of Section 253 and the *FCC Ruling/Order* when it was considering changes to the Code in late 2018 and early 2019.  Nevertheless, on February 20, 2019, Defendant adopted the Code.

33.     Several provisions in the Code violate Section 253, including as explicitly interpreted in the *FCC Ruling/Order*.

### A.     The Code's Annual Right-Of-Way Compensation Fees Are at Odds with Federal Law.

34.     The Code requires several categories of annual "right-of-way compensation" from providers of telecommunications services that occupy or use the public rights-of-way in the City that conflict with, and are preempted by, Section 253.

#### (i)     *Annual Fees Based on "Value"—Rather than Cost—Are Unlawful.*

35.     The Code purports to impose charges reflecting "the value of the right-of-way and the municipal facilities."[32]

36.     The Code's imposition of fees reflecting "the value of the right-of-way and the municipal facilities" is preempted by Section 253.  As the *FCC Ruling/Order* clearly states, Section 253 requires fees to be based on actual and objectively reasonable costs.  Accordingly,

---

[31] *See id.* at 9104 ¶ 37; *id.* at 9106–08 ¶ 40.
[32] Code § 106-15(B).

non-cost- "value"-based fees that are untethered to and above cost, and designed to maximize revenue, are prohibited.[33]

      **(ii)**    ***The Code's Annual per Pole Attachment Fees Are Unreasonably High.***

37.    For "pole attachments," which relate to siting a Small Wireless Facility, the Code imposes the following annual per pole attachment fees:

> POLE ATTACHMENTS.  One thousand five hundred dollars per standard City-owned pole or standard pole purchased and replaced by the licensee and dedicated to the City, and $1,000 per smart pole installed by the licensee and dedicated to the City.  Any smart poles installed by the City shall be such amount as set forth in a master license agreement.[34]

38.    These rates stand in sharp contrast with the *FCC Ruling/Order*, which found that the following fee levels are presumptively consistent with Section 253 requirements: *recurring* Small Wireless Facility fees capped at $270 annually, which includes all recurring fees related to the Small Wireless Facility, such as any possible right-of-way access fee or fee for attachment to municipally-owned structures in the right-of-way.[35]  The *FCC Ruling/Order* states that there will be "only very limited circumstances in which localities can charge higher fees consistent with the requirements of Section 253."[36]

39.    The Code's *recurring* pole attachment fees far exceed the presumptively reasonable limit established by the *FCC Ruling/Order* and are not based on a reasonable approximation of objectively reasonable costs actually incurred by the City as a result of a provider's attachment of a Small Wireless Facility to municipal poles.  In fact, when Verizon Wireless requested that the

---

[33] *See FCC Ruling/Order* at 9125–27 ¶ 73.

[34] Code § 106-15(B)(4).  The first paragraph of § 106-15(B) states that these amounts are assessed annually: "RIGHT-OF-WAY COMPENSATION.  All Licensees shall pay annually to the City, as compensation for use of the City's right-of-way and/or for the use of municipal facilities, . . . the following annual amounts:".

[35] *See FCC Ruling/Order* at 9129 ¶ 79.

[36] *Id.* at 9129–30 ¶ 80.

City provide cost justification for these rates, the City did not provide any substantiation based on costs.  *See* Exs. A and B.

40.    The Code also imposes additional *recurring* fees associated with the Small Wireless Facility attachments that exacerbate the non-compliant structure and amount of the recurring fees. Specifically, the Code imposes charges on providers whose Small Wireless Facilities are deployed in the public rights-of-way for: "administrative costs for retaining and managing documents and records"; "costs for managing, coordinating and responding to public concerns and complaints"; and "the costs of the City's self-insurance."[37]  To the extent these fees seek additional recurring compensation for Small Wireless Facilities attaching in or occupying the public rights-of-way, even if "specifically related to and caused by the deployment,"[38] they are nonetheless presumed unlawful because the recurring Small Wireless Facility attachment fees in the Code already exceed the FCC's presumptive limit, and the FCC made clear that *all* recurring fees for a Small Wireless Facility are to be taken into account when considering compliance with the Commission's standard interpreting Section 253.[39]

> **(iii)    *The Code's Annual Underground and Aerial Installation Fees for Backhaul Are Not Cost-Based, Are Unreasonably High, and Are Discriminatory.***

41.    For "underground installations," the Code imposes three categories of annual fees:

> (a) OPEN TRENCHING. In the first year, $10,000 for up to 2,500 linear feet of telecommunications facilities per contiguous site, per conduit or multiple conduits up to five inches total in diameter in the right-of-way, $1.50 per linear foot for 2,500 through 12,500 linear feet of telecommunications facilities and $0.75 per linear foot thereafter. Annually after the first year of installation, $5,000 for up to 2,500 linear feet of telecommunications facilities and $1 per linear foot for 2,500 through 12,500 linear feet of telecommunications facilities and $0.50 per linear foot thereafter;

---

[37] Code § 106-15(B).
[38] *FCC Ruling/Order* at 9113 n.131.
[39] *See id.* at 9129 ¶ 79.

(b) INSTALLATION IN EXISTING FACILITIES. Five thousand dollars for up to 2,500 linear feet of telecommunications facilities, including wire, fiber optic strands, innerduct or other facilities which do not require the installation of new conduit and are installed in existing facilities and $1 per linear foot for 2,500 through 12,500 linear feet of telecommunications facilities and $0.50 per linear foot thereafter;

(c) DIRECTIONAL BORING. In the first year, $500 for each site of excavation required to facilitate directional boring for placement of conduit or multiple conduits up to five inches total in diameter in the right-of-way and $1.50 per linear foot of installed facilities resulting from such directional boring for 2,500 through 12,500 linear feet of telecommunications facilities and $0.75 per linear foot thereafter. Annually after the first year, $5,000 for up to 2,500 linear feet of installed telecommunications facilities and $1 per linear foot for 2,500 through 12,500 linear feet of telecommunications facilities and $0.50 per linear foot thereafter[.][40]

42.    The Code's "underground" fee structure is not a reasonable approximation of actual cost, is not objectively determined, and is discriminatory.

43.    The Code imposes the same $10,000 first-year and $5,000 subsequent-year fees for "underground" open-trenching use of either one linear foot or 2,500 linear feet, which inherently cannot accurately reflect Defendant's cost in each case.  These fees are thus not cost-based, are unreasonable, and are not objectively determined.  The "underground" fees for installation in existing facilities and for directional boring suffer from the same deficiencies.

44.    The Code imposes the same "underground" fee on a provider using one linear foot as it imposes on another provider using 2,500 linear feet, and the fee is thus discriminatory.  On information and belief, the City's actual and reasonable costs are not flat for the first 2,500 linear feet for "underground installations," regardless of whether the facilities are placed underground through open-trenching, in existing facilities, or through directional boring.

---

[40] Code § 106-15(B)(1).

45.     The inherently unreasonable and discriminatory nature of applying the same "underground" fee for one linear foot as for 2,500 linear feet is demonstrated by the Code itself because the fee is flat up to 2,500 linear feet and then increases on a per linear foot basis afterward in substantial amounts.   The fee structure above 2,500 linear feet thus demonstrates that a significant portion of the City's costs vary based on the length of the build, but the fees for infrastructure builds at and below 2,500 linear feet do not reflect any changes in cost based on length of the build.

46.     Whether for open-trenching, installations in existing facilities, or directional boring, the Code imposes different per linear foot fees for "underground" use of between 2,500 and 12,500 linear feet and a lesser per linear foot  amount on additional use above 12,500 linear feet, which inherently cannot accurately reflect Defendant's cost and is thus unreasonable.

47.     Whether for open-trenching, installations in existing facilities, or  directional boring, the Code imposes different per linear foot fees for "underground" use in each case of between 2,500 and 12,500 linear feet and a lesser per linear foot amount for additional use above 12,500 linear feet and is thus discriminatory.

48.     Nothing in the Code's fee framework provides an indication, nor to Verizon Wireless's knowledge has the City provided a demonstration, that the "underground" fees are based on a reasonable approximation of cost that is objectively determined and non-discriminatory.

49.     For "aerial installations" of "fiber or other telecommunications facilities and accessory equipment strung between poles, buildings, or other facilities," the Code delineates the following annual fee structure:

> AERIAL INSTALLATIONS.   Aerial installation of fiber or other telecommunications facilities and accessory equipment strung between poles, buildings, or other facilities, is strongly discouraged due to area weather, safety concerns, limited capacity, and aesthetic disturbances.

16

Upon demonstrating that there is no reasonable alternative to such installation, and if such installation is approved, then $10,000 for up to 2,500 linear feet of telecommunications facilities, $1.50 per linear foot for 2,500 through 12,500 linear feet of telecommunications facilities and equipment and $0.75 per linear foot thereafter.  Annually after the first year of installation, $5,000 for up to 2,500 linear feet of telecommunications facilities and $1 per linear foot for 2,500 through 12,500 linear feet of telecommunications facilities and $0.50 per linear foot thereafter.[41]

50.     This "aerial" fee structure is not a reasonable approximation of actual cost, is not objectively determined, and is discriminatory.

51.     The Code imposes the same $10,000 first-year and $5,000 subsequent-year fees for "aerial" use of either one linear foot or 2,500 linear feet, which inherently cannot accurately reflect Defendant's cost in each case and is thus unreasonable and not objectively determined.[42]

52.     The Code imposes the same "aerial" fee on a provider for one linear foot that it imposes on another provider for 2,500 linear feet, and the fee is thus discriminatory.  On information and belief, the City's actual and reasonable costs are not flat for the first 2,500 linear feet for "aerial installations."

53.     The inherently unreasonable and discriminatory nature of applying the same "aerial" fee for one linear foot as for 2,500 linear feet is demonstrated by the Code itself because the fee is flat up to 2,500 linear feet but then increases on a per linear foot basis afterward in substantial amounts.  The fee structure above 2,500 linear feet apparently suggests that a significant portion of the City's costs vary based on the length of the build, but the fees for infrastructure builds at and below 2,500 linear feet do not reflect any changes in cost based on length of the build.

---

[41] *Id.* § 106-15(B)(2).
[42] The City does not explain why costs would be the same for aerial and open trenching when presumably maintenance costs for air space would be lower.

54.     The Code imposes different per linear foot fees for "aerial" use of between 2,500 and 12,500 linear feet and a lesser per linear foot amount on additional use above 12,500 linear feet, which inherently cannot accurately reflect Defendant's cost and is thus unreasonable.

55.     The Code imposes different fees per linear foot for "aerial" use of between 2,500 and 12,500 linear feet and a lesser per linear foot amount for additional use above 12,500 linear feet, and is thus discriminatory.

56.     Nothing in the Code's fee framework provides an indication, nor to Verizon Wireless's knowledge has the City provided a demonstration, that the fees are based on a reasonable approximation of cost that is objectively determined and non-discriminatory.

57.     As further indication that the Code's underground-installations and aerial-installations fees are not based on a reasonable approximation of costs objectively determined, the Code arbitrarily provides a substantial discount for relocating aerial installations underground—even though aerial installations tend to place less of a burden on the management and maintenance of the public right-of-way.[43]

58.     The non-complaint nature of the Code's *recurring* underground-installations and aerial-installations fees is exacerbated by the fact that the Code imposes additional *recurring* fees associated with underground and aerial installations.  Specifically, the Code imposes charges on providers that use and occupy the public rights-of-way for: "administrative costs for retaining and managing documents and records"; "costs for managing, coordinating and responding to public

---

[43] *See* Code § 106-15(B)(5).  The City may have other rationales for seeking to have wireless and other network infrastructure deployed underground (*e.g.*, aesthetics), but this does not alter the requirement that, pursuant to Section 253, all fees for use of public rights-of-way by telecommunications services providers must be a reasonable approximation of objectively reasonable costs.

concerns and complaints"; and "the costs of the City's self-insurance."[44]  To the extent these fees seek additional compensation for underground or aerial installations attaching in or occupying the public rights-of-way, even if "specifically related to and caused by the deployment,"[45] they are nonetheless unlawful because the underground-installations and aerial-installations fees are non-cost-based in violation of Section 253.[46]

### B.    The Code's Excess and Duplicative Fees Are at Odds with Federal Law.

59.    The Code provides that the fees discussed above in paragraphs 34–58 are in addition to any other applicable fees imposed by the Code, including rent, special assessments, and taxes:

> The compensation set forth in this section [(106-15)] shall be exclusive of, and in addition to, any other applicable fees, including but not limited to permit fees, registration costs, or other costs established by this chapter or by Chapter 104, any rental amounts for lease of City municipal facilities and all special assessments and taxes of whatever nature.[47]

60.    But these "other applicable fees" established by Chapters 106 or 104 of the Code violate Section 253 where they apply to providers with Small Wireless Facility attachments and/or underground or aerial installations to the extent that they are in excess of and duplicative of the non-cost-based fees of Section 106-15 described in paragraphs 34–58.  The combined fees are thus not a reasonable approximation of objectively reasonable costs actually incurred by the City as a result of a provider's use of the right-of-way.

---

[44] Code § 106-15(B).
[45] *FCC Ruling/Order* at 9113 n.131.
[46] *See id.* at 9129 ¶ 79.
[47] Code § 106-15(F).

61.     The Code's allowance of the "other applicable fees" also compounds the magnitude of the Code's combined violations of federal law, as they move even further away from the reasonable approximation of actual and objectively reasonable costs required by the law.

62.     Moreover, some of the costs imposed by Chapters 104 and 106 of the Code, such as those identified in the next two paragraphs, also are captured in the fees imposed by other provisions of the Code described in paragraphs 34–58 herein, meaning that such costs may be recovered more than once, which would be inherently non-cost-based and unreasonable in violation of Section 253.[48]

63.     Section 106-15(A) of the Code imposes registration fees, Section 104-57 imposes permit fees, Section 104-57(E) imposes permit fees for excavations of multiple openings, and Section 106-15(F) allows for additional registration costs and permit fees.  To the extent that the otherwise applicable annual fees include these costs, there would be duplication in recovery of the foregoing fees.

64.     Section 106-15(B)(1) of the Code provides for annual fees relating to underground installations.  Section 104-57(H) imposes fees for excavation in the right-of-way unless the excavation was for the renewal of residential water service and does not disturb the roadway or public sidewalk.  Section 104-57(B) requires companies performing work in the City to pay an annual maintenance fee, including fees for all work other than work requiring excavation in the City rights-of-way.  Section 104-20 imposes 15-year extended maintenance fees, in addition to permit fees, for excavations made in newly reconstructed or newly resurfaced pavement.  To the extent that the otherwise applicable annual fees include these costs, there would be duplication in recovery of the foregoing fees.

---

[48] *Compare id.* § 106-15, *with id.* §§ 104-57 and 104-20.

65.     Section 106-15(F) of the Code, which imposes "all special assessments and taxes of whatever nature" is, by its own terms, not tied to a reasonable approximation of actual and reasonable costs specifically related to and caused by a provider's use of the right-of-way and, therefore, violates Section 253.

## IV.     VERIZON WIRELESS SEEKS TO DEPLOY WIRELESS NETWORK INFRASTRUCTURE TO OFFER NEXT-GENERATION TELECOMMUNICATIONS SERVICES IN ROCHESTER

66.     To better serve its customers and the City and to begin to serve new customers and provide new services, Verizon Wireless seeks to extend, densify, and upgrade its wireless network infrastructure, including to install additional Small Wireless Facilities to support the provision of current and next-generation telecommunications services such as 5G and to deploy fiber to connect these facilities.  To successfully do this, Verizon Wireless requires new approvals from Defendant to access City property.

67.     Accordingly, on January 10, 2019, Verizon Wireless petitioned Defendant in writing not to enact the Code for several reasons, including those stated in this Complaint.

68.     On February 7, 2019, Verizon Wireless provided Defendant, in writing, with suggested revisions to the Code to comply with federal law, including revisions to the fee provisions of the Code described elsewhere within this Complaint.

69.     On February 20, 2019, the City Council enacted the Code without incorporating the vast majority of Verizon Wireless's suggested revisions.

70.     On April 1, 2019, the Code took effect.

71.     On April 15, 2019, by letter, Verizon Wireless sought clarification from Defendant as to whether it believed the Code complies with federal law, and, if so, to provide support for that belief.  Verizon Wireless advised Defendant in that letter that it was eager to deploy wireless

network infrastructure to enable it to offer next-generation wireless services in the City, but the City's response would affect Verizon Wireless's ability to do so.  *See* Ex. A.

72.    On April 29, 2019, Defendant advised Verizon Wireless that "we have concluded that our permit fees and recurring fees for use of the City's rights of way, including those for pole attachments related to the deployment of small wireless facilities, comply with all federal law requirements and limitations."  Ex. B.

73.    Defendant's April 29, 2019, communication made clear that an unavoidable and actual controversy exists.

74.    On July 30, 2019, Defendant wrote Verizon Wireless and advised that, in order to be in compliance with the Code, Verizon Wireless is required, by October 1, 2019, to register under Section 106-5 of the Code, complete and enter into a Master License Agreement, complete Permit applications as necessary, and make "payment of all fees and compensation due to the City that accrued as of the effective date of [the Code]."  Ex. C.

75.    As a result of Defendant's actions, Verizon Wireless has been, and will continue to be, damaged and irreparably harmed absent the relief requested herein.  The harm caused by Defendant's unlawful actions includes, but is not limited to, an effective prohibition on Verizon Wireless's ability to provide telecommunications services in the affected area of the City, materially inhibiting Verizon Wireless's: (a) ability to provide the public with telecommunications services, including the ability to provide emergency communications; (b) ability to compete with other providers of telecommunications services; and (c) full use of its existing licenses and business investments, all of which are irretrievably impairing Verizon Wireless's good will and business reputation.

76.     In the ultra-competitive telecommunications industry, particularly at this critical time when next-generation wireless services are being deployed across the country, each day this regulatory uncertainty lingers and affects Verizon Wireless's deployment decisions yields greater harm.

77.     As the *FCC Ruling/Order* underscores, deployment of wireless network infrastructure to support next-generation services is a matter of significant public interest.  Not only does the prohibition and regulatory uncertainty created by the Code cause significant harm to Verizon Wireless, it also causes significant harm to the public who are deprived of the benefits of efficient deployment of wireless network infrastructure, both of current- and next-generation technologies, that the FCC sought to secure.  The public interest in promoting competition in the telecommunications arena—the express goal of the Communications Act—has been irreparably harmed, and will continue to be irreparably harmed, by Defendant's unlawful actions.  Verizon Wireless's present and future customers, as well as the public, are significantly prejudiced by Defendant's unlawful conduct.

## COUNT I

**Violation of 47 U.S.C. §§ 253(a) and (c)—Unfair and Unreasonable Small Wireless Facility Attachment Fees That Prohibit or Have the Effect of Prohibiting Telecommunications Service**

78.     Verizon Wireless re-alleges and incorporates by reference all preceding paragraphs.

79.     Section 253(a) provides that "[n]o State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service."

80.     Section 253(c) provides that local governments may "require fair and reasonable compensation    from    telecommunications    providers,    on    a    competitively    neutral    and

nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government."

81.     The *FCC Ruling/Order* found that fees charged by localities to attach to facilities within or to occupy public rights-of-way "violate [Section 253] unless these conditions are met: (1) the fees are a reasonable approximation of the state or local government's costs [in connection with a provider's use of the right-of-way], (2) only objectively reasonable costs are factored into those fees, and (3) the fees are no higher than the fees charged to similarly-situated competitors in similar situations."

82.     The *FCC Ruling/Order* also set forth standards for certain fee levels that presumptively do not violate Section 253, including, among others, recurring Small Wireless Facility fees capped at $270 per Small Wireless Facility annually, which includes all fees related to deployment of the Small Wireless Facility, such as any possible right-of-way access fee or fee for attachment to municipally-owned structures in the right-of-way.

83.     As set forth above, the Code's *recurring* Small Wireless Facility attachment fees also far exceed the limit established by the *FCC Ruling/Order*.

84.     As set forth above, the Code's *recurring* Small Wireless Facility attachment fees are not a reasonable approximation of the City's actual and objectively reasonable costs and are discriminatory.

85.     As set forth above, the Code imposes duplicative recurring fees on Small Wireless Facility attachments that alone and in combination with other recurring fees are not a reasonable approximation of the City's actual and objectively reasonable costs.

86.     The recurring fees for Small Wireless Facility attachments in the Code are therefore inconsistent with and violate Section 253(a), Section 253(c), and the *FCC Ruling/Order*.

## COUNT II

**Violation of 47 U.S.C. §§ 253(a) and (c)—Unfair and Unreasonable Underground and Aerial Facility Rights-of-Way Fees That Prohibit or Have the Effect of Prohibiting Telecommunications Service**

87.     Verizon Wireless re-alleges and incorporates by reference all preceding paragraphs.

88.     Section 253(a) provides that "[n]o State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service."

89.     Section 253(c) provides that local governments may "require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government."

90.     The *FCC Ruling/Order* found that fees charged by local governments to attach to facilities within or to occupy public rights-of-way "violate [Section 253] unless these conditions are met:  (1) the fees are a reasonable approximation of the state or local government's costs [in connection with a provider's use of the right-of-way], (2) only objectively reasonable costs are factored into those fees, and (3) the fees are no higher than the fees charged to similarly-situated competitors in similar situations."

91.     As set forth above, the Code's framework for recurring fees for underground installations reveal that the fees, on their face, cannot consistently be a reasonable approximation of the City's actual and objectively reasonable costs and that they are discriminatory.

92.     As set forth above, the Code's framework for *recurring* fees for aerial installations reveal that the fees, on their face, cannot consistently be a reasonable approximation of the City's actual and objectively reasonable costs and that they are discriminatory.

93.     As set forth above, the Code imposes fees (*e.g.*, for registration and permitting) that are duplicative of other non-compliant fees imposed for the use and occupation of the rights-of-way and therefore are not a reasonable approximation of the City's actual and objectively reasonable costs caused by underground and aerial installations that are not already recovered by the City.

94.     The recurring fees in the Code underground and aerial installations are therefore inconsistent with and violate Section 253(a), Section 253(c), and the *FCC Ruling/Order*.

WHEREFORE, Plaintiff Verizon Wireless respectfully requests that this Court issue an Order and Judgment:

a.      Declaring that the recurring fees applicable to pole attachments in Section 106-15 of the Code violate 47 U.S.C. §§ 253(a) and 253(c);

b.      Declaring that the recurring fees applicable to backhaul in Section 106-15 of the Code violate 47 U.S.C. §§ 253(a) and 253(c);

c.      Declaring that the fees applicable to "the value of the right-of-way and the municipal facilities" in Section 106-15 of the Code violate 47 U.S.C. §§ 253(a) and 253(c);

d.      Declaring that the excessive and duplicative fees allowed in Section 106-15(F) of the Code violate 47 U.S.C. §§ 253(a) and 253(c);

e.      Declaring that the recurring fees applicable to pole attachments in Section 106-15 of the Code are preempted by 47 U.S.C. § 253;

f.      Declaring that the recurring fees applicable to backhaul in Section 106-15 of the Code are preempted by 47 U.S.C. § 253;

g.      Declaring that the fees applicable to "the value of the right-of-way and the municipal facilities" in Section 106-15 of the Code are preempted by 47 U.S.C. § 253;

h.      Declaring that the excessive and duplicative fees allowed in Section 106-15(F) of the Code are preempted by 47 U.S.C. § 253;

i.      Ordering, directing, and enjoining Defendant from continuing to enforce Section 106-15 of the Code;

j.      Awarding Verizon Wireless the costs, disbursements, and expenses of this action as permitted by law; and

k.      Granting such other and further relief as this Court deems just and proper.

Dated: New York, New York
       August 8, 2019

Respectfully submitted,

KELLEY DRYE & WARREN LLP

By:    /s/ Geoffrey W. Castello
      Geoffrey W. Castello
      Damon Suden (admission pending)
      101 Park Avenue
      New York, New York 10178
      Tel: (212) 808-7800

      Edward A. Yorkgitis, Jr. (*pro hac vice* forthcoming)
      3050 K Street, N.W.
      Washington, D.C. 20007
      Tel: (202) 342-8400

      Lauri A. Mazzuchetti (*pro hac vice* forthcoming)
      Robert N. Ward (admission pending)
      One Jefferson Road, 2nd Floor
      Parsippany, NJ 07054
      Tel: (973) 503-5900

      *Attorneys for Plaintiff*
      *Verizon Wireless*