UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

CELLCO PARTERNSHIP D/B/A VERIZON WIRELESS,

                                        Plaintiff,                    MEMORANDUM OF LAW

            v.
                                                                      Case No. 19-CV-6583
CITY OF ROCHESTER,

                                        Defendant.

## PRELIMINARY STATEMENT

Verizon brings claims against the City of Rochester under Section 253 of the

Telecommunications Act of 1996 (47 U.S.C. § 253) contending that small cell attachment fees

and linear underground and aerial facility fees charged in the City's Telecommunications Code

have the effect of prohibiting Verizon from providing telecommunications services in the City

of Rochester.  Even assuming that § 253 provides Verizon with a cause of action in federal

court, Verizon does not and cannot demonstrate that the City's fees have effectively prohibited

Verizon from providing telecommunications services.  In any case, the City's fees are exactly

the sort of fair and neutral compensation that municipalities are expressly allowed to collect

under § 253.

## STATEMENT OF FACTS

In February 2019, the City of Rochester enacted its Telecommunication Ordinance,

which is codified at Chapter 106 of the Code of the City of Rochester, entitled

"Telecommunications in the Right-Of-Way" ("Telecom Code").  *See* Beath Decl. ¶ 2 and

Exhibit A thereto.  Section 106-15 of the Telecom Code sets forth fees.  Beath Decl. ¶ 3 and

Exhibit B thereto.

The Telecom Code requires an entity with telecommunications facilities in the right-of-way—or one that proposes to install telecommunications facilities in the right-of-way—to register under the Telecom Code and enter into a Master License Agreement prior to obtaining any permit for work in the right of way related to any telecommunications facility.  Beath Decl. ¶ 4.    Under the Telecom code, a telecommunications facility is defined as "[t]he plant, equipment and property, including but not limited to cables, wires, fiber optic strands, conduits, pipes, ducts, dishes, pedestals, poles, antennas, radio equipment, electronics and other appurtenances, including both underground and overhead facilities, used or to be used to transmit, receive, distribute, support, provide or offer FCC licensed or FCC authorized telecommunications services."  Beath Decl. ¶ 5.  A "small cell" is defined as "[a]n umbrella term for low-powered radio access nodes, including those that operate in licensed spectrum and unlicensed carrier-grade Wi-Fi. Small cell technology includes, but is not limited to, femtocells, picocells, microcells, metrocells and distributed antenna systems, which provide a network densification solution that offloads traffic from the macro network to add capacity."  Beath Decl. ¶ 6.  The "preferred location" for a small cell is "on existing municipal facilities, other existing poles or structures ('existing infrastructure') or on replacement polies located in the same location as existing infrastructure."  Beath Decl. ¶ 7.

Plaintiff Verizon Wireless describes itself as "a Delaware general partnership . . . [that] constructs and deploys wireless and other facilities for the provision of telecommunications services to the public as that term is defined and used in Sections 153 and 253 of the [Federal] Communications Act [of 1934]."  Beath Decl. ¶ 8.  Plaintiff is a wholly-owned subsidiary of Verizon Communications, Inc.  *See* February 25, 2021 Annual 10-k Filing of Verizon Communications, Inc., listing subsidiary entities, including Cellco Partnership (d/b/a/ Verizon

2

Wireless) at https://sec.report/Document/0000732712-21-000012/ (last checked October 19, 2021).

In 2018, Verizon provided the City with a presentation addressing the potential for 5G technology which included a "conceptual" imagining of the installation of small cell facilities within the City.  Since that time, plaintiff has never brought nor attempted to bring this concept to fruition.  Beath Decl. ¶ 9.  In the instant action, plaintiff admits that it owns no telecommunications facilities in the City's right of way.  Beath Decl. ¶ 10  To date, plaintiff has not registered under the City's Telecom Code, has not sought to enter into a Master License Agreement, and has not sought to undertake any work in the City's right of way to install any telecommunications facilities.  Beath Decl. ¶ 11.  Since plaintiff has no telecommunications facilities in the City's right of way, it has not been charged any of the fees under the Telecom Code with which it takes issue.  Beath Decl. ¶ 12.

Notwithstanding that plaintiff is not presently subject to the City's Telecom Code and does not appear to have any concrete plan to deploy telecommunication facilities in the City, plaintiff claims that the fees charged by the City for small cell pole attachments and for aerial and underground linear telecommunications facilities are so high as to prohibit plaintiff from providing telecommunications services.  Beath Decl. ¶ 13 and Exhibit C thereto.

The City's Telecom Code charges an annual fee of $1,500 for each small cell pole attachment.  Beath Decl. ¶ 14 and Exhibit B at 106-15(B)(4).  As to fees for underground or aerial conduit containing telecommunications facilities such as fiber, the Code charges fees as follows: "In the first year, $10,000 for up to 2,500 linear feet of telecommunications facilities per contiguous site, per conduit or multiple conduits up to five inches total in diameter in the right-of-way, $1.50 per linear foot for 2,500 through 12,500 linear feet of telecommunications

facilities and $0.75 per linear foot thereafter. Annually after the first year of installation, $5,000 for up to 2,500 linear feet of telecommunications facilities and $1 per linear foot for 2,500 through 12,500 linear feet of telecommunications facilities and $0.50 per linear foot thereafter." Beath Decl. ¶ 15 and Exhibit B at 106-15(B)(1)(a) and (B)(2).

Plaintiff, despite claiming that the City's fees are prohibitively high, has refused to provide any information on its ability to afford the City's fees in this litigation.  Beath Decl. ¶ 16.  Since plaintiff is not a publicly traded company, there are few public filings available to demonstrate its revenue or assets.  Beath Decl. ¶ 17.  Notably, however, the February 2021 annual 10-k filing of Verizon Communications, Inc.—plaintiff's parent company—makes particular note that in December 2020, plaintiff Cellco Partnership participated in "FCC Auction 107, which relates to mid-band wireless spectrum known as C-Band," and that plaintiff was the "winning bidder," purchasing "approximately $45.5 billion" of licenses.  *See* https://sec.report/Document/0000732712-21-000012/ (last checked October 19, 2021).  Plainly, plaintiff has significant capital at hand.[1]  Beath Decl. ¶ 18.

In any case, the pole-attachment fees charged by the City are in line with fees charged in other municipalities around the Country and regularly paid by Verizon.  Beath Decl. ¶ 19 and Exhibit D.  Additionally, the City's Telecom fees are less than a reasonable approximation of the City's costs for right of way maintenance related to the telecommunications facilities.  Beath Decl. ¶ 20.  The City's Director of Telecommunications, Louie Tobias, undertook a cost analysis that is reflected in the spreadsheet attached to the Beath Declaration as Exhibit E. Beath Decl. ¶ 21.  The first five pages of the spreadsheet set forth an approximation of City

---

[1] Consistent with this abundance of capital, plaintiff's parent corporation Verizon Communications reported consolidated revenues last year of $128,292,000,000.00 and profits ("consolidated net income") of $18,348,000,000.00.  *See* https://sec.report/Document/0000732712-21-000012/ (last checked October 19, 2021).

costs related to small cell pole attachments (see Exhibit E at COR 000001 – COR 000005), the second five pages set forth an approximation of City costs related to aerial/underground linear conduit in the right of way (see Exhibit E at COR 000006 – 000010).  Beath Decl. ¶ 23.  As Mr. Tobias explained during his deposition, in attempting to determine the City's costs as related to each small wireless facility or each linear foot of conduit, he evaluated the amount of time spent by various staff members in different departments of the City in relation to telecommunications facilities in the right of way, then calculated the proportionate cost of that time based upon the individual's salary and benefits.  Beath Decl. ¶ 24 and Tobias Deposition, Exhibit F, at 122-134. Mr. Tobias arrived at the time estimates in the spreadsheet by interviewing City employees and supervisors about the amounts of time spent working on issues related to telecommunications in the right of way.  Beath Decl. ¶ 25, Exhibit F at 136-137.  Once Mr. Tobias arrived at a total annual telecommunications cost estimate, he distributed the cost over the total number of small cell attachments to arrive at a per-facility cost, and did the same for the underground and aerial facilities to arrive at a per-linear-foot cost.  Beath Decl. ¶ 26, Exhibit F at 152-156.

Mr. Tobias's cost analysis found that the City's approximate right of way costs related to small cell facilities on a per-facility basis was $4,381 per pole attachment based upon an assumption of 300 installations per year, and was $6,571 per pole attachment based upon an assumption of 200 installations per year.  Thus, under Mr. Tobias's analysis, the City's annual pole attachment fee of $1,500 is less than the City's approximate costs.  Beath Decl. ¶ 27.

Similarly, Mr. Tobias determined that the approximate right-of-way costs related to linear telecommunications facilities is $6.13 per linear foot.  The City charges $10,000 for the first 2,500 of linear feet of telecommunications conduit, which comes to $4 per foot; the per-foot fee decreases as additional facilities beyond the first 2,500 feet are installed.  Thus, like the

small cell attachment fee, the fees for underground and aerial linear facilities are less than the City's approximate costs.  Beath Decl. ¶ 28.

Because plaintiff cannot demonstrate that the City's fees are so high as to effectively prohibit it from providing telecommunications service and because, in any case, the City's fees are reasonable, non-discriminatory and competitively neutral, the City is entitled to summary judgment on both of plaintiff's claims.

## SUMMARY JUDGMENT STANDARD

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Jennejahn v. Vill. of Avon*, 575 F. Supp. 2d 473, 477 (W.D.N.Y. 2008) (quoting Fed. R. Civ. P. 56(c)). In deciding whether to grant summary judgment the Court must decide whether there are any disputed material facts and must resolve all ambiguities and draw all reasonable inferences in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986); *Coach Leatherware Co., Inc. v. AnnTaylor, Inc.*, 933 F.2d 162, 166-67 (2d Cir. 1991); *Jennejahn*, 575 F. Supp. at 477.

A genuine issue regarding a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. *See also Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991); *Jennejahn*, 575 F. Supp. at 477.  "The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact, after which the nonmoving party must come forward with sufficient evidence to support a jury verdict in its favor; the motion will not be defeated based upon conjecture, surmise or the existence of 'metaphysical doubt' concerning the facts." *Jennejahn*, 575 F. Supp. at 477 (citing

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Bryant*, 923 F.2d at 982).

## ARGUMENT

**I.     The Matter Must Be Dismissed Because 47 U.S.C. § 253 Provides No Private Right of Action**

Only a cause of action gives individuals the privilege of "invoke[ing] the power of the court." *Davis v. Passman,* 442 U.S. 228, 239-40 n.19 (1979). A cause of action must either be expressly provided by Congress in statute or implied by the courts from a federal (constitutional or statutory) right. Here, plaintiff asserts two causes of action, each purportedly arising directly under Section 253. Yet this Circuit has held that Section 253 does not provide a cause of action either expressly or impliedly. Accordingly, plaintiff may not bring this or any federal action to remedy perceived violations of Section 253.

In *NextG Networks of N.Y., Inc. v. City of N.Y.*, 513 F.3d 49, 53 (2d Cir. 2008), the Second Circuit clearly held that, while Section 253 imposed "some limits on the ability of state and local governments to regulate telecommunications" it <u>does not</u> confer any benefits on telecommunications providers that are subject to enforcement as a federal right under 42 U.S.C. § 1983. The *NextG* Court did not reach the question of whether a cause of action for equitable or declaratory relief may lie under Section 253, but other courts that have reached this question have determined that no such right of action exists.

In *GST Tucson Lightwave v. City of Tucson*, 950 F. Supp. 968, 970 (D. Ariz. 1996), the District of Arizona began by acknowledging that, on its face, Section 253 contains no express right of action. *Tucson* then looked to the Supreme Court's decision in *Cort v. Ash*, 422 U.S. 66, 78 (1975) for the test of whether a private right of action is implicit in the statute: "(1) whether the plaintiff is one of the class for whose especial benefit the statute was enacted; (2)

7

whether any explicit or implicit indication of legislative intent exists to create or deny a remedy;

(3) whether implication of a remedy would be consistent with the underlying purposes of the

legislative scheme; and (4) whether the cause of action is one traditionally relegated to state

law, making the inference of a cause of action solely under federal law inappropriate."  After

undertaking this analysis, the *Tucson* court found that no private right of action existed under

Section 253, and dismissed the plaintiff's claims for injunctive and declaratory relief.

     In *AT&T Communs. v. City of Austin*, 975 F. Supp. 928, 936 (W.D. Tex. 1997), both the

Court *and* the parties in agreed that "the FTA does not create an express or implied private right

of action for violations of § 253(a) and (c)." (citing *Tuscon*, 950 F. Supp. at 970-71 (D. Ariz.

1996)).  Plaintiff AT&T argued, however, that it could maintain a cause of action for violation

of Section 253 on two separate grounds: 42 U.S.C. § 1983 and Constitution's Supremacy

Clause.  The *Austin* Court (which never reached the § 1983 issue) found that AT&T's

Supremacy Clause claim was cognizable.  This is consistent with Second Circuit precedent in

*W. Air Lines, Inc. v. Port Auth. of N.Y. & N.J.*, 817 F.2d 222, 225 (2d Cir. 1987), which

recognized that a party could bring a claim under the Supremacy Clause even where no right of

action exists directly under a statute:

> A claim under the Supremacy Clause that a federal law preempts a
> state regulation is distinct from a claim for enforcement of that
> federal law. "The primary function of the Supremacy Clause is to
> define the relationship between state and federal law. It is
> essentially a power conferring provision, one that allocates
> authority between the national and state governments. . . ." *White
> Mountain Apache Tribe v. Williams*, 810 F.2d 844, 848 (9th Cir.
> 1987). A claim under the Supremacy Clause simply asserts that a
> federal statute has taken away local authority to regulate a certain
> activity.

*See also P.R. Tel. Co. v. Municipality of Guayanilla,* 450 F.3d 9, 14-15 (1st Cir. 2006)(noting

"the difficult question of whether any section of the TCA provides a private cause of action"

then sidestepping the question "because PRTC *brought this action* to challenge Ordinance No. 40 *under the Supremacy Clause*.").

Here then, plaintiff might have been able to enforce the terms of Section 253 had it brought a claim under the Supremacy Clause—but it didn't.  In both *W. Air Lines* and in the *Austin* case, the plaintiff had expressly asserted a cause of action under the Supremacy Clause. Here, Verizon Wireless has done no such thing.  Not only that, the Supremacy Clause is not raised even once in their complaint.  This, despite the fact that the defendant's answer, at its Seventh Affirmative Defense, averred: "This Court is without subject matter jurisdiction over the claims herein as 47 U.S.C. 253(a) and (c)—the sole legal authority upon which plaintiff's claims are premised—do not provide a private right of action for declaratory or injunctive relief."

Because plaintiff brings its claims directly under Section 253, for which no private right of action exists, and otherwise fails to invoke the Supremacy Clause or any other legal basis upon which it might sustain its causes of action, the matter must be dismissed.

## II.     Plaintiff Lacks Standing and Its Claims Are Not Ripe

Jurisdictional principles ensure that courts review actual cases and controversies, and that litigants, thus sufficiently invested, offer the court the best circumstances in which to make determinations.  Establishing jurisdiction is as important—and "must be supported in the same way" and to the same degree—as the elements of the case itself. *Lujan v. Defenders of the Wildlife*, 504 U.S. 555, 561 (1992).

In this matter, plaintiffs lack both standing and a ripe claim, and as such, this case should be dismissed.

### A. Plaintiff lacks standing, because it does not have an injury in fact.

In order to attain standing, a plaintiff must demonstrate (1) an "injury in fact" that is concrete and particularized, and actual and imminent; (2) a causal connection between the injury and defendants' conduct; and (3) that the injury will "likely" be redressed by a favorable decision. *Lujan v. Defenders of the Wildlife*, 504 U.S. 555, 561 (1992). Plaintiff fails on the first element, in that it lacks an "injury in fact" that is concrete and particularized and "actual and imminent."

The injury in fact requirement demands not only the existence of a legally recognized injury, but also that the plaintiff itself be "among the injured." *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 42 (2d Cir. 2005) (deciding that adult establishment lacked standing because it had not shown any harm to the business or owners from the ordinance). An injury in fact must be both *qualitatively and temporally* concrete and "distinct and palpable." *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) (denying standing based on possible habeas corpus relief to a life sentence. Thus to satisfy standing in pre-enforcement lawsuits (or other prospective claims like this one), plaintiffs must show that the injury is "certainly impending," (*Whitmore*, 495 US at 158) or "real, immediate, and direct." *Centro De La Comunidad Hispana De Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 110 (2d Cir. 2017).

Even if a plaintiff satisfies the constitutional requirements of standing, a court may still decline standing pursuant to prudential considerations regarding standing, which include refraining from adjudicating "abstract questions" or cases whose claims do not lie within the "zone of interests" protected or regulated by the statute or regulation in question. *Sullivan v. Syracuse Housing Authority*, 962 F.2d 1101, 1106 (2d Cir. 1992).

Plaintiff does not have standing, because Plaintiff cannot come forward with any evidence regarding any injury in fact—whether ongoing or impending—that would show it is "among th[os]e injured" by the City's Code. *Keepers*, 807 F.3d at 42.

Plaintiff has not registered under the City's Telecom Code, has not sought to enter into a Master License Agreement, and has not made any attempt to install any telecommunications facilities in the City's right of way. The most that plaintiff has done is provide the City—in 2018—a "conceptual" presentation of telecommunications facilities that might one day be installed. Or might not. In any case, that day has not come and has not been calendared.

Failing to show that it is or will ever be subject to the City's Telecom Code, plaintiff can hardly show that it has been harmed, or will be harmed, by the fees to which it objects so strenuously. Indeed, as set forth in Exhibit D to the Beath Declaration, plaintiff is already paying municipal right of way fees for small cell attachments in other cities that are as high or considerably higher than those to be charged by the City of Rochester, without causing plaintiff any discernable harm. In the City of Rochester, plaintiff has paid no right of way fees. If plaintiff has been harmed by any right-of-way fees, it is not by Rochester's fees.

Finally, Plaintiff could have demonstrated standing by documenting the efforts it undertook to prevent or mitigate the imminent harm caused by the statute. *Sackin v. Transperfect Global, Inc.*, 278 F.Supp.3d 739, 746-47 (2d Cir. 2017) (incurring the cost of identity protection services following a data breach). As the record is void of any evidence that Plaintiff mitigated any harm, Plaintiff has failed yet again to substantiate injury in fact.

## B. Plaintiff similarly lacks a ripe claim.

Plaintiff fails to hurdle a second principle of justiciability: ripeness. This Court has already noted that "'constitutional ripeness' is 'a specific application of the actual injury aspect

of Article III standing.'" **MTD Decision at 12,** citing *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 688 (2d Cir. 2013). Ripeness, in other words, is whether a claim is "not 'actual or imminent' but instead 'conjectural or hypothetical.'" *Id.*

As explained above, Plaintiff has not shown any injury that is imminent. Plaintiff has not provided any details to show whether or how its "conceptual" projects have been or are about to be harmed by the City's code.  Plaintiff has not set forth any impact to its finances or even entered into a Master License Agreement, a precondition for the telecommunications services at the heart of this matter. This claim is not ripe for review.

Plaintiff's suit should be dismissed for lack of standing or ripeness of the issues.

III.    **Plaintiff Fails to Demonstrate that the City's Fees Have Effectively Prohibited it From Providing Telecommunications Service**

In determining claims for effective prohibition under Section 253, like the ones here, courts in the Second Circuit place the burden on plaintiff to first demonstrate a prohibition or effective prohibition of service under § 253(a).  *See, e.g., TC Sys. v. Town of Colonie*, 263 F. Supp. 2d 471, 481 (N.D.N.Y. 2003)("The burden of showing that a municipality has violated § 253(a) is on the party seeking preemption, in this case, Plaintiffs.").  After making such a showing, the burden shifts to the municipality to demonstrate that the regulation or fee at issue is subject to the safe harbor provision set forth at § 253(c).  *Id.* at 484 ("Once the party seeking preemption has sustained its burden of showing that a local regulation has violated § 253(a), the burden of proving that the regulation is saved by § 253(c) is on the party claiming that the 'safe harbor' applies, in this case, the Town.").  This burden shifting framework remained the same even after the FCC issued its Small Cell Order in September of 2018.  *See Crown Castle NG E. LLC v. Town of Oyster Bay*, No. 17-CV-3445 (SJF) (ARL), 2020 U.S. Dist. LEXIS 31355, at *40 (E.D.N.Y. Feb. 21, 2020)("The burden is on the plaintiff to prove that Section 253(a) acts

as a prohibition of the regulation in question before determining whether the regulation is saved by Section 253(c).”), *R&R affirmed and case dismissed*, *Crown Castle NG E. LLC v. Town of Oyster Bay*, No. 17-CV-3445(SJF)(ARL), 2020 U.S. Dist. LEXIS 83546 (E.D.N.Y. May 11, 2020).

“[T]he purpose of Section 253 is to impose some limits on the ability of state and local governments to regulate telecommunications but not to interfere with the right of such governments to impose reasonable charges for the concomitant use of public property.”  *NextG Networks of N.Y., Inc. v. City of N.Y.*, 513 F.3d 49, 53 (2d Cir. 2008).  “Courts have held that a prohibition does not need to be complete or ‘insurmountable’ to run afoul of § 253(a).”  *TCG N.Y., Inc. v. City of White Plains*, 305 F.3d 67, 76 (2d Cir. 2002)(citing *RT Communs., Inc. v. FCC*, 201 F.3d 1264, 1268 (10th Cir. 2000)). “Additionally, the FCC has stated that, in determining whether an ordinance has the effect of prohibiting the provision of telecommunications services, it ‘considers whether the ordinance materially inhibits or limits the ability of any competitor or potential competitor to compete in a fair and balanced legal and regulatory environment.’” *Id.* (quoting *Cal. Payphone Ass'n*, 12 FCC Rcd 14191 (1997)). Plaintiff must come forward “with sufficient evidence demonstrating that the requirement at issue has or may act as a ‘barrier to entry’ into the telecommunications market.”  *Pac. Bell Tel. Co. v. Cal. DOT*, 365 F. Supp. 2d 1085, 1088 (N.D. Cal. 2005)(citing *Qwest Corp. v. City of Portland*, 385 F.3d 1236, 1241 (9th Cir. 2004)).

Where a telecommunications provider claims that the municipality’s fees are prohibitively high, it may not rely upon “wholly conclusory statements and speculation,” but must come forward with “evidence as to what the actual economic effect” of the City’s fees “would have been upon the company.”  *NextG Networks of N.Y., Inc. v. City of N.Y.*, 2006 U.S.

13

Dist. LEXIS 8597, at *41 (S.D.N.Y. Mar. 6, 2006), *aff'd in part and rev'd in part on other grounds*, *NextG Networks of N.Y., Inc. v. City of N.Y.*, 513 F.3d 49 (2d Cir. 2008).  Such proof of actual economic effect may come in the form of "revenues, capitalization, profits, available capital, costs, budget" or "expert economic testimony . . . to explain the (alleged prohibitive) effect of the City's requirements upon NextG or the telecommunications market."  *Id.* at *43.

Here, plaintiff cannot demonstrate that the City's pole attachment fees (addressed in plaintiff's first cause of action) or its fees for linear aerial or underground telecommunications facilities (addressed in plaintiff's second cause of action) effectively prohibit plaintiff from providing telecommunications service and, even if they could, the City's fees are saved by § 253(c).  For purposes of this analysis, defendant addresses first plaintiff's second claim for relief which attacks the City's linear telecommunications fees, then addresses the first claim for relief, which attacks the City's small cell pole attachment fees.

## A. Plaintiff Cannot Demonstrate that the City's Fees for Aerial and Underground Linear Facilities Effectively Prohibit Plaintiff from Providing Telecommunications Services.

In discovery in this action, plaintiff has refused to disclose the very evidence that it would otherwise have to rely upon to make out its claim of effective financial prohibition resulting from the City's fees: "revenues, capitalization, profits, available capital, costs, budget".  Since plaintiff is not a publicly traded company—is, rather, a wholly-owned subsidiary of Verizon Communications—there is almost no recent public information about its finances, with the exception of reporting in Verizon Communication's 2021 10-k filing that plaintiff purchased mid-band wireless spectrum from the FCC for the price of $45.5 billion.  Plaintiff is well capitalized.

In stark juxtaposition to plaintiff's apparently significant capitalization, is the lack of any evidence that plaintiff intends to deploy <u>any</u> linear facilities aerially or underground in the City of Rochester.  The only evidence of potential deployment of telecommunications facilities provided to the City at any point was a 2018 presentation of a "conceptual" deployment of small cell attachments—the presentation included no indication of anticipated fiber or other linear telecommunication facility deployment, conceptual or otherwise.  In short, plaintiff does not demonstrate what fees it might be responsible for paying the City for linear telecommunications deployment (if any) and it does not demonstrate the financial strain that such fees would cause the plaintiff (if any).

The First Circuit's analysis in *P.R. Tel. Co. v. Municipality of Guayanilla*, 450 F.3d 9, 16-18 (1st Cir. 2006) is instructive.  There, in order to establish that local fees were prohibitive, the telecommunications provider presented the Court with its annual profits from the most recent fiscal year; an estimate of the impact on the provider's profits if each municipality that it served were to charge fees akin to those charged by the defendant municipality; the amounts in taxes and other fees already being paid to municipalities by the provider; and the overall impact on the providers' bottom line.  The Court accepted this proof—unrebutted by the municipality—to determine that the fees at issue could have a prohibitive effect.

In the instant matter, the City sought from plaintiff just such information about profits and potential collective impact of municipal fees, but plaintiff refused to provide any such information; has not disclosed any financial information in its Rule 26 disclosures; and cannot now provide such information on this motion.  Because plaintiff has not made even a cursory showing that the City's fees related to linear telecommunications facilities effectively prohibit

(or have any discernable impact at all on) telecommunications services, plaintiff's second claim for relief must be dismissed.

Defendants anticipate that plaintiff will attempt to excuse its failure to provide any evidence of the prohibitive effect of the City's linear telecommunications facilities fees by arguing that the FCC's Small Cell Order (*In re Accelerating Wireless Broadband Deployment by Removing Barriers et al.*, 33 FCC Rcd 9088 (F.C.C. September 27, 2018)) establishes as a matter of law that municipal fees have prohibitive effect where they exceed an approximation of the City's reasonable costs related to right of way maintenance.  This argument is flawed for a number of reasons.

First, the FCC Small Cell Order does not apply to linear underground and aerial telecommunications facilities.  While the FCC could have applied its analysis in the Small Cell Order to all telecommunications facilities, it did not.  Rather, the FCC Small Cell Order was issued to address the fact that "America is in the midst of a transition to the next generation of wireless services, known as 5G" which requires telecommunications providers to "densify their networks with new small cell deployments that have antennas often no larger than a small backpack."  Small Cell Order at ¶¶ 1 and 3.  According to the FCC, "estimates predict that upwards of 80 percent of all new deployments will be small cells going forward.  To support advanced 4G and 5G offerings, providers much build out small cells at a faster pace and at a far greater density of deployment than before." Small Cell Order at ¶ 3.  Given the centrality and volume of anticipated small cell deployments, the FCC limited the scope of its Small Cell Order to just small cell technology, defined, in footnote 9 of the Order as follows:

> "Small Wireless Facilities," as used herein and consistent with section 1.1312(e)(2) [of the Code of Federal Regulations], encompasses facilities that meet the following conditions:

(1) The facilities--

      (i) are mounted on structures 50 feet or less in height including their antennas as defined in section 1.1320(d), or

      (ii) are mounted on structures no more than 10 percent taller than other adjacent structures, or

      (iii) do not extend existing structures on which they are located to a height of more than 50 feet or by more than 10 percent, whichever is greater;

(2) Each antenna associated with the deployment, excluding associated antenna equipment (as defined in the definition of antenna in section 1.1320(d)), is no more than three cubic feet in volume;

(3) All other wireless equipment associated with the structure, including the wireless equipment associated with the antenna and any pre-existing associated equipment on the structure, is no more than 28 cubic feet in volume;

(4) The facilities do not require antenna structure registration under part 17 of this chapter;

(5) The facilities are not located on Tribal lands, as defined under 36 CFR 800.16(x); and

(6) The facilities do not result in human exposure to radiofrequency radiation in excess of the applicable safety standards specified in section 1.1307(b).

FCC Small Cell Order, ¶ 11, fn. 9.

The Small Cell Order is plain that it applies only to Small Wireless Facilities:

We conclude that ROW access fees, and fees for the use of government property in the ROW, such as light poles, traffic lights, utility poles, and other similar property *suitable for hosting Small Wireless Facilities*, as well as application or review fees and similar fees imposed by a state or local government *as part of their regulation of the deployment of Small Wireless Facilities* inside and outside the ROW, violate Sections 253 or 332(c)(7) unless these conditions are met: (1) the fees are a reasonable approximation of the state or local government's costs, (2) only objectively reasonable costs are factored into those fees, and (3)

the fees are no higher than the fees charged to similarly-situated competitors in similar situations.

Small Cell Order ¶ 50.  Accordingly, the Small Cell Order is of no value to plaintiff in its challenge to the City's fees for linear telecommunications facilities, which fall outside of the definition of "small wireless facility" at 47 CFR 1.1312 and, therefore, are beyond the reach of the Small Cell Order.

Second, even if the Small Cell Order did apply here (and even if it were good law—see Section III.B.b., *infra*), such that the City's fees could be no greater than an approximation of the City's costs related to the facility, still this claim should be dismissed as the fees here, at most $4/linear foot, are less than the City's reasonable approximation of costs, which comes out to $6.13/linear foot based upon the analysis conducted by Mr. Tobias.  Further, the linear foot fees are competitively neutral and nondiscriminatory because all providers are treated the same and providers with the same amounts of fiber in the City right of way pay identical rates.  The Second Circuit is clear that competitive neutrality and nondiscrimination do not request absolute parity of treatment:

> The requirements of § 253 are not inflexible, however. The statute does not require precise parity of treatment. An earlier draft of the bill that ultimately became § 253 included a provision that would have forbidden local governments from imposing any fee that "distinguishes between or among providers of telecommunications services." H.R. 1555, 104th Cong. § 243(e) (1995). Both the elimination of that provision and the language of the enacted version of § 253 strongly support the conclusion that franchise fees need not be equal. Municipalities can take into account different costs incurred by different uses of the rights-of-way. They can also consider the scale of the use of rights-of-way. They also retain the flexibility to adopt mutually beneficial agreements for in-kind compensation. Neutrally applied most-favored-vendee provisions that require service providers to offer their best rates to the city or requirements that service providers allow the city free use of conduit space or similar treatment are at least potentially permissible. A city can negotiate different agreements with different service providers; thus, a city could enter into

18

> competitively neutral agreements where one service provider
> would provide the city with below-market-rate telecommunications
> services and another service provider would have to pay a larger
> franchise fee, provided the effect is a rough parity between
> competitors.

*TCG N.Y., Inc. v. City of White Plains*, 305 F.3d 67, 80 (2d Cir. 2002).  Even if the FCC's Small

Cell Order applied to these fees, still plaintiff fails to demonstrate that the fees are preempted by

Section 253 and, accordingly, the claim should be dismissed.

### B. Plaintiff Cannot Demonstrate that the City's Small Cell Pole Attachment Fees Effectively Prohibit Plaintiff from Providing Telecommunications Services.

As noted in the preceding subsection, plaintiff's abject failure to provide any financial

information whatsoever concerning the actual prohibitive effect of the City's pole attachment

fees on Verizon Wireless's ability to do business ought to be fatal to its claims here.  But

plaintiff believes that the FCC Small Cell Order negates its obligation to make a showing of

effective prohibition and allows it, instead, to assume that municipal right of way fees that

exceed a reasonable approximation of the City's objectively reasonable right-of-way costs are—

by definition—a material inhibition of plaintiff's ability to provide telecommunications

services.  The FCC Small Cell Order should be rejected by the Court because it turns the plain

meaning of § 253(a) on its head by requiring a showing of municipal costs that is entirely

untethered from the prohibitive effect showing required by the statute.  "[F]ees are prohibitive

because of their financial effect on service providers, not because the happen to exceed a state

or local government's costs."  *City of Portland v. United States*, 969 F.3d 1020, 1054 (9th Cir.

2020)(Bress, J., dissenting).

### a. The Court May Consider the Validity of the FCC Small Cell Order

In the course of this matter, plaintiff has argued that the Hobbs Act robs this Court of

jurisdiction to entertain any challenge to the FCC Small Cell Order.  Plaintiff is incorrect.  The

Hobbs Act, codified at 28 U.S.C. § 2342, provides that the Courts of Appeal have "exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of . . . all final orders of the Federal Communications Commission made reviewable by section 402(a) of title 47."  Section 402(a) of title 47 states: "Any proceeding to enjoin, set aside, annul or suspend any order of the Commission under the Act . . . shall be brought as provided by and in the manner prescribed in" 28 U.S.C. § 2342.

The City here is not bringing a "proceeding to enjoin, set aside, annul or suspend" the FCC Small Cell Order.  Rather, it is raising as an affirmative defense in a proceeding brought against the City, that the Small Cell Order is arbitrary and irrational and should not be followed by this Court.  Further, notwithstanding the language of 28 U.S.C. § 2342(1) and 47 U.S.C. 402(a), 28 U.S.C. § 1331 provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States"—there is no carve out of this jurisdiction for FCC Orders.

Whether the Hobbs Act precludes a District Court's review remains an open question in the Second Circuit (*see Prayze FM v. FCC*, 214 F.3d 245, 250 (2d Cir. 2000)), and under Supreme Court precedent (*see PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.,* 139 S. Ct. 2051 (2019)).  The Supreme Court took *PDR Network* in order to decide "whether the Hobbs Act's commitment of 'exclusive jurisdiction' to the courts of appeals requires a district court in a private enforcement suit like this one to follow the FCC [Order at issue.]"  *Id.* at 2055. Though squarely posing this question, the majority of the Court did not answer it, finding, instead, that more information was required and remanding the case to the lower courts for further proceedings.  Notably, however, in remanding the matter, the Supreme Court noted a number of circumstances in which the Hobbs Act "may" not bar a defense challenging the FCC

Order, such as when the FCC Order at issue is "interpretive" rather than "legislative", or where the party raising a defense challenging the FCC Order did not have a "prior" and "adequate" opportunity to seek review of the Order.  Justice Kavanaugh, joined by Justices Thomas, Alito and Gorsuch, went even further than this in a concurring opinion, concluding "that the Hobbs Act does not bar a defendant in an enforcement action from arguing that the agency's interpretation of the statute is wrong" reasoning that the jurisdictional limitations of the Hobbs Act applies only to "facial pre-enforcement review" of an FCC Order.  *Id.* at 2058.

This Court should follow the rationale of the concurring Justices in *PDR Network* and evaluate the validity of the FCC Small Cell Order.

### b.  The Small Cell Order is Inconsistent with Statute and Irrational

Section 253(a) provides that "[n]o State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service."  This section of the statute says nothing about State or locality's costs—it focuses on the prohibitive effect of a regulation or legal requirement <u>on the telecommunications provider</u>.

The FCC Order—in assuming that all above-cost municipal fees necessarily effect a prohibition of service—essentially expunges from the statute the need for a telecommunications provider to make any showing of prohibition whatsoever.  An interpretation of statute that falls so far from the plain-text mark is not entitled to any deference by the Court.  Because the FCC's interpretation of § 253(a) is so flawed, this Court should not adopt the reasoning of the Small Cell Order.

Judge Bress of the 9th Circuit recently expressed his frustration with the irrationality of the Small Cell Order's presumption that municipal fees in excess of costs are prohibitive:

> On this record, the FCC has not adequately explained its basis for
> concluding, contra our precedent, that there is an intrinsic
> relationship between a fee's approximation of costs and its
> prohibitive effect on service providers. The FCC's reliance on
> individual fees it considers "excessive" tells us that fees can work
> effective prohibitions. But this does not on its own justify a blanket
> prohibition on all above-cost fees. A $ 7,500 fee in Portland may
> well prohibit service, but that is because of the financial toll it
> inflicts, not because it exceeds the city's costs.

*City of Portland v. United States*, 969 F.3d 1020, 1055 (9th Cir. 2020)(Bress, J., dissenting).  In

deciding whether to follow "an agency's construction of the statute which it administers," a

Court is confronted with two questions:

> First, always, is the question whether Congress has directly spoken
> to the precise question at issue. If the intent of Congress is clear,
> that is the end of the matter; for the court, as well as the agency,
> must give effect to the unambiguously expressed intent of
> Congress. If, however, the court determines Congress has not
> directly addressed the precise question at issue, the court does not
> simply impose its own construction on the statute, as would be
> necessary in the absence of an administrative interpretation.
> Rather, if the statute is silent or ambiguous with respect to the
> specific issue, the question for the court is whether the agency's
> answer is based on a permissible construction of the statute.

*Chevron, U.S.A., Inc. v. NRDC, Inc.,* 467 U.S. 837, 842-43 (1984).  Here, congress's intent is

unambiguous: a local regulation or legal requirement is of no moment except where it

"prohibit[s] or [has] the effect of prohibiting the ability of any entity to provide any interstate or

intrastate telecommunications service."  The plain language of the statute makes clear that

Section 253(a) is violated only where the telecommunications provider is prohibited from

providing telecommunications service.  This is not ambiguous and, accordingly, the FCC Order

should be considered a nullity.

Even if there were some ambiguity here, the FCC's equation of local above-cost fees with effective prohibition of telecommunications services is not "a permissible construction of the statute."

> If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute.

*Chevron*, 467 U.S. at 843-44.  The FCC's Small Cell Order is both arbitrary and capricious. Judge Bress's decision in the 9th Circuit's *Portland* matter—where he had the full FCC record to evaluate—well articulates the arbitrariness of the Order.  Looking at the "linchpin" of the FCC's factual analysis—a 2018 study by Corning, Inc. that estimated a $ 2 billion cost savings and reinvestment to the telecommunications industry as a result of reduced municipal fees[2]-- Judge Bress sounded the depths of the FCC Order's irrationality:

> At bottom, what the Corning Study conveys is that if fees are reduced, it will produce cost savings to those who pay the fees. Small Cell Order ¶¶ 50, 53, 55-56, 60 & n.169, 64-65 & nn.194-95. But that commonsense observation would be true of any fee considered in the aggregate. And it would seemingly mean that any fee in any amount could qualify as an effective prohibition, once aggregated. The same would be true of the aggregate effects of any form of regulation that localities would apply outside the fee context. I am therefore concerned that on the record as it stands, the FCC's approach lacks a limiting principle. At least absent some estimated quantification of above-cost fees in the aggregate (which the Corning Study does not provide) or some further estimate tied to the rule it adopted, *the FCC's logic would appear to justify the preemption of any state or local rule.*

*Id.* at 1055 (emphasis added).  Judge Bress's analysis also set forth a thought experiment to illuminate the irrationality of the FCC Order:

---

[2] Note that the industry-wide cost saving of $2 billion pales in comparison to plaintiff's recent $45 billion purchase of wireless spectrum from the FCC.

> Consider a $ 500 fee in Small Town A that exceeds the town's
> costs by 1¢, and a $ 2,000 cost-based fee in Big City B. By the
> Small Cell Order's logic, the lower fee is preempted, but the higher
> fee is not. It is hard to rationalize the former under the statute,
> which requires an actual and material inhibition of
> telecommunications or wireless service.

*Id.* at 1054.  Discovery in the instant action has borne out this hypothetical.  As set forth in

Exhibit D to the Beath Declaration, Verizon is paying various annual small cell pole attachment

fees in various jurisdictions.  Some of those are less than the City of Rochester's $1,500 fee—

many others are more than the $1,500 fee.  The City of Boston, for instance, charges $2,500 per

attachment—66% more than does the City of Rochester.  Yet Verizon has not sued Boston,

presumably because it believes Boston's fee reflects Boston's costs.  Assuming this to be true,

the FCC Order, as applied, has determined that Boston's more costly small cell attachment fee

is less likely to prohibit Verizon from providing telecommunications services than the

significantly lower Rochester fee; this is a new breed of economics for sure.

All told, the FCC Small Cell Order is irrational, arbitrary and capricious and is not

entitled to deference by this Court.  Rather, the plain language of § 253(a) should control and

plaintiff's claims should be dismissed because it has failed entirely to demonstrate that the

City's fees effectively prohibit it from providing telecommunications services.

### c.   The City's Small Cell Attachment Fees Do Not Exceed the City's Objectively Reasonable Costs

Even if plaintiff had shown that the City's small cell pole attachment fees prohibit

plaintiff from providing telecommunications services, still the fees are saved by § 253(c)

because they constitute reasonable compensation.  As set forth in the City's right of way costs

spreadsheet (Exhibit E) and in the deposition of Mr. Tobias (Exhibit F), the City undertook an

analysis of City costs related to small cell pole attachments and arrived at a per-attachment cost

of $4,381 on the assumption of 300 annual deployments per year, and a cost of $6,571 on the assumption of 200 annual deployments per year. Accordingly, the City's $1,500 fee is well below its approximation of objectively reasonable costs.

## CONCLUSION

For the foregoing reasons, the City of Rochester respectfully requests that the Court grant summary judgment to the City on all claims, dismiss the complaint with prejudice and grant such other and further relief as the Court deems just.

DATED: October 20, 2021

                             /S/Patrick Beath

BY:    PATRICK BEATH
        Deputy Corporation Counsel
        *Attorneys for Defendant*
        30 Church Street, Room 400A
        Rochester, New York 14614
        (585) 428-6812

To:    KELLEY DRYE & WARREN LLP
        Geoffrey W. Castello
        Damon Suden
        101 Park Avenue
        New York, New York 10178
        (212) 808-7800