UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

CELLCO PARTNERSHIP D/B/A VERIZON
WIRELESS,

     Plaintiff,

   v.

CITY OF ROCHESTER,

     Defendant.

6:19-cv-06583-EAW-MWP

### PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF
### ITS MOTION FOR SUMMARY JUDGMENT

KELLEY DRYE & WARREN LLP
3 World Trade Center
175 Greenwich Street
New York, NY 10007
Tel: (212) 808-7800

Attorneys for *Plaintiff*
*Cellco Partnership d/b/a Verizon Wireless*

# <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT .................................................................................... 1

FACTUAL BACKGROUND ..................................................................................... 2

    I.     THE INSTALLATION OF SMALL CELL INFRASTRUCTURE IS STRAIGHT-FORWARD AND CARRIERS ASSUME THE MAJORITY OF COSTS ............................................................................................. 2

    II.    VERIZON INTENDS TO DEPLOY FACILITIES IN THE CITY'S ROW ....... 4

    III.   THE CITY ADOPTED A NEW TELECOMMUNICATIONS CODE THAT IMPOSES EXCESSIVE FEES THAT ARE NOT COST-BASED .......... 5

         A.    Prior To The Barriers Order, The City Considered A Fee Structure For Telecom Installations To Generate Revenue, Rather than Recover Costs ............................................................................ 5

         B.    The City Enacted The Code With Revenue-Generating Fees Substantially Similar To Those It Considered Pre-Barriers Order ............ 5

    IV.   Summary of Fees Charged By the City Pursuant to the Code ............................... 6

         A.    The Code's One-Time Permit and Registration Fees ................................ 6

         B.    The Code's Recurring Fees .................................................................... 7

    V.    THE CITY'S SPREADSHEET ................................................................. 9

STANDARD OF REVIEW ..................................................................................... 12

ARGUMENT ....................................................................................................... 13

    I.     THE COST-BASED STANDARD IN THE BARRIERS ORDER GOVERNS ......................................................................................... 13

         A.    The FCC's Barriers Order Sets A Cost-Based Standard For Determining "Effective Prohibition" And "Fair And Reasonable Compensation" ................................................................................ 13

         B.    A Cost-Based Standard Applies To All Of The Challenged Fees ........... 14

    II.    THE CITY CANNOT MEET ITS BURDEN TO DEMONSTRATE THAT ITS FEES ARE COST-BASED UNDER THE BARRIERS ORDER ............................................................................................ 16

         A.    As a Threshold Matter, The City Cannot Meet Its Burden Because The Spreadsheet Representing the City's Purported Costs Is Inadmissible ...................................................................................... 17

             i.     The Spreadsheet Is Inadmissible Hearsay .................................... 17

             ii.    The Spreadsheet Violates Federal Rule Of Evidence 1006 ......... 19

i

B.    Even if Admissible, The Spreadsheet Is Fundamentally Flawed And Cannot Be Used To Justify The City's Excessive Fees .................. 20

    i.    The Spreadsheet does not approximate "actual" costs and its estimates are unreliable ........................................................ 20

    ii.    The City does not distinguish between recurring and non-recurring costs, rendering its analysis suspect and resulting in repeatedly collecting the same one-time costs ......................... 22

    iii.    The City has not measured its incremental costs, or costs that are "caused by" telecommunications equipment in the ROW, as required by federal law .................................................. 23

    iv.    Verizon's Expert Offers Unrebutted Opinions Debunking the Spreadsheet .......................................................................... 27

III.    THE CITY'S AFFIRMATIVE DEFENSES FAIL AS A MATTER OF LAW ............................................................................................................... 28

CONCLUSION ..................................................................................................................... 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Investment*,
33 FCC Red 9088.................................................................................................. *passim*

*Advanced Mktg. Grp., Inc. v. Bus. Payment Sys., LLC*,
No. 05-CV-9121, 2012 WL 6101991 (S.D.N.Y. Dec. 10, 2012) ...........................................19

*Cellco Partnership v. City of Rochester*,
473 F. Supp. 3d 268 (W.D.N.Y. 2020) ...................................................................................29

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)...........................................................................................................12, 13

*City of Portland v. United States*,
969 F.3d 1020 (9th Cir. 2020), *cert. denied*, *City of Portland v. FCC*, 141 S.
Ct. 2855 (2021) ..................................................................................................................16, 28

*Crown Castle Fiber LLC v. City of Rochester*,
No. 6:20-cv-06866-EAW-MWP (W.D.N.Y.)................................................................3, 16, 21

*Delaney v. Bank of Am. Corp.*,
766 F.3d 163 (2d Cir. 2014)....................................................................................................17

*ExteNet Sys., Inc. v. City of Rochester*,
No. 6:20-cv-07129-EAW-MWP (W.D.N.Y.)............................................................................3

*Giles v. Rhodes.*
No. 94 Civ. 6385, 2000 WL 1425046 (S.D.N.Y. Sept. 27, 2000) ...........................................17

*Gorss Motels, Inc. v. Otis Elevator Co.*,
No. 3:16-CV-1781 (KAD), 2019 WL 1490102 (D. Conn. Apr. 4, 2019) .............................29

*Hook v. Regents of Univ. of Cal.*,
394 F. App'x 522 (10th Cir. 2010) ........................................................................................18

*King v. Time Warner*,
894 F.3d 473 (2d Cir. 2018)................................................................................................28, 29

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)................................................................................................................12

*In the Matter of Missouri Network All., LLC d/b/a Bluebird Network & Uniti Leasing Mw LLC Petition for Preemption & Declaratory Ruling*,
No. DA20-1331, 2020 WL 6591665 (OHMSV Nov. 9, 2020) ..............................................17

*New York Cent. Mut. Fire Ins. Co. v. Toyota Motor Sales, U.S.A., Inc.*,
No. 03-CV-0083E(SR), 2004 WL 2643172 (W.D.N.Y. Nov. 18, 2004) ...........................3, 13

*In the Matter of Petition for Declaratory Ruling That Clark Cty., Nevada Ordinance No.4659 Is Unlawful Under Section 253 of the Commc'ns Act As Interpreted by the Fed. Commc'ns Comm'n & Is Preempted*,
No. DA21-59, 2021 WL 228002 (OHMSV Jan. 14, 2021) .....................................................16

*Petition for Waiver of the Definition of "Study Area" Contained in Part 36, Appendix-Glossary and Sections 36.611 and 69.2(hh) of the Commission's Rules*,
WC Docket No. 10-90, CC Docket No. 96-45, Memorandum Opinion and Order, FCC 17-85, 32 FCC Rcd 5878 (2017) .........................................................................17

*Puerto Rico Tel. Co. v. Telecomm. Reg. Bd. of Puerto Rico*,
189 F.3d 1 (1st Cir. 1999) .................................................................................................13, 14

*Qwest Corp. v. City of Santa Fe, New Mexico*,
380 F.3d 1258 (10th Cir. 2004) ..............................................................................................16

*Raskin v. Wyatt Co.*,
125 F.3d 55 (2d Cir. 1997) ......................................................................................................17

*Smith v. American Exp. Co.*,
853 F. 2d 151 (2d Cir. 1988) ...................................................................................................19

*TCG New York, Inc. v. City of White Plains*,
305 F.3d 67 (2d Cir. 2002) ...............................................................................................15, 16

*U.S. Commodity Futures Trading Comm'n v. Highland Stone Cap. Mgmt., L.L.C.*,
No. 11 CIV. 5209 KBF, 2013 WL 4647191 (S.D.N.Y. Aug. 29, 2013) ................................18

*United States Sec. & Exch. Comm'n v. Alpine Secs. Corp.*,
354 F. Supp. 3d 396 (S.D.N.Y. 2018).........................................................................19, 20, 23

*United States v. Any & All Radio Station Transmission Equip.*,
207 F.3d 458 (8th Cir. 2000) ...................................................................................................28

*US v. Feliz*,
467 F.3d 227 (2d Cir. 2006).....................................................................................................18

**Statutes**

28 U.S.C. § 2342(1) ......................................................................................................................28

47 U.S.C. § 253 ................................................................................................. *passim*

**Other Authorities**

Fed. R. Evid. 801 ...........................................................................................................17

Fed. R. Evid. 1006 ....................................................................................................17, 19

31 Wright & Miller, *Federal Practice & Procedure: Evid.* § 8045 (1st ed. 2021) ......................19

## PRELIMINARY STATEMENT

Plaintiff Cellco Partnership d/b/a Verizon Wireless ("Verizon") brings this action to challenge certain telecommunications-related fees codified by the defendant City of Rochester (the "City") in its municipal code (the "Code"). In February 2019, the City amended its Code to impose excessive fees on applicants like Verizon that seek to deploy and maintain telecommunications facilities in the City right-of-way ("ROW"). Federal law prohibits such fees if the City cannot demonstrate that they are based on a reasonable approximation of the actual and direct costs incurred by the City as a result of the deployment of the telecommunications facilities. The City has failed to establish that either its small cell or fiber fees are cost-based. Indeed, its small cell fees are five times higher than the FCC's presumptively reasonable amounts. The City's fees, therefore, violate federal law and the Court should grant Verizon summary judgment.

Federal law precludes and preempts state and local government action that prohibits or effectively prohibits the provision of telecommunications services. *See* 47 U.S.C. § 253. In September 2018, the FCC affirmed that when a local government charges excessive fees for telecommunications facility installations, that amounts to an effective prohibition of service under Section 253. *In re Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Investment*, 33 FCC Red 9088, ¶ 3 (2018) (the "*Barriers Order*"). For such fees to be lawful, the locality must be able to show that they are limited to a "reasonable approximation" of the government's "objectively reasonable costs" that are "actual and direct" and "specifically related to and caused by the deployment." *Id.* ¶¶ 55, 79-80, 131; n.234. Fees related to small cell installations are presumptively reasonable if one-time application fees are less than $500 and recurring fees are less than $270 per year; there will be "only very limited circumstances in which localities can charge higher fees consistent with the requirements of Section 253." *Id.* ¶¶ 79, 80.

1

On its face, the Code acknowledges that the challenged fees are at least partly based on "the value of the [ROW]" and therefore are not limited to costs.  The City also failed to produce any evidence that its fees are cost-based. Discovery confirmed that, before amending its Code, the City made no effort to determine what costs were "specifically related to and caused by" the installation of telecommunications infrastructure, and has done nothing to track such costs since.

Instead, the City relies exclusively on an inadmissible, post-hoc, unsupported and unreliable "analysis" that the Court need not consider, given the myriad evidentiary issues.  But, even if the Court were to entertain it, the "analysis" does not represent a credible attempt at calculating the City's costs as contemplated by the *Barriers Order*.  The methodology used to develop the "analysis" is unclear and undocumented, and, to the extent it can be deciphered, is internally inconsistent and flawed.  The City has not produced any supporting documentation for the numbers in the "analysis" and admits that none exists.  The results of the "analysis" are facially unreasonable, if not absurd, and reflect over-counting that would result in the City recovering the same alleged costs many times over, as well as costs that are unrelated to the telecommunications facilities.  The City also concedes that its "analysis" merely allocates approximations of overhead and other costs that the City would incur regardless of whether or how many telecommunications installations occur.  Thus, the so-called "estimated costs" in the Spreadsheet are not specifically *caused* by any installations.  The "analysis" is defective in numerous other respects set out in Verizon's expert's report.  The City did not depose that expert, submit its own expert report, or otherwise attempt to rebut that expert testimony.  Thus, Verizon is entitled to summary judgment.

## FACTUAL BACKGROUND

## I.   THE INSTALLATION OF SMALL CELL INFRASTRUCTURE IS STRAIGHT-FORWARD AND CARRIERS ASSUME THE MAJORITY OF COSTS

Verizon brought this challenge to the City's Code because it sought to deploy small cell

infrastructure within the City to provide services to residents, businesses, first responders, and others, but faced unfair and unreasonable fees to do so.[1]  The installation of the small cell infrastructure is straightforward, and generally comprised of two components: (a) the installation of a small cell attachment to street-light or other utility pole; and (b) connecting that attachment to underground or aerial fiber facilities in the ROW.  (Plaintiff's Local Rule 56 Statement of Facts ("SOF") ¶ 1.)  These underground and aerial fiber facilities, referred to in the industry as "backhaul," are cables or fiber that connect the small cells to the larger network.  (SOF ¶ 2.)  The fiber, as well as the electrical service, are necessary to the operation of the small cells.  (SOF ¶¶6-7)

The City has published rules and regulations that govern installations within the City ROW. *Rules and Regulations for Work in the Right-of-Way, City of Rochester, New York, Department of Environmental Services,* Bureau of Architecture and Engineering, Regulations authorized by Rochester City Code, Chapter 104, April, 1 2019, Updated April 5, 2019 ("*ROW Rules*") (SOF ¶ 8.)  The *ROW Rules* make clear that when a wireless carrier or other applicant seeks to attach a small cell to a City-owned pole or install fiber backhaul cable, the carrier/applicant takes on most of the planning, organizing, and execution independently and at its own costs.  (SOF ¶ 9.)  There are few up-front tasks or costs borne by the City and even those are on a one-time basis.  After the facilities are deployed, there are few, if any, recurring costs to the City.  Specifically, the applicant must:

- Submit an application that, in addition to standard information, includes a description of the applicant's existing and proposed telecommunications facilities and equipment within the City, and anticipated construction schedule for the next two years;

---

[1]    Other providers have pursued similar claims in two other actions that are also pending before this Court.  *See Crown Castle Fiber LLC v. City of Rochester*, No. 6:20-cv-06866-EAW-MWP (W.D.N.Y.) (the "*Crown Castle Action*"); *ExteNet Sys., Inc. v. City of Rochester*, No. 6:20-cv-07129-EAW-MWP (W.D.N.Y.) (the "*ExteNet Action*," and together the "*Related Actions*").

- Offer proof that existing pole locations are not suitable for its needs before submitting a permit for a new pole location;

- Transfer ownership of all new poles to the City;

- Provide post-installation information to the City;

- Conduct annual inspections, if applicable, and submit certifications to the City;

- Maintain facilities, including installed landscaping, and remove any graffiti and posters;

- Each year supply a GIS map (indicating locations as well as detail on the length of the fiber, diameter of the duct, etc.) in electronic form to the City; and

- Be "solely responsible for construction, installation and maintenance of its facilities."

    (SOF ¶¶ 10-17.)

(*S*)  The *ROW Rules*, by contrast, do not identify any post-installation tasks that the City will assume; the City merely retains "the right at all times to inspect the facilities to assure compliance with all Permits or approvals granted by City."  (SOF ¶¶18-19.)  The City's internal documents confirm that, in the years subsequent to an installation, "the permit office is done unless there is an issue or complaint."  (SOF ¶20.)

## II.    VERIZON INTENDS TO DEPLOY FACILITIES IN THE CITY'S ROW

Verizon, for some time, has sought to extend, densify, and upgrade its wireless network infrastructure in the City to support the provision of current and next-generation telecommunications services, as contemplated by the *Barriers Order*.  (SOF ¶21.)  Verizon would also need to deploy fiber to connect these facilities to the network.  (SOF ¶ 22.)  In October 2018, Verizon gave a presentation to the City reflecting Verizon's anticipated plans for the installation of small wireless facilities, including the conceptual location of small wireless facilities on City poles, smart poles, or utility poles.  (SOF ¶23.)  Verizon thereafter continued to express its eagerness to deploy facilities, while raising concerns and even proposing revisions to the

anticipated Code to ensure it complied with the *Barriers Order*, which the City rejected.  (SOF ¶ 24.)  As a result of the parties' dispute, Verizon put on hold a number of projects for the installation of small wireless facilities on City poles and on privately-owned rooftops that required access to the ROW.  (SOF ¶ 25.)

### III.   THE CITY ADOPTED A NEW TELECOMMUNICATIONS CODE THAT IMPOSES EXCESSIVE FEES THAT ARE NOT COST-BASED

#### A.   Prior To The *Barriers Order*, The City Considered A Fee Structure For Telecom Installations To Generate Revenue, Rather than Recover Costs

Before the *Barriers Order* was issued, the City was aware of the need for further deployment to support services like 5G and was considering making changes to its fee structure to capitalize on that need.  But the City did not attempt to limit its fees to the costs it would incur as a result of new deployments.  To the contrary, in or about May 2018, the City instead discussed "How can the City of Rochester profit from the new 5G transformation?"  (SOF ¶ 26.)  In fact, on July 23, 2018, the Mayor was briefed that the revised fees would generate "revenue" for the City (rather than being cost-based) and that the new Code was based on, among other things, "Law Department review of codes from other cities, federal law and regulations, articles, treatises, and seminars on telecommunications" with input from consultants (*i.e.*, not based on the City's own costs).  (SOF ¶ 28.)  Indeed, a draft of the Code prior to the *Barriers Order* referred to the fees as reflecting "fair market value rental compensation" for use of the ROW.  (SOF ¶ 29.)[2]

#### B.   The City Enacted The Code With Revenue-Generating Fees Substantially Similar To Those It Considered Pre-*Barriers Order*

The City was aware of the federal law discussed in the *Barriers Order* when it drafted the

---

[2]    Although the City claimed in its interrogatory responses that it looked at other municipal fee structures to confirm that its "cost-based fees" were not unreasonable (SOF ¶ 33), it is undisputed that the cost analysis produced by the City was generated after the Code was enacted.  (SOF ¶ 66.)

Code.  (SOF ¶ 30.)  On September 11, 2018, the City's counsel wrote to New York City's counsel and recognized that the federal law confirmed by the *Barriers Order* presented an obstacle to the City's plans to profit from the ROW via the proposed Code provisions.  Specifically, the City's counsel admitted that the *Barriers Order* "would seriously and adversely impact [the City's] proposed code and the City's ability to manage our ROW."  (SOF ¶ 31.)  On or about September 18, 2018, the City's mayor wrote to the FCC Secretary Marlene Dortch imploring her to oppose the adoption of the *Barriers Order* and challenging the $270 presumptively valid fee for small cell attachments—not because it failed to allow the City to recover its costs – but as insufficient to cover "market value."  (SOF ¶ 32.)

The FCC rejected such arguments and adopted the *Barriers Order*.  Rather than revise its draft Code to charge fees based on its own costs caused by the deployment of the facilities, in or about December 2018, the City continued to focus on fee structures imposed by other municipalities.  (SOF ¶ 33.)  Ultimately, drafts of the Code show that the City did little more than remove buzzwords—for example, replacing "fair market value rental compensation" with "license fee."  (SOF ¶ 34.)  Much of the actual fee scheme in the final version of the Code remained substantially similar to what the City had proposed all along to generate revenue and "profit" from what it perceived as the market value of the ROW, instead of recovering its costs.  (SOF ¶ 35.)

## IV.    SUMMARY OF FEES CHARGED BY THE CITY PURSUANT TO THE CODE

### A.    The Code's One-Time Permit and Registration Fees

Pursuant to the Code, the City charges a one-time permit fee for work within the ROW at a rate of $2,000 per existing pole and $2,500 per each replacement pole.  (SOF ¶ 36; Code § 1016-15(F).)  The City testified that "there may be some other permitting fees that are associated with such an application" beyond this permit fee.  (SOF ¶ 37.)  The City's Mayor stated in a submission

to the FCC that the permit fee was intended to cover "the comprehensive services required for each application, including clerical time for accepting and processing an application, engineering review of the application, plans and drawings, site inspections as described above, attendance at public meetings, preconstruction meetings with contractors, review of as-built documents and follow-up inspection of involved cities, and [the City] concluded that the actual costs to the City are approximately $2,000." (SOF ¶ 38.) As discussed below, these same activities that form the basis for these one-time fees also are used by the City to justify its recurring fees. (SOF ¶ 39.) In other words, the City purports to recover its claimed costs for these activities through one-time fees, but then also recovers the same claimed costs for those same activities—which the City admits only occur during the application/installation process—each and every year thereafter through recurring fees. (SOF ¶ 40.)

In addition to the permit fee, which by itself far exceeds the FCC's presumptively valid fee amount, applicants are also required to pay an initial registration fee of $1,000 to cover "administrative costs of processing registration information and materials, including all subsequent information updates required during the term of a master license agreement." (SOF ¶41 (Code § 106-15(A)).) In addition, the City requires an applicant to enter a master license agreement with the City. (SOF ¶ 42 (Code § 106-4).) Upon the expiration of a master license agreement, the City imposes another $500 fee. (SOF ¶ 43 (Code § 106-15(A)).)

**B.    The Code's Recurring Fees**

Pursuant to a section of the Code entitled "Right-of-way compensation," the City imposes various fees that recur on an annual basis. (SOF ¶ 44 (Code §106-15(B)).) On its face, this section of the Code confirms that compensation is not limited to cost recovery. Section 106-15(B) explicitly states that the fees are to be paid to the City for, among other things, "*the value of the*

*right of way and the municipal facilities*."  (SOF ¶ 45 (Code § 106-15(B)).)

**Pole Attachment Fees.**  For each small cell attached to a standard pole, the Code imposes a $1,500 annual fee.  (SOF ¶ 46 (Code § 106-15(B)(4)).)  For each small cell attached to a smart pole, the Code imposes a $1,000 annual fee if the pole was installed by the licensee and, if installed by the City, "such amount as set forth in a master license agreement."  (SOF ¶ 47 (Code § 106-15(B)(4)).)  Where the pole is replaced by the provider, the new pole then becomes property of the City, reducing the City's costs.  (SOF ¶ 48 (Code §106-15(B)(4)).)

**Backhaul Fees.**  In the first year of deployment, for underground installations, the fee for open trenching requires the provider to pay "$10,000 for up to 2,500 feet of telecommunications facilities per contiguous site, per conduit or multiple conduits up to five inches total in diameter in the right-of-way."  (SOF ¶ 49 (Code § 106-15(B)(1)(a)).)  Beyond 2,500 feet, the City charges on a per-foot basis: $1.50 per foot through 12,500 feet and $0.75 per each additional foot.  (SOF ¶ 50 (Code § 106-15(B)(1)(a)).)  If installation is through directional boring, the provider pays the City $500 per site plus the same per-foot fees: $1.50 per foot from 2,500 to 12, 500 feet and $.075 beyond 12,500 feet.  (SOF ¶ 51 (Code § 106-15(B)(1)(c)).)  For aerial installations, the Code imposes fees of $10,000 for up to 2,500 feet of telecommunications facilities, $1.50 per foot for 2,500 through 12,500 feet of telecommunications facilities and equipment and $0.75 per foot thereafter.  (SOF ¶ 52 (Code § 106-15(B)(2)).)

For each year after the year of installation, the City considers any existing conduit to be an "existing facility."  (SOF ¶ 53.)  Instead of charging on a per-site basis, the City charges on a per-foot basis based on the provider's total network footage in the ROW.  (SOF ¶ 54 (Code § 106-15(B)(1)(a-c)).)  The Code provides fees of $5,000 for up to 2,500 feet of existing facilities, an additional $1 per foot between 2,501 and 12,500 feet, and an additional $0.50 per foot for facilities

with footage in excess of 12,500 feet.  (SOF ¶ 55 (Code § 106-15(B)(1)(a-c), (B)(2).)

**Additional Fees.**  The Code provides for several additional fees.  Section 106-15(E) requires that the "Licensees shall pay the actual costs, including but not limited to the legal and engineering fees, of any expert consultant the City may reasonably require for review of applications submitted pursuant to this chapter."  (SOF ¶ 56 (Code § 106-15(E)).)  Section 106-15(F) allows for additional registration costs and permit fees.  (SOF ¶ 57 (Code § 106-15(F)).)  Section 104-57(H) imposes fees for certain excavation in the ROW.  (SOF ¶ 58 (Code § 104-57(H)).)  Section 104-57(B) requires companies performing work in the City to pay an annual maintenance fee.  (SOF ¶ 59.)  And, Section 104-20 imposes 15-year extended maintenance fees and permit fees for certain excavations.  (SOF ¶ 60.)

## V.    THE CITY'S SPREADSHEET

Verizon sought discovery from the City regarding whether its fees are a reasonable approximation of its objectively reasonable costs, as per the *Barriers Order*.  (SOF ¶ 61.)  The City ultimately admitted that it "does not specifically and independently track all costs related to telecommunications in the right of way."  (SOF ¶ 62.)  Instead, the City relies on a two-tabbed MS Excel spreadsheet purporting to represent an "analysis" of the City's "costs" (the "Spreadsheet").  (SOF ¶ 63.)  The City contends that the Spreadsheet is:

> an analysis of recurring annual costs resulting from the installation and maintenance of small cell wireless facilities in the City right of way … and recurring annual costs related to installation and maintenance of fiber and fiber conduit in the right of way, both aerial and underground.

(SOF ¶ 64.)  The City claims that "[t]his analysis was performed . . . in an ongoing fashion, during the drafting of the City Code Chapter 106, following its adoption, and during the pendency of this action."  (SOF ¶ 65.)

In fact, the Spreadsheet was not created until April 17, 2019—well after the City adopted

the Ordinance that amended the Code in February 2019, and *after* the Ordinance's effective date of April 1, 2019.  (SOF ¶ 66.)  Mr. Tobias, the City's designee pursuant to a Rule 30(b)(6) deposition notice covering the creation and content of the Spreadsheet, could not identify any portions of the analysis that were performed prior to the adoption of the Code.  (SOF ¶ 67.) Although Mr. Tobias may have starting working on preliminary steps of his analysis before April 2019, *i.e.*, gathering information, he testified that there was not a "prior iteration" of the Spreadsheet.  (SOF ¶ 68.)

Mr. Tobias also testified that the Spreadsheet was prepared in anticipation of litigation from Verizon and others.  (SOF ¶ 69; SOF ¶ 70 ("When we were doing the final analysis, what I was trying to get to was to make sure that our $1,500 number was reasonable or below our actual cost because that was the driver of the final exercise as it related to the lawsuit.").)  Other records also show that the Spreadsheet was prepared for purposes of litigation.  (SOF ¶ 71 (noting "risk of litigation," existing and expected "push-back" from industry, and that "simple ruling by the FCC . . . could render portions of [Code] unenforceable").)

The Spreadsheet lists numerous tasks, categorizing them by City department, that allegedly relate to small cells and backhaul facilities.  (SOF ¶ 72.)  But the Spreadsheet does not attempt to identify actual costs, or costs that are actually caused by any such deployments.  Rather, for each task, the Spreadsheet allocates a fraction of existing full time City employees' time, or full time equivalency (FTE), multiplied by corresponding approximate annual compensation for those employees in order to approximate the "cost" to the City.  (SOF ¶ 73.)

The Spreadsheet's conclusions are facially unreasonable.  The Spreadsheet suggests that 1,118 City employees from 15 departments must work a total of 49,805 hours per year, which would be equal to 192 hours per day, on tasks related to small wireless and fiber backhaul facilities.

(SOF ¶ 74.)  Given the limited number of tasks the City performs related to any given deployment under the *ROW Rules* and the number of deployments at issue (which the Spreadsheet estimated would be 300 per year)—those numbers would be unachievable under any circumstance.

Moreover, the Spreadsheet does not even attempt to identify costs *caused by* telecommunications installations.  The number of work hours in the Spreadsheet does not change based on the number of applications received or installations performed.  Rather, the City assumes its employees would work the same number of hours in the event of a single small cell installation, 200 small cell installations, or 300 small cell installations.  (SOF ¶ 75.)  In other words, the Spreadsheet indicates that the City employees would work the same number of hours and earn the same salaries (*i.e.*, incur the same cost) regardless of whether or how many telecommunications installations occur.  In addition, and without any substantiation, the Spreadsheet purports to track costs that have some, attenuated nexus to telecommunications, but does not track costs that would be incurred as a result of the deployments at issue.  (SOF ¶ 76.)

The Spreadsheet nevertheless allocates these FTE percentages to its purported maintenance of small cell attachments and fiber backhaul—but does so using an undefined ratio that varies from task to task.  (SOF ¶ 77.)  The City has not explained how that ratio was derived, why it varies from task to task, or why it is in any way accurate.  (SOF ¶ 78.)  The Spreadsheet then applies the FTE percentages to the loaded salaries (wages and benefits) for each City position that allegedly completes these tasks to generate annual estimates of personnel costs.  (SOF ¶ 79.)  For fiber backhaul facilities only (the second tab), the Spreadsheet also allocates varying percentages of existing and planned capital costs.  (SOF ¶ 80)

The Spreadsheet provides that small cell attachment installations to City poles cause the City to incur personnel costs totaling $1,314,218 per year.  (SOF ¶ 81.)  Without any basis (because

the City made no effort to track—and could not track—actual costs or work performed related to actual small cell installations), Mr. Tobias testified that this annual cost related to the 88 small cells that were already installed in the City when the Spreadsheet was prepared.  (SOF ¶¶ 82-83.)  According to Mr. Tobias, this means that each small cell attachment cost the City $14,934.  (SOF ¶ 84.)  That claim lacks any substantiation whatsoever.  And that is a staggering number, which is facially incredible—or at least should be viewed with considerable skepticism—when compared to the FCC's presumptively valid, cost-based fee of $270 per attachment.

The Spreadsheet then assumes that there may be 200 or 300 installations in future years and further assumes that the aggregate annual costs would stay the same, resulting in $6,571 per pole for 200 attachments and $4,381 per pole for 300 attachments.  (SOF ¶ 85.)  In contrast to the Spreadsheet itself, Mr. Tobias testified that if the number of installations increased, the costs would increase accordingly—*e.g.*, if there were 1800 small cells, Mr. Tobias incredibly claims the costs could balloon to "10 million, 15 million, 20 million" dollars, but he did not calculate such amounts or provide any support for that claim.  (SOF ¶ 86.)

Similarly, the City claims that fiber backhaul in the ROW causes Rochester to incur $5,285,908 in costs per year.  (SOF ¶ 87.)  For backhaul, the City allocates not only the cost of personnel, but also inexplicably allocates an additional $4.3 million in capital expenditures as City costs allegedly caused by backhaul facilities.  (SOF ¶ 88.)  Spread equally over the 431,567 feet of existing conduit and 431,253 feet of existing fiber in the City (*i.e.*, a total of 862,819 feet), the City estimates that each foot of fiber backhaul causes the City to incur costs of $6.13.  (SOF ¶ 89.)

## **STANDARD OF REVIEW**

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317,

322-23 (1986).  To avoid summary judgment, the non-movant may not rest on mere conclusory allegations or unsupported speculations.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  "If the non-moving party fails to establish, after a reasonable opportunity for discovery, the existence of an element essential" to the merits "on which it will bear the burden of proof at trial, summary judgment is appropriate because such failure to establish an essential element of the case renders all other facts immaterial."  *New York Cent. Mut. Fire Ins. Co. v. Toyota Motor Sales, U.S.A., Inc.*, No. 03-CV-0083E(SR), 2004 WL 2643172, at *4 (W.D.N.Y. Nov. 18, 2004).  In such a case, "the plain language of Rule 56(c) mandates the entry of summary judgment."  *Celotex*, 477 U.S. at 322-23.

## ARGUMENT

## I.    THE COST-BASED STANDARD IN THE *BARRIERS ORDER* GOVERNS

### A.    The FCC's *Barriers Order* Sets A Cost-Based Standard For Determining "Effective Prohibition" And "Fair And Reasonable Compensation"

As this Court recognized, the TCA was enacted to "provide for a pro-competitive, deregulatory national policy framework . . . by opening all telecommunications markets to competition."  Dkt. 22 at 20 (citing H.R. Conf. Rep. No. 104-458, at 113 (1996)).  Section 253(a) of the TCA, which courts have long-recognized as a "broad preemption of laws that inhibit competition," provides that "[n]o State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service."  47 U.S.C. § 253(a); *see also Puerto Rico Tel. Co. v. Telecomm. Reg. Bd. of Puerto Rico*, 189 F.3d 1, 9, 11 n.7 (1st Cir. 1999).   While municipalities may "require fair and reasonable compensation . . . on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way," 47 U.S.C. § 253(c), they may not charge excessive fees that amount to a prohibition or effective prohibition of service.

13

The *Barriers Order* confirmed that "Section 253(c)'s 'fair and reasonable compensation' provision" "refer[s] to fees that represent a reasonable approximation of actual and direct costs incurred by the government, where the costs being passed on are themselves objectively reasonable." *Id.* ¶ 55. Market-based fees do not comply with Section 253 because, "while it might well be fair for providers to bear basic, reasonable costs of entry, the record does not reveal why it would be fair or reasonable from the standpoint of protecting providers to require them to bear costs beyond that level." *Id.* Accordingly, a local government can only charge fees that it can demonstrate are (1) a reasonable approximation of the local government's costs that are "specifically related to and caused by the deployment," (2) those costs themselves are reasonable, and (3) a non-discriminatory reasonable approximation of its costs. *Barriers Order*, ¶¶ 50, 80; *id.* n.131, n.233. The state or local government bears the burden of establishing that its fees are cost-based. *See* Point II, *infra*.

The FCC declared certain small cell fees as presumptively reasonable if they do not exceed certain thresholds—$500 for application fees, and $270 per year for recurring fees. *Id.* ¶ 79. But as the FCC cautioned, there will be "only very limited circumstances in which localities can charge higher fees consistent with the requirements of Section 253." *Id*. at ¶ 80. But here, it is undisputed that the City's small cell fees do not fall below the presumptively reasonable rates. (SOF ¶¶ 36, 46-47.) In fact, the $1500 per pole attachment recurring fee is over 5 times higher than the presumptive rate. As explained below, although there is no presumptive rate for fiber fees, those fees must still be cost-based to survive scrutiny.

Thus, to avoid preemption, the City had to—but did not and cannot—justify all of its fees as a reasonable approximation of its actual, direct, and reasonable costs caused by the telecommunications deployments in the ROW.

14

**B.    A Cost-Based Standard Applies To All Of The Challenged Fees**

The City has argued that the fees for underground installations, aerial installations, and relocations are not preempted by Section 253 because the *Barriers Order* only applies to small cell installations, not fiber installations.  (Dkt. 41-12 at 2.)  The City is wrong for at least two reasons.

*First,* the City admits that backhaul is a necessary and essential part of every small cell installation.  (SOF ¶¶ 6-7.)  Wireless calls travel from the caller's device to the nearest small cell, which then passes the call through fiber facilities connected to that small cell to travel over fiber to a small cell or other facility closer to the called party.  Small cells rely on backhaul to carry traffic.  (*See* Dkt. 1 ¶ 11; Dippon ¶ 16; *Remarks of FCC Chairman Ajit Pai at the Inst. for Policy Innovation's Hatton W. Sumners Distinguished Lecture Series Irving, Texas*, 2017 WL 3953434, at *4 (Sept. 7, 2017) ("We are talking about hundreds of thousands, if not millions, of small cells. And those cells are going to need backhaul—that is, the fiber and other connections that carry wireless traffic from cells back into the core of the network.").)  Mr. Tobias confirmed that it is necessary to connect a small cell installation to the network through backhaul.  (SOF ¶ 6.)  Because the two cannot be separated, the same standard should apply to both the small cells themselves and the necessary associated fiber.

Indeed, it would frustrate Congress's intent and the FCC's goal of encouraging the deployment of 5G technology to only apply a cost-based standard to small cell attachment fees, but ignore the necessary associated fiber installations.  The impact of municipal fees must be assessed in total and in combination.  *See TCG New York, Inc. v. City of White Plains*, 305 F.3d 67, 77 (2d Cir. 2002) ("a town could effectively prohibit telecommunications services through a

combination of individually non-objectionable provisions").[3]   Applying a different standard to fiber fees would be inconsistent with both the law and the practical realities.

*Second*, the federal statutory provision addressed in the *Barriers Order*—Section 253— does not distinguish between different types of telecommunications facilities; all are subject to the same provisions.  *See, e.g.*, *Barriers Order* ¶¶ 22, 24.  The statute certainly does not speak in terms of small cell versus fiber fees, 47 U.S.C. § 253, and there is no reason for the Court to adopt separate standards for each.  Indeed, the case law cited in the *Barriers Order* as supporting a cost-based standard actually involved pre-small cell and *fiber* installations.  *See, e.g.*, *Barriers Order* ¶ 34 (citing, among others, *TCG New York, Inc.*, 305 F.3d at 76); *id.* ¶ 42 (rejecting insurmountable barrier being standard); *id.* ¶ 46 (discussing cases decided well before small cell technology).  Far from being limited to small cells, as the FCC recognized, numerous cases have imposed a cost-based standard on fees for fiber installations.  *Id.* at n.122 (citing *XO Missouri v. City of Maryland Heights*, 256 F. Supp. 2d 987, 993-95 (E.D. Mo. 2003)); s*ee also id.* ¶ 44 (discussing fees for fiber installations challenged in *TCG New York, Inc.*, 305 F.3d at 71); *id.* ¶ 45 (discussing per-foot fee at issue in *Qwest Corp. v. City of Santa Fe, New Mexico*, 380 F.3d 1258 (10th Cir. 2004)).  And the *Barriers Order* confirmed that is the proper standard to use for facilities deployments under Section 253.  *Barriers Order* ¶¶ 50-56.

## II.    THE CITY CANNOT MEET ITS BURDEN TO DEMONSTRATE THAT ITS FEES ARE COST-BASED UNDER THE *BARRIERS ORDER*

The City bears the burden to justify its fees.  "Fees that cannot ultimately be *shown by a state or locality* to be a reasonable approximation of its costs . . . are not 'fair and reasonable

---

[3]    Excluding fiber also incentivizes a municipality to simply re-allocate excessive small cell fees to the accompanying fiber that small cells rely on—having the same effect.  Thus, the fees must all be assessed in total and in combination.  *TCG N.Y., Inc.*, 305 F.3d at 77.

compensation'" under Section 253(c) and, therefore, have the effect of prohibiting service under Section 253(a). *Barriers Order* ¶¶ 56, 76 (emphasis added); *see also* ¶¶ 79-80, n.234. As the Ninth Circuit held in upholding the *Barriers Order*, a locality may only "charge fees above the [presumptively reasonable] levels *where they can demonstrate* that their actual costs exceed the presumptive levels." *City of Portland v. United States*, 969 F.3d 1020, 1037 (9th Cir. 2020) (emphasis added), *cert. denied*, *City of Portland v. FCC*, 141 S. Ct. 2855 (2021); *see also In the Matter of Petition for Declaratory Ruling That Clark Cty., Nevada Ordinance No.4659 Is Unlawful Under Section 253 of the Commc'ns Act As Interpreted by the Fed. Commc'ns Comm'n & Is Preempted*, No. DA21-59, 2021 WL 228002, at ¶ 7 (OHMSV Jan. 14, 2021) (noting "the [*Barriers Order*] explained that the locality, not the petitioner, has the burden of demonstrating" that its fees above safe harbor levels meet the cost-based standard).[4] As set forth below, there is no record evidence that could meet the City's burden of showing that its fees are cost-based.

A.    **As a Threshold Matter, The City Cannot Meet Its Burden Because The Spreadsheet Representing the City's Purported Costs Is Inadmissible**

Evidentiary rules apply at summary judgment. *See Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 169-70 (2d Cir. 2014); *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) ("[I]t is appropriate for district courts to decide questions regarding the admissibility of evidence on summary judgment."). The Spreadsheet, which is the only evidence proffered by the City in an

---

[4]    Indeed, it is well settled that "the burden of proving that a statute, regulation, or legal requirement comes within the exemptions found in [S]ections 253(b) and (c) falls on the party claiming that exception applies." *In re the Matter of Connect America Fund; Sandwich Isles Communications, Inc.; Petition for Waiver of the Definition of "Study Area" Contained in Part 36, Appendix-Glossary and Sections 36.611 and 69.2(hh) of the Commission's Rules*, WC Docket No. 10-90, CC Docket No. 96-45, Memorandum Opinion and Order, FCC 17-85, 32 FCC Rcd 5878, at ¶ 24 (2017); *see also In the Matter of Missouri Network All., LLC d/b/a Bluebird Network & Uniti Leasing Mw LLC Petition for Preemption & Declaratory Ruling*, No. DA20-1331, 2020 WL 6591665, at *10, ¶ 31 (OHMSV Nov. 9, 2020) ("The Cities have not attempted to demonstrate that their fee requirements fall within the safe harbor established by section 253(c), as is their burden")

attempt to justify its fees, is inadmissible because it constitutes hearsay and violates Rule 1006 of the Federal Rules of Evidence related to summary evidence.

### i.      The Spreadsheet Is Inadmissible Hearsay

The Spreadsheet is inadmissible hearsay.  "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Fed. R. Evid. 801; *see also, e.g.*, *Giles v. Rhodes.* No. 94 Civ. 6385, 2000 WL 1425046, at *8-9 (S.D.N.Y. Sept. 27, 2000).  The Spreadsheet is a quintessential example of hearsay.  It is based on oral conversations with unidentified people for which there are no notes, documents, or other supporting records.  The Spreadsheet reflects information about what City employees purportedly stated to Mr. Tobias regarding the time that they supposedly spend on various tasks.  But, as Mr. Tobias admits, the City employees do not keep track of their time in the normal course of business (SOF ¶ 100), nor were any such time records produced by the City, despite repeated requests.  The City offers the Spreadsheet to prove the truth of its content—namely, that the costs included in the document were in fact incurred by the City or are an accurate approximation of its reasonable costs.[5]

The haphazard, informal, and irregular manner in which the Spreadsheet was prepared raises serious questions about its reliability and accuracy, which are incapable of being tested or

---

[5]      The Spreadsheet does not qualify for the business record exception. "[B]ecause Rule 803(6) requires business records to be kept in the regular course of a business activity, records created in anticipation of litigation do not fall within its definition."  *US v. Feliz*, 467 F.3d 227 (2d Cir. 2006).  Here, Mr. Tobias admitted that the Spreadsheet was not prepared "in the course of a regularly conducted activity" of the City's business, but rather that it was prepared in anticipation of litigation from Verizon and others.  (SOF ¶ 69 (urgent need to justify fees after the Code was already enacted); SOF ¶ 70 ("When we were doing the final analysis, what I was trying to get to was to make sure that our $1,500 number was reasonable or below our actual cost because that was the driver of the final exercise as it related to the lawsuit.").); *see also* SOF ¶ 71 (noting "risk of litigation," "push-back" from industry, and that FCC ruling could render Code unenforceable).)

verified due to the lack of underlying documentation and information.[6]  The City did not keep any record of who Mr. Tobias spoke with, or the questions asked or answered provided.  *See, e.g.*, *Hook v. Regents of Univ. of Cal.*, 394 F. App'x 522, 530-31 (10th Cir. 2010) (noting a party "has not explained how these transcripts and interview notes are more trustworthy than documents prepared in anticipation of litigation, which do not qualify as business records."); *see also U.S. Commodity Futures Trading Comm'n v. Highland Stone Cap. Mgmt., L.L.C.*, No. 11 CIV. 5209 KBF, 2013 WL 4647191, at *18 (S.D.N.Y. Aug. 29, 2013) ("The CFTC did not submit the underlying individual account data for the Court's review, raising hearsay concerns."); *Smith v. American Exp. Co.,* 853 F. 2d 151 (2d Cir. 1988) (party could not use a chart because it was "unsupported by any admissible evidence and [was] based on information and belief, rather than personal knowledge").

### ii.      The Spreadsheet Violates Federal Rule Of Evidence 1006

The Spreadsheet, which purports to be a summary of information, also violates Fed. R. Evid. 1006.  Rule 1006, titled "Summaries to Prove Content," provides in relevant part that "[t]he proponent may use a summary, chart, or calculation to prove the content of voluminous writings . . . that cannot be conveniently examined in court" but that "proponent must make the originals or duplication available for examination or copying."  Fed. R. Evid. 1006.  A summary document "must be 'based on foundation testimony connecting it with the underlying evidence summarized and must be based upon and fairly represent competent [and admissible] evidence.'" *United States Sec. & Exch. Comm'n v. Alpine Secs. Corp.*, 354 F. Supp. 3d 396, 419 (S.D.N.Y. 2018).

---

[6]      Mr. Tobias may have spoken directly to some people, but indirectly to others, and in some cases he spoke only with a representative of a larger group.  (SOF ¶ 94.)  He may have shared drafts of the Spreadsheet "by email with some of them," but for "some of them, [they] sat down in a room and said, hey, what do you think about this" and "hey, is this reasonable?" (SOF ¶ 103.)

Rule 1006 requires that the proponent of the summary "must" make available the underlying data or documents being summarized.  The word "must" means that "as a condition to the admission of summary evidence, the proponent of that evidence must show that it made the source materials reasonably available."  31 Wright & Miller, *Federal Practice & Procedure: Evid.* § 8045 (1st ed. 2021).  If this requirement is not met, the summary exhibit is inadmissible.  *Id.*; *see also, e.g.*, *Advanced Mktg. Grp., Inc. v. Bus. Payment Sys., LLC*, No. 05-CV-9121, 2012 WL 6101991, at *7 (S.D.N.Y. Dec. 10, 2012), *report and recommendation adopted*, No. 05-CV-9121, 2013 WL 45868 (S.D.N.Y. Jan. 3, 2013).

Here, the City has not, and cannot, make available the underlying data and documents the Spreadsheet summarizes.  Mr. Tobias admitted he did not retain documents or other records that he claims are summarized in the Spreadsheet; indeed, he concedes that at least some underlying documentation "got tossed or overwritten."  (SOF ¶ 99.)  Even if the underlying data and documents had been made available, the City cannot establish that they represent competent and admissible evidence that is fairly represented in the Spreadsheet.  *Alpine Secs. Corp.*, 354 F. Supp. 3d at 419.  Mr. Tobias was not even able to identify everyone he spoke to in creating the Spreadsheet.  (SOF ¶ 96.)  Thus, the Spreadsheet is not admissible evidence and, because it is the only purported "proof" offered by the City to support its fee structure, this Court should grant Verizon's motion for summary judgment.

### B.    Even if Admissible, The Spreadsheet Is Fundamentally Flawed And Cannot Be Used To Justify The City's Excessive Fees

Even if it were admissible, which it is not, the Spreadsheet does not satisfy the City's burden of demonstrating that its fees are a reasonable approximation of its actual and reasonable costs caused by the deployment of telecommunications facilities.  *Barriers Order* ¶¶ 50, 76, 80; *id.* n.131.  The Spreadsheet does not represent a serious analysis of the City's costs, is flawed in

numerous respects, and is unsupported by any evidence in the record.

### i. The Spreadsheet does not approximate "actual" costs and its estimates are unreliable

The City admits that it did not track any of its actual costs associated with telecom installations. (SOF ¶ 90.) Because the City does not know what its actual costs are—and made no attempt to ascertain them prior to (or even since) enacting the Code (SOF ¶ 66.)—the fees set forth in the Code are not (and cannot possibly be) cost-based. This alone warrants summary judgment for Verizon.

The City instead relies on what admittedly is an after-the-fact "estimate" of costs reflected in the Spreadsheet. But the amounts and assumptions set forth in the Spreadsheet are unsupported and unreliable for a myriad of reasons, including that they have no basis in reality.

The Spreadsheet was based only on Mr. Tobias's informal, undocumented conversations with City employees, asking them to tell him what they do and "how much of [their] day is done doing that." (SOF ¶ 91 ("Of every one of those activities that are on that list, we called people – first of all, we sent out, you know, a request saying, hey guys, we need help.").) From those conversations, Mr. Tobias would then attempt to approximate the percentage of working time that each employee spent on tasks that may relate to telecommunications generally. (SOF ¶ 92.) The City did not rely on, or otherwise keep, any documentation of how its employees allocated their time among various tasks. (SOF ¶ 93.) And, of course, Mr. Tobias did not speak with every City employee—rather, he spoke to a "representative sample;" for example, if there are "five engineer[s], maybe [he] spoke to two of them." (SOF ¶ 94.)

When asked if he kept records of the conversations that formed the basis for the City's so-called allocation of costs, Mr. Tobias stated that "I will say that I'm sure that there's somewhere that maybe I wrote on a piece of paper or in a pad or on an earlier version of a spreadsheet that

maybe I got that said, hey, da, da, da, da, da." (SOF ¶ 95.) [7] Likewise, Mr. Tobias did not keep track

of the people that he spoke with to gather information. (SOF ¶ 96.) All in all, Mr. Tobias conceded

that the City has no backup worksheets, notes, or other documents to support the figures in the

Spreadsheet. (SOF ¶ 96.)

The only "quality control" that Mr. Tobias employed was having himself and various other

city employees assess whether the estimates that he came up with were "reasonable." (SOF ¶ 104.)

When asked if he did "anything to make sure all of the costs [he was] counting were objectively

reasonable," Mr. Tobias testified that he relied on his "common sense" and his "smell test." (SOF

¶ 105.) This methodology is entirely insufficient. The approach was entirely subjective, and the

results cannot be verified because the City does not keep records of its costs and Mr. Tobias did

not document his conversations.

> ii. **The City does not distinguish between recurring and non-recurring costs, rendering its analysis suspect and resulting in repeatedly collecting the same one-time costs**

The Spreadsheet is also fundamentally flawed and unreliable because Mr. Tobias testified

that he does not know which of the activities identified in the Spreadsheet as recurring activities

will actually recur and which will not. (SOF ¶ 106.) Indeed, Mr. Tobias did not perform any

analysis to determine which activities occur on an up-front or one-time basis in the year of

installation versus those that occur later and/or on a recurring basis. (SOF ¶ 107.) Thus, his

analysis assumes that all activities recur each year, despite the fact that City records indicate the

opposite—*i.e.*, that any City tasks (such as permitting) only occur once, on the front-end, prior to

installation. (SOF ¶ 108 ("the permit office is done [once the permit is issued] unless there is an

---

[7]      Mr. Tobias testified similarly at his deposition in the *Crown Castle Action*. (SOF ¶ 98 ("Q: … Did you take notes? A: I did. But it – yeah. The answer is yeah, I took notes. Q: Did you save those notes? A: No ….").)

issue or complaint.")  Indeed, the Spreadsheet erroneously counts all of the "the comprehensive services" that the City's Mayor described as occurring during the application/pre-installation process ("accepting and processing an application, engineering review of the application, plans and drawings, site inspections . . ., attendance at public meetings, preconstruction meetings with contractors, review of as-built documents and follow-up inspection of involved cities") as if those same "comprehensive services" are performed with respect to each installation each and every year after the installation is complete.  (SOF ¶ 109.)  This not only demonstrates that the Spreadsheet was developed in an unreliable manner, but it also results in the City over-counting its purported costs to recover for the same one-time activities over and over again, as if they recur each and every year, when the City has conceded the opposite.

> iii.   **The City has not measured its incremental costs, or costs that are "caused by" telecommunications equipment in the ROW, as required by federal law**

Federal law requires that the challenged fees be based on "objectively reasonable costs" that are "specifically related to and caused by the deployment."  *Barriers Order*, ¶¶ 79-80, 131; *id.* n.234.  But the Spreadsheet included all sorts of tasks that have little or nothing to do with— and certainly were not caused by—the deployment of telecommunications facilities in the ROW. Implicitly acknowledging the federal law standard, the City's interrogatory responses described the Spreadsheet as providing "the approximate *incremental* personnel, operating and/or capital costs associated with installation and maintenance of wireless facilities in the right of way."  (SOF ¶ 112).  "Incremental" in the context of a cost analysis, of course, means "the additional costs caused by a change in activity."  (SOF ¶ 113.)  Such costs are often referred to as "differential costs" "because they represent the difference between total expenditures with and without a change in activity," or "avoidable costs" because the entity would not incur these costs but-for the change

in activity."  (SOF ¶ 114.)

But Mr. Tobias admitted at his deposition that the Spreadsheet ***does not*** reflect incremental costs caused by the facilities at issue here; rather, he testified that he misused the word "incremental" in the interrogatory response.  (SOF ¶ 115.)  In fact, Mr. Tobias further confirmed that nothing in the Spreadsheet was actually an "incremental" cost caused by the deployment of small cell or backhaul facilities, because even if there were no small cell attachments in the City, neither the salaries that formed the basis for the amounts reflected in the Spreadsheet nor the overall City budget would be reduced.  (SOF ¶ 116.)  The Spreadsheet thus relies on the premise that the City incurs the same total annual costs regardless of how many attachments it oversees— a premise fundamentally inconsistent with measuring incremental costs caused by the deployment of facilities.  (SOF ¶ 117.)  Thus, and as set forth in further detail below, the Spreadsheet is comprised of allocations of personnel costs that the City would incur anyway, regardless of whether or how many installations there are.

**Inspections**.  The Spreadsheet includes alleged costs related to "inspections."  (SOF ¶ 118.) But the City did not produce any records of inspections (whether caused by the existence of telecom facilities in the ROW or not), and Mr. Tobias testified that "I can't tell you what the recordkeeping is on" inspections.  (SOF ¶ 119.)  Mr. Tobias also testified that he had no personal knowledge of any inspections of telecommunications facilities taking place.  (SOF ¶ 120.)  Rather, whatever knowledge he has comes from "talk[ing] to the people who do the work" inspecting poles and streetlights after a weather event or automobile accent involving a pole.  (SOF ¶ 121.)  Those people, according to Mr. Tobias, "might" occasionally inspect small cells when they already happened to be in the area, for example, to perform unrelated pavement work.  (SOF ¶ 122.)  Or, he says, employees may, in the course of performing other duties, inspect a pole "to make sure that

the streetlight is operational," or to do a "check after particularly difficult storms, weather events, and things of that sort" by "folks that are … out there regardless," or in connection with a downed pole caused by a motor vehicle accident.  (SOF ¶ 123.)  The only inspections cited to by Mr. Tobias were not caused by small cell deployments.  (SOF ¶ 125.)  Rather, Mr. Tobias explained that those were "pretty much inspections of the pole," as opposed to "specific to the small cell attachment." (SOF ¶ 124.)  In other words, those pole inspections would have taken place regardless of whether there was a small cell attached to the pole.

**Street Lighting**.  The Spreadsheet also allocates "Street Lighting" personnel overhead "for emergency response and repair and things of that sort" to pole attachments and fiber backhaul. (SOF ¶ 126.)  But small cells and fiber backhaul cause none of these expenses, which the City admits it incurs irrespective of whether any telecommunications facilities might be attached to those street lights.  As the City's budget indicates, the expenses incurred by the Street Lighting department are exclusively for "operating, maintaining, upgrading & acquiring" streetlights.  (SOF ¶ 127.)  The budget references neither emergencies nor small cells.

**Fire, Police, Emergency**.  The City also allocates part of its annual salary overhead for fire, police, and dispatch departments to pole attachments and fiber backhaul.  (SOF ¶ 128.)  It is undisputed, though, that the City would pay those same salaries to those City employees regardless of any small cell attachments or fiber deployments.  (SOF ¶ 129.)  Mr. Tobias also admitted that, in safety-related incidents involving poles—*e.g.*, a car colliding with a pole—the City might have to deploy one or multiple departments regardless of whether there was a small-cell attachment on the pole or not.  (SOF ¶ 130.)

**Water Department**.  The Spreadsheet includes a portion of the City's Water Department employees' annual salaries.  (SOF ¶ 131.)  Mr. Tobias testified that "the water department is the

division within the City that does the staking out when the permits department gets a request for someone to intrude into the right-of-way" and the water department will paint the ground to indicate where not to dig.  (SOF ¶ 132.)  But such activities are caused by the third party seeking to intrude into the ROW (such as a resident doing work on his or her driveway), not by the telecom provider.  (SOF ¶ 133.)  Moreover, the third party who applies for a permit to intrude into the ROW, as Mr. Tobias described, is subject to a separate permit fee, which already covers all costs associated with that permit, including any staking out by the water department.  (SOF ¶ 134.)  In any event, Mr. Tobias acknowledged that he has no knowledge of whether such "staking out" ever took place even with respect to the 88 small cells already installed in the City or would take place with respect to any future installations, so these claimed costs could not have been caused by small cell deployment.  (SOF ¶ 135.)

**Architecture and Engineering.**  The City allocates a portion of its total "architecture and engineering" capital costs to fiber backhaul.  (SOF ¶ 136.)  The City's Bureau of Architecture and Engineering lists the costs of 173 projects from 2014 to 2018, which include bridges, an underpass, trail landscaping, a cemetery, a water play center upgrade, repair of city-owned parking garages, milling and surfacing roads, and other projects.  (SOF ¶ 137.)  These projects are unrelated to— and not caused by—fiber backhaul deployments, but they are nevertheless treated as such in the Spreadsheet.  (SOF ¶¶ 138-139.)  The City has provided no basis to recover its unrelated capital expenditures through fees for telecommunications installations.

**Street Design Department.**  The City allocates portions of annual salaries for the Street Design Department to pole attachments and fiber backhaul.  (SOF ¶ 140.)  The City provided no evidence that the Street Design Department needs to be involved in the installation and maintenance of pole attachments and fiber backhaul.  (SOF ¶ 141.)  In fact, Mr. Tobias specifically

denied that telecommunications facilities cause the City to undertake any street design activities. (SOF ¶ 142.)

**Equipment.**  The Spreadsheet allocates annual amounts for equipment costs.  (SOF ¶ 143.) But service providers and their contractors ordinarily provide their own equipment and do not use the City's equipment in deploying small cells or fiber backhaul.  (SOF ¶ 144.)  And the City has not identified any tasks it would undertake in connection with that deployment that would cause it to use such equipment.  (SOF ¶ 144.)

> ### iv. Verizon's Expert Offers Unrebutted Opinions Debunking the Spreadsheet

Verizon proffered an expert witness, Christian Dippon, who opined that "the annual pole attachment and fiber backhaul fees specified in the Rochester City Code are not realistic or reasonable approximations of objective reasonable costs incurred by the City caused by its management of existing Small Wireless Facilities on City-owned street furniture and associated fiber backhaul facilities in the City's ROW."  (SOF ¶ 148.)[8]

*First*, Mr. Dippon opined that the City "allocate[d] a portion of City employees' salaries and City capital projects despite the fact that these costs are not caused by the deployment of small cells or related fiber backhaul."  (SOF ¶ 149.)  Relatedly, Mr. Tobias's testimony that the City would not avoid any of the costs if there were zero pole attachments or fiber backhaul, "not only confirms that the City did not *measure* incremental cost but also that the City does not *incur* any incremental costs due to pole attachment and related backhaul facilities."  (SOF ¶ 151.)

*Second*, by including costs that "are nonrecurring and that the permit fee already recovers," the Spreadsheet counts costs as if they are recurring each and every year that the City has admitted

---

[8]     Mr. Dippon is an economist with extensive experience in the telecommunications sector. (SOF ¶ 146.)

are associated with tasks that only occur during the year of installation.  (SOF ¶ 153.)  Mr. Dippon highlights a number activities listed in the Spreadsheet that are already accounted for in the City's permitting costs.  (SOF ¶ 154.)

*Third*, the "City's cost exercise relies on objectively unreasonable costs," for example:

- "15 different municipal departments . . . involved in processing a permit for a relatively small piece of electronics on a streetlight";

- "1,118 City employees . . . involved in managing the maintenance and use of the ROW by small cell and fiber backhaul facilities";

- "the equivalent of a team consisting of 14 full-time City employees for managing the use and occupancy of the ROW by existing pole attachments and a team of 10 full-time City employees for managing existing fiber backhaul[,]" which implies that "*each* pole attachment requires 97 hours of City work per year"; and

- an arbitrary portion of the City's existing capital expenses—expenses related to bridges, landscaping, building upgrades, streets, new construction street lighting, and mapping upgrades—allocated to fiber backhaul facilities.  (*Id.*  ¶ 60.)

  (SOF ¶¶ 154-157.)

*Finally*, after "removing [the] costs not caused by existing small cells and fiber backhaul as well as the double-counted costs," the City's costs fall below the safe harbor rate. (SOF ¶ 158.)

The City did not rebut any of Mr. Dippon's opinions.  (SOF ¶ 159.)  Nor did it bother to even take his deposition.  Similarly, the expert opinions submitted by the plaintiffs in the *Related Actions* are also unrebutted, including ExteNet's expert, Patricia D. Kravtin, who, in addition to identifying the myriad flaws in the Spreadsheet, opined that:

> In my over forty years of experience in regulatory cost study and cost allocation development, rarely have I seen such an undocumented, unsupported, non-transparent, and internally inconsistent compilation of cost figures as presented in the [Spreadsheet] provided in this litigation.  And certainly, never in the context where the applicable standard to be met, along with the public interest rationale for the standard, are so clearly set forth as they are in the [*Barriers Order*] ….  What the City has produced and claims to represent as its supporting ROW cost analysis is, at best, an ad hoc compilation of disparate, unsupported, inconsistent, unverified, and non-replicable numbers presented on two tabs of in the [Spreadsheet.]

(SOF ¶ 160.)  Thus, the City has failed to meet its burden to justify its fees.

## III.  THE CITY'S AFFIRMATIVE DEFENSES FAIL AS A MATTER OF LAW

The City asserts in its second affirmative defense that the *Barriers Order* is invalid for a number of reasons (Dkt. 23 at 2), but each of those reasons have already been addressed and rejected by the Ninth Circuit, exercising its exclusive authority under the Hobbs Act, in *City of Portland*, 969 F.3d at 1037-39.  This is now binding nationwide and the City cannot mount a collateral challenge in this lawsuit.  28 U.S.C. § 2342(1); *see also United States v. Any & All Radio Station Transmission Equip.*, 207 F.3d 458, 463 (8th Cir. 2000) ("It is hard to think of clearer language confining the review of regulations to the Courts of Appeal."); *see also King v. Time Warner*, 894 F.3d 473, 476 n.3 (2d Cir. 2018) (recognizing court of appeal was sole forum for challenges); *Gorss Motels, Inc. v. Otis Elevator Co.*, No. 3:16-CV-1781 (KAD), 2019 WL 1490102, at *4 (D. Conn. Apr. 4, 2019) ("[U]nder the [Second Circuit's] *King* analysis, the D.C. Circuit's decision is binding on this Court").[9]

The City also claims in its Third and Fifth Affirmative Defenses that Verizon lacks standing and that its claims are not ripe.  (Dkt. 23 at 2-3.)  This Court already held that Verizon alleged sufficient facts to support Article III standing and ripeness.  *Cellco Partnership v. City of Rochester*, 473 F. Supp. 3d 268 (W.D.N.Y. 2020).  Those facts are now undisputed in the record and set forth in the Declaration of Mark Coon.  Thus, these defenses fail as a matter of law.[10]

## CONCLUSION

For the reasons set forth above, Verizon respectfully requests that the Court grant it summary judgment on all counts in Verizon's Complaint.

---

[9]     Similarly, the City's Fourth and Eighth Affirmative Defenses (Dkt. 23 at 2-3) also amount to improper collateral attacks on the *Barriers Order*.

[10]    The rest of the City's alleged affirmative defenses are either inapplicable or meritless.

Dated: New York, New York          KELLEY DRYE & WARREN LLP
        October 20, 2021

By:    /s/ Damon W. Suden      
              Damon W. Suden
              Geoffrey W. Castello
              3 World Trade Center
              175 Greenwich Street
              New York, NY 10007
              Tel: (212) 808-7800
              Email: dsuden@kelleydrye.com

              Edward A. Yorkgitis, Jr. (*pro hac vice*)
              3050 K Street, N.W.
              Washington, D.C. 20007
              Tel: (202) 342-8400
              Email: cyorkgitis@kelleydrye.com

              Lauri A. Mazzuchetti (*pro hac vice*)
              Robert N. Ward
              One Jefferson Road, 2nd Floor
              Parsippany, NJ 07054
              Tel: (973) 503-5900
              Email: lmazzuchetti@kelleydrye.com
                    rward@kelleydrye.com
              *Attorneys for Plaintiff*
              *Cellco Partnership d/b/a Verizon Wireless*