UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

CELLCO PARTNERSHIP D/B/A VERIZON
WIRELESS,

                Plaintiff,

      v.

CITY OF ROCHESTER,

                Defendant.

6:19-cv-06583-EAW-MWP

---

**PLAINTIFF'S RESPONSE TO DEFENDANT'S LOCAL RULE 56 STATEMENT OF FACTS AND STATEMENT OF ADDITIONAL MATERIAL FACTS**

---

KELLEY DRYE & WARREN LLP
3 World Trade Center
175 Greenwich Street
New York, NY 10007
Tel: (212) 808-7800

Attorneys for *Plaintiff*
*Cellco Partnership d/b/a Verizon Wireless*

## <u>TABLE OF CONTENTS</u>

<b>Page</b>

RESPONSE TO DEFENDANT'S LOCAL RULE 56 STATEMENT OF FACTS ..................... 1

STATEMENT OF ADDITIONAL MATERIAL FACTS ........................................................ 11

I.    VERIZON INTENDS TO DEPLOY FACILITIES IN THE CITY'S ROW .................................................................................................... 13

II.   THE CITY ADOPTED A NEW TELECOMMUNICATIONS CODE THAT IMPOSES EXCESSIVE FEES THAT ARE NOT COST-BASED ................................................................................................ 14

    A.   Prior To The Barriers Order, The City Considers A Fee Structure For Telecom To Generate Revenue, Rather than Recover Costs ........... 14

    B.   The City Enacted The Code With Revenue Generating Fees Substantially Similar To Those It Considered Pre-Barriers Order .......... 15

III.  SUMMARY OF FEES CHARGED BY THE CITY PURSUANT TO THE CODE .............................................................................................. 16

    A.   The Code's One-Time Permit and Registration Fees .............................. 16

    B.   The Code's Recurring Fees ..................................................................... 17

    Additional Fees. ..................................................................................................... 19

IV.  THE CITY'S SPREADSHEET ....................................................................... 19

    A.   The City Created The Spreadsheet After Enacting The Code And In Anticipation Of Litigation ................................................................. 20

    B.   Summary Of The Spreadsheet's Conclusions .......................................... 21

    C.   The Spreadsheet Does Not Approximate "Actual" Costs And Its Estimates Are Unreliable ....................................................................... 24

    D.   The City Does Not Distinguish Between Recurring And Non-Recurring Costs And Results In Repeatedly Collecting The Same One-Time Costs ...................................................................................... 26

    E.   The City Has Not Measured Its Incremental Costs, or Costs That Are "Caused By" Telecommunications Equipment in The ROW .......... 27

V.   VERIZON'S EXPERT OFFERS UNREBUTTED OPINIONS DEBUNKING THE SPREADSHEET .............................................................. 32

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule of Civil Procedure 56(b)(2), Plaintiff Cellco Partnership d/b/a Verizon Wireless ("Verizon") submits, in opposition to defendant City of Rochester's (the "City") motion for summary judgment, the following response to the City's statement of facts and Verizon's statement of additional material facts.

## RESPONSE TO DEFENDANT'S LOCAL RULE 56 STATEMENT OF FACTS

1.     Undisputed.

2.     Disputed to the extent this statement contains a legal conclusion and thus is not a proper assertion of fact to which any response is required.  Further disputed to the extent the statement is inconsistent with the referenced municipal code (the "Code") and Verizon refers to the Code, which speaks for itself, for a full and accurate statement of its contents.

3.     Undisputed that the quoted language appears in the section of the Code cited.

4.     Undisputed that the quoted language appears in the section of the Code cited.

5.     Undisputed that the quoted language appears in the section of the Code cited.

6.     Undisputed that the quoted language appears in the allegation of the Complaint cited.

7.     Disputed to the extent the City mischaracterizes the referenced presentation and Verizon's subsequent actions.  On or about October 9, 2018, Verizon met with City officials and gave a presentation in which Verizon outlined plans for the installation of small cell wireless facilities in the City's rights-of-way ("ROW") (App. Ex.[1] G ¶ 5)—not the abstract "potential for 5G technology."  As part of that presentation, Verizon identified proposed locations for the installation of 511 5G small wireless facilities on City poles, smart poles, or utility poles

---

[1]     "App. Ex." refers to the exhibits attached to Verizon's Appendix to Local Rule 56.1 Statement of Additional Material Facts, submitted herewith.  This appendix contains the same exhibits as in Verizon's appendix submitted in support of its own motion (Dkts. 58-3 to 58-29).

throughout the City (App. Ex. G ¶ 5)—not the abstract "imagining" of the installation of facilities. Around the same time the City was moving forward with plans to enact the Code with its unlawful fees.  (App. Exs. L, M at 3, N, O.)

Just three months after its presentation to the City, on or around January 10, 2019, Verizon petitioned the City in writing not to enact the Code because it proposed to charge fees in violation of federal law and such fees would materially inhibit Verizon from carrying out its plans to install numerous facilities in the City right-of-way.  (App. Ex. G ¶ 7.)  The City enacted the Code anyway in February, 2019.  (*See* No. 1, *supra*.)  On April 15, 2019, by letter, Verizon sought clarification from the City as to whether it believed the Code complied with federal law, and, if so, to provide support for that belief.  (App. Ex. G ¶ 9.)  Verizon advised the City in that letter that it was eager to deploy wireless network infrastructure to enable it to offer next-generation wireless services in the City, but the City's response would affect Verizon's ability to do so.  (App. Ex. G ¶ 9.)  On April 29, 2019, the City advised Verizon that it contended the Code's fees comply with federal law.  (App. Ex. G ¶ 10.)  On July 30, 2019, the City wrote Verizon and advised that in order to be in compliance with the Code, Verizon was required, by October 1, 2019, to register under Section 106-5 of the Code, complete and enter into a Master License Agreement, complete Permit applications as necessary, and make "payment of all fees and compensation due to the City that accrued as of the effective date of [the Code]."  (App. Ex. G ¶ 11.)

With that deadline fast approaching, Verizon brought this action to remove the barrier to its deployment plans presented by the City's Code.  (Dkt. 1.)  The continuing regulatory obstacles and regulatory uncertainty posed by the Code affect Verizon's ability to deploy necessary infrastructure and harm the company.  (App. Ex. G ¶ 12.)  The record shows that as of September 28, 2020, Verizon had a number of projects for the installation of small cell wireless facilities that

were on hold because of the fees that are the subject of this lawsuit.  (App. Ex. G ¶ 13.)  These projects cannot proceed with the City's fees in place.  (App. Ex. G ¶ 13.)  As of September 28, 2020, Verizon also had a number of projects for the installation of small cell wireless facilities on privately-owned rooftops in the City that likewise were on hold because the network design required companion facilities in the ROW.  (App. Ex. G ¶ 14.)  These projects also cannot proceed with the City's fees in place.  (App. Ex. G ¶ 14.)  Verizon still intends to pursue the small cell and rooftop projects provided the fees charged in the Code comply with federal law (subject to any updates that may be necessary due to the passage of time).  (App. Ex. G ¶ 15.)

8.    Disputed to the extent that Verizon disclosed in discovery that two affiliated companies have existing telecommunications facilities in the City ROW.  (App. Ex. G ¶¶ 16-18.) This statement is also immaterial because Verizon need not have existing facilities in the ROW to pursue its claims.  It need only demonstrate that it has "an actual and well-founded fear that the law will be enforced against it"—for example, in connection with a future application to deploy planned new facilities.  *Pac. Capital Bank, N.A. v. Connecticut*, 542 F.3d 341, 350 (2d Cir. 2008).

9.    Undisputed that Verizon has not "registered under the City's Telecom Code" or "enter[ed] into a Master License Agreement."  Disputed that Verizon "has not sought to undertake any work in the City's right of way to install any telecommunications facilities."  Verizon has "sought to undertake" such work, as explained above, but its efforts were stymied by the enactment of the Code and the City's clear expression that it would enforce and apply the Code to Verizon. *See* No. 7, *supra*.  This statement is also immaterial because Verizon need not engage in any of the listed activities to pursue its claims.  *Cellco P'ship v. City of Rochester*, 473 F. Supp. 3d 268, 281 (W.D.N.Y. 2020) ("Plaintiff was not required to submit to the Code before challenging it in court.") (citing *Bach v. Pataki*, 408 F.3d 75, 82-83 (2d Cir. 2005) and *Williams v. Lambert*, 46

3

F.3d 1275, 1280-81 (2d Cir. 1995)); *Pac. Capital Bank, N.A.*, 542 F.3d at 350 (plaintiff need only demonstrate "that it has 'an actual and well-founded fear that the law will be enforced against' it'").

10.     Disputed.  Verizon affiliates have telecommunications facilities in the City ROW. *See* No. 8, *supra*.  On July 30, 2019, the City wrote to Verizon that "the time for compliance with the Code is fast approaching" and urged Verizon to commence the Registration process, complete a Master License Agreement, and make "payment of all fees and compensation due to the City that accrued as of the effective date of this chapter" on or before October 1, 2019.  (App. Ex. G ¶ 11.)  This statement is also immaterial because Verizon does need to be charged any fees to maintain this action.  *Cellco*, 473 F. Supp. 3d at 281 ("Plaintiff was not required to submit to the Code before challenging it in court.") (citing *Bach v. Pataki*, 408 F.3d 75, 82-83 (2d Cir. 2005) and *Williams v. Lambert*, 46 F.3d 1275, 1280-81 (2d Cir. 1995)); *Pac. Capital Bank, N.A.*, 542 F.3d at 350 (plaintiff need only demonstrate "that it has 'an actual and well-founded fear that the law will be enforced against' it'").

11.     Disputed.  This statement mischaracterizes Verizon's claims and the governing law. Verizon alleges that the Code violates and is preempted by Section 253 because the fees charged in the Code are not cost-based as required by the *Barriers Order* (*In re Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Investment*, 33 FCC Red 9088 (2018)) and, with respect to small cell fees, are higher than the presumptively reasonably rates. Dkt. 1 at ¶¶ 79-86, 88-94; *Barriers Order* ¶¶ 50, 79, 80, n.131, n.233; Dkt. 58-1 (Verizon's memorandum of law in support of motion for summary judgment).  Moreover, such fees, according to the *Barriers Order*, have the effect of prohibiting the provision of telecommunications services as a matter of law regardless of whether Verizon can afford to pay them.  *Cellco*, 473 F. Supp. 3d

at 281 ("Plaintiff's ability to pay the fees mandated by the Code does not affect whether the Code is preempted by federal law.").

12.    Undisputed that the cited Section 106-15(B)(4) of the Code provides for an annual fee of "One thousand five hundred dollars per standard City-owned pole."  Disputed that this is the only fee charged per small cell pole attachment by the Code.  Other fees include, for example, fees for fiber backhaul facilities required to connect to the small cell pole attachment (Code § 106-15(B)(1-2)), permit fees (Code § 1016-15(F); App. Ex. B at 70:11-20), registration fees (Code § 106-15(A)), fees associated with a master license agreement with the City (Code § 106-15(A)), and "any other applicable fees, including but not limited to permit fees, registration costs, or other costs established by [Chapter 106 of the Code] or by Chapter 104, any rental amounts for lease of City municipal facilities and all special assessments and taxes of whatever nature" (Code § 106-15(F)).

13.    Undisputed that the quoted language appears in Section 106-15(B)(1)(a) of the Code.  Disputed that the quoted language appears in Section 106-15(B)(2) of the Code.  Further disputed to the extent the fees charged by the City "for underground or aerial conduit" are not limited to the amounts quoted.  Other fees include, for example, permit fees (Code § 1016-15(F); App. Ex. B at 70:11-20), registration fees (Code § 106-15(A)), fees associated with a master license agreement with the City (Code § 106-15(A)), and "any other applicable fees, including but not limited to permit fees, registration costs, or other costs established by [Chapter 106 of the Code] or by Chapter 104, any rental amounts for lease of City municipal facilities and all special assessments and taxes of whatever nature" (Code § 106-15(F)).

14.    Undisputed that Verizon is a wholly owned subsidiary of Verizon Communications Inc.  Disputed to the extent the statement mischaracterizes Verizon's claim.  *See* No. 11, *supra*.

Undisputed that Verizon has not provided "any information on its ability to afford the City's fees," but this is because the Magistrate Judge ruled that such information was irrelevant to the litigation under governing federal law and denied the City's motion to compel discovery of such information. (Dkt. 53.) Information about Verizon's ability to afford the City's fees has no bearing on the claims in this proceeding. *Cellco*, 473 F. Supp. 3d at 281 ("Plaintiff's ability to pay the fees mandated by the Code does not affect whether the Code is preempted by federal law.").

15. Undisputed that Verizon is not publicly traded. Disputed to the extent the phrase "few public filings" is vague and the ability of Verizon to "demonstrate its revenues or assets" is immaterial. *Cellco*, 473 F. Supp. 3d at 281 ("Plaintiff's ability to pay the fees mandated by the Code does not affect whether the Code is preempted by federal law.").

16. Disputed to the extent the statement misstates the contents of the cited 10-k filing, which speaks for itself and to which Verizon refers for a full and accurate statement of its content. Disputed that the 10-k demonstrates that "plaintiff has significant cash on hand" because the 10-k does not make any statements about the cash on hand of plaintiff (as opposed to its parent company). Also disputed because the statement is immaterial. *Cellco*, 473 F. Supp. 3d at 281 ("Plaintiff's ability to pay the fees mandated by the Code does not affect whether the Code is preempted by federal law.").

17. Disputed because the statement does not cite to admissible evidence or evidence that can be presented in admissible form at trial as required by Federal Rule 56(c)(1)(A) and Local Rule 56(a)(1). Rather, the City cites to an untitled document attached to an attorney declaration without any explanation of what it is, who created it, under what circumstances, from what data (if any), and for what purpose. To the extent it purports to show the per-pole annual fees for small cell attachments in various localities, there is no foundation from any witness with personal

6

knowledge explaining where the data in the chart came from, how it was verified, and whether, as alleged, it reflects amounts "regularly paid" by Verizon.  Thus, the document is inadmissible hearsay.  *See* Fed. R. Evid. 802.  It also appears to be a summary document of some kind but the City never produced the underlying documents or data from which this document may have been created and, therefore, the document is inadmissible as a summary document under Federal Rule of Evidence 1006.  Also disputed because the amounts that Verizon may be paying in fees in other municipalities are immaterial to the question of whether the City's fees are cost-based as required by the *Barriers Order*.

18.     Disputed.  *See* No. 17, *supra*.

19.     Disputed. *See* No. 17, *supra*.  Also disputed because whether Verizon has challenged any of the fees charged by other municipalities is immaterial to the issue of whether the City's fees are cost-based as required by the *Barriers Order*.

20.     Disputed.  The cited evidence does not demonstrate that the City's "fees are less than a reasonable approximation of the City's costs for right of way maintenance related to the telecommunications facilities" for all of the reasons set forth in Verizon's accompanying opposition brief to the City's motion for summary judgment (*see* Argument Section I), Verizon's separate motion for summary judgment (Dkt. 58-1 at 16-27), the unrebutted report of Verizon's expert, Chris Dippon (Dkt. 58-4), Verizon's Statement of Additional Facts set out below (*see* Nos. 61-161), and the motions for summary judgment and expert reports submitted by the plaintiffs in the two related actions pending before the Court challenging the Code (*see* Brief, *Crown Castle Fiber LLC v. City of Rochester*, No. 6:20-cv-06866-EAW-MWP (W.D.N.Y.) (the "*Crown Castle Action*"), Dkt. 26-1 at 14-25, 28-29; Report, *Crown Castle Action*, Dkt. 26-29; Brief, *ExteNet Sys.,*

*Inc. v. City of Rochester*, No. 6:20-cv-07129-EAW-MWP (W.D.N.Y.) (the "*ExteNet Action*"), Dkt. 30-1 at 20-29; Report, *ExteNet Action*, Dkt. 30-25).

21.     Undisputed that Mr. Tobias prepared the referenced spreadsheet.  Disputed that Mr. Tobias' actions constituted a "cost analysis," let alone of costs that are specifically related to and caused by telecommunications facilities in the City's ROW, as required by federal law.  (*See generally* App. Ex. A; Dkt. 58-1; *see also infra* Statement of Additional Facts Nos. 61-161.)

22.     Undisputed that Verizon deposed Mr. Tobias as the City's Federal Rule of Civil Procedure 30(b)(6) designee, including concerning the referenced spreadsheet.

23.     Disputed because the referenced spreadsheet does not reflect an "approximation of City costs related to" either small cell pole attachments or fiber backhaul.  (*See generally* App. Ex. A; Dkt. 58-1; *see also infra* Statement of Additional Facts Nos. 61-161.)  Moreover, Mr. Tobias testified that the first five pages of the printed spreadsheet (reflected in the first tab of the native Excel file) includes both supposed costs related to the installation of small cells and the costs associated with installing the fiber necessary to operate those small cells.  (App. Ex. C at 287:12-290:5.)

24.     Disputed.  Mr. Tobias did not "evaluate[] the amount of time spent by various staff members in different departments of the City in relation to telecommunications facilities in the right of way."   Rather, Mr. Tobias claims that he had oral conversations with a sampling of unidentified City employees, but he does not recall who he spoke to and he did not keep any notes of those conversations.  (App. Ex. B at 126:13-127:11, 136:4-9, 144:12-17.)  The City did not keep or maintain any supporting documents, work papers, notes, or other records reflecting the time spent by City employees on tasks related to telecommunications facilities in the ROW.  (App. Ex. B at 50:21-51:8.)  In fact, the City admits that it does not track actual costs associated with such

installations.  (App. Ex. V.)  The spreadsheet only contains estimated costs.  (App. Ex. A at Ex. A ¶¶ ES9, 35, 61, 63; App. Ex. B at 110:5-19; 127:22-128:6.)  Mr. Tobias also admits that he did not make any effort to determine which of those alleged, estimated costs in the spreadsheet were one-time costs versus recurring costs.  (App. Ex. B at 259:7-260:10.)  Mr. Tobias also included in the spreadsheet many costs that were not related to or caused by the deployment of telecommunications facilities.  (App. Ex. B at 105:13-22; App. Ex. AA at COR 000677; App. Ex. C at 221:4-16; App. Ex. Z at 140:9-142:18.)  Although the City claimed in discovery responses that the estimated costs in the spreadsheet were incremental costs (App. Ex. K at Interrog. Resp. No. 1), Mr. Tobias admitted that was incorrect and that the spreadsheet did not include incremental costs.  (App. Ex. B at 124:3-9)  Mr. Tobias further admitted that the employee salaries and benefits making up costs in the spreadsheet would not change depending on the number of small cells or other facilities installed in the City ROW.  (App. Ex. B at 124:3-9, 130:9-17, 135:14-17.)  Also, the spreadsheet allocates employees' full-time equivalency percentages to its purported maintenance of small cell attachments and fiber backhaul using an undefined ratio that varies from task to task and the City has not explained how the ratio was derived or why it varies. (App. Ex. A ¶ 35.)

25.     Disputed for the reasons explained in response to statement 24, *supra*.

26.     Disputed for the reasons explained in response to statement 24, *supra*. Further disputed that Mr. Tobias "arrive[d] at a per-facility cost."  Although his testimony was somewhat unclear and inconsistent, Mr. Tobias suggested that the purported annual cost reflected in the spreadsheet related to the 88 small cells that were already installed in the City when the spreadsheet was prepared.  (App. Ex. C at 321:24-322:3.)  The spreadsheet then assumes that there may be 200 or 300 installations in future years and further assumes that the aggregate annual costs would stay

the same.  (App. Ex. R at 10.)  Thus, this is not a "per-facility cost."  Mr. Tobias did not calculate costs increasing from additional installations.  (App. Ex. C at 326:2-16.)

27.     Disputed for the reasons explained in response to statement 24, *supra*.  Also disputed that Mr. Tobias determined costs on a "per-facility basis."  Mr. Tobias suggested that the purported annual cost reflected in the spreadsheet related to the 88 small cells that were already installed in the City when the spreadsheet was prepared.  (App. Ex. C at 321:24-322:3.)  The spreadsheet then assumes that there may be 200 or 300 installations in future years and further assumes that the aggregate annual costs would stay the same.  (App. Ex. R at 10.)  Thus, this is not a "per-facility cost."  Mr. Tobias did not calculate costs increasing from additional installations. (App. Ex. C at 326:2-16.)  Also disputed that the City's fees for a pole attachment are limited to $1,500 (*see* No. 12, *supra*) or that $1,500 is "less than the City's approximate costs" (*see* No. 20, *supra*).

28.     Disputed for the reasons explained in response to statement 24, *supra*.  Also disputed that Mr. Tobias calculated the City's "per linear foot" cost for "linear telecommunications facilities."  Mr. Tobias testified that the City's budget would not be changed depending on the amount of telecommunications facilities in its ROW, nor would any employee's salary change depending on the extent of installations.  (App. Ex. B at 130:3-13, 133:21-24.)  Further disputed that "[t]he City charges $10,000 for the first 2,500 of linear feet of telecommunications conduit, which comes to $4 per foot" and "the per-foot fee decreases as additional facilities beyond the first 2,500 feet are installed."  The Code provides, in the first year of deployment, for underground installations, the fee for open trenching requires the provider to pay "$10,000 for up to 2,500 feet of telecommunications facilities per contiguous site, per conduit or multiple conduits up to five inches total in diameter in the right-of-way."  (Code at § 106-15(B)(1)(a).)  Further disputed that

10

"the small cell attachment fee" and "the fees for underground and aerial linear facilities are less than the City's approximate costs."  *See* No. 20, *supra*.

## STATEMENT OF ADDITIONAL MATERIAL FACTS

The following additional material facts are also set forth in Verizon's Local Rule 56 Statement of Facts (Dkt. 58-2) submitted in support of its own motion for summary judgment (Dkt. 58-1).  Because they support the denial of the City's motion, Verizon reasserts them here.

1.     The installation of small cell infrastructure is straightforward, and generally comprised of two components: (a) the installation of a small cell attachment to street-light or other utility pole; and (b) connecting that attachment to underground or aerial fiber facilities in the right-of-way ("ROW").  (App. Ex. A at Ex. A ¶ 9; *see also* App. Ex. B at 65:18-66-3; App Ex. C at 267:12-25.)

2.     These underground and aerial fiber facilities, referred to in the industry as "backhaul," are cables or fiber that connect the small cells to the larger network.  (App. Ex. A at Ex. A ¶ 9; *see also* App. Ex. B at 65:18-66:3; App. Ex. C at 267:12-25.)

3.     Small cells rely on backhaul to carry traffic.  (App. Ex. A at Ex. A ¶ 16.)

4.     Louis Tobias testified as the City's designee in response to a deposition notice pursuant to Federal Rule of Civil Procedure 30(b)(6).  (App. Ex. B at 15:8-16:5; App. Ex. D.)

5.     Mr. Tobias is the Director of Telecommunications and Special Projects for the City. (App. Ex. B at 22:13-18.)

6.     Mr. Tobias confirmed that small call attachments must be connected to the network by using backhaul.  (App. Ex. B at 65:18-66-3; App. Ex. C at 267:12-25.)

7.     Mr. Tobias described backhaul as "the infrastructure . . . the small cell connects to." (App. Ex. C at 267:12-14.)

8.      The City has published *Rules and Regulations for Work in the Right-of-Way, City of Rochester, New York, Department of Environmental Services*, Bureau of Architecture and Engineering, Regulations authorized by Rochester City Code, Chapter 104, April, 1 2019, Updated April 5, 2019 ("*ROW Rules*").  (App. Ex. E.)

9.      Section 9 of Rochester's *ROW Rules* details the respective responsibilities of the carrier/provider (the permittee) and the services offered by the City.  The *ROW Rules* make clear that when a wireless carrier or other applicant seeks to attach a small cell to a City-owned pole or install fiber backhaul cable, the carrier/applicant takes on most of the planning, organizing, and execution independently and at its own costs.  (App. Ex. E at § 9.)

10.     Pursuant to the *ROW Rules*, the City requires carriers/providers to submit an application that, in addition to standard information, includes a description of the applicant's existing and proposed telecommunications facilities and equipment within the City, an anticipated construction schedule for the next two years, and a description of the excess capacity of the applicant's facilities (including underground conduits) available for expansion or colocation of other providers.  (App. Ex. E at § 9.)

11.     Pursuant to the *ROW Rules*, the City requires carriers/providers to offer proof that existing pole locations are not suitable for its needs before submitting a permit for a new pole location.  (App. Ex. E at § 9.)

12.     Pursuant to the *ROW Rules*, the City requires carriers/providers to transfer ownership of all new poles to the City.  (App. Ex. E at § 9.)

13.     Pursuant to the *ROW Rules*, the City requires carriers/providers to provide post-installation information to the City.  (App. Ex. E at § 9.)

14.     Pursuant to the *ROW Rules*, the City requires carriers/providers to conduct annual inspections, if applicable, and submit certifications to the City.  (App. Ex. E at § 9.)

15.     Pursuant to the *ROW Rules*, the City requires carriers/providers to maintain all facilities, including installed landscaping, and remove any graffiti and posters.  (App. Ex. E at § 9.)

16.     Pursuant to the *ROW Rules*, the City requires carriers/providers to each year supply a GIS map (indicating locations as well as detail on the length of the fiber, diameter of the duct, etc.) in electronic form to the City.  (App. Ex. E at § 9.)

17.     Pursuant to the *ROW Rules*, the City requires carriers/providers to be "solely responsible for construction, installation and maintenance of its facilities."  (App. Ex. E at § 9.)

18.     The *ROW Rules* do not identify any post-installation tasks that the City will assume. (*see generally* App. Ex. E.)

19.     The *ROW Rules* provide that the City retains "the right at all times to inspect the facilities to assure compliance with all Permits or approvals granted by City."  (App. Ex. E at § 9.20.)

20.     The City's internal documents reflect that, in the years subsequent to an installation, "the permit office is done unless there is an issue or a complaint[]."  (App. Ex. F at 2.)

I.     **VERIZON INTENDS TO DEPLOY FACILITIES IN THE CITY'S ROW**

21.     To better serve its customers and the City, and to begin to serve new customers and provide new services, Verizon has sought to extend, densify, and upgrade its wireless network infrastructure in the City, including to install small cell wireless infrastructure to support the provision of current and next-generation telecommunications services, such as 5G.  (App. Ex. G ¶ 3.)

13

22.     Verizon would need to deploy fiber to connect these facilities to the network.  (App. Ex. A at Ex. A ¶ 9; *see also* App. Ex. B at 65:16-66-3; App. Ex. C at 267:12-25.)

23.     In October 2018, Verizon gave a presentation to the City reflecting Verizon's anticipated plans for the installation of small wireless facilities, including the conceptual location of small wireless facilities on City poles, smart poles, or utility poles.  (App. Ex. G at ¶¶ 5-6.)

24.     Verizon thereafter continued to express its eagerness to deploy facilities, while raising concerns and even proposing revisions to the anticipated Code to ensure it complied with the *Barriers Order*, which the City rejected.  (App. Ex. G at ¶¶ 7-10; Dkt. 1 ¶¶ 68-69, 71; Dkt. 3 at 2-3; Dkt. 23 ¶¶ 1, 7-8.)

25.     As a result of the parties' dispute, Verizon put on hold a number of projects for the installation of small wireless facilities on City poles and on privately-owned rooftops that required access to the ROW.  (App. Ex. G at ¶¶ 12-15.)

## II.     THE CITY ADOPTED A NEW TELECOMMUNICATIONS CODE THAT IMPOSES EXCESSIVE FEES THAT ARE NOT COST-BASED

### A.     Prior To The *Barriers Order*, The City Considers A Fee Structure For Telecom To Generate Revenue, Rather than Recover Costs

26.     In or about May 2018, the City discussed "How can the City of Rochester profit from the new 5G transformation?"  (App. Ex. H at 6.)

27.     City "draft" minutes for a May 24, 2018 City "Smart City" Technology Governance Committee meeting include that a participant asked:  "How can the City of Rochester profit from the new 5G transformation?"  (App. Ex. H at 6.)

28.     On July 23, 2018, the Mayor was briefed by City officials that the revised fees would generate "revenue" for the City (rather than being cost-based) and that the new Code was based on, among other things, "Law Department review of codes from other cities, federal law and

14

regulations, articles, treatises, and seminars on telecommunications" with input from consultants (i.e., not based on the City's own costs).  (App. Ex. I at 1.)

29.     A draft of the Code prior to the Barriers Order referred to the fees as reflecting "fair market value rental compensation" for use of the ROW.  (App. Ex. J at COR 003619.)

**B.     The City Enacted The Code With Revenue Generating Fees Substantially Similar To Those It Considered Pre-*Barriers* Order**

30.     The City was aware of the federal law discussed in the *Barriers Order* when it drafted the Code.  (Dkt. 23 ¶ 6; App. Ex. K at Interrog. Resp. No. 4.)

31.     On September 11, 2018, the City's counsel wrote to New York City's counsel and recognized that the federal law confirmed by the *Barriers Order* presented an obstacle to the City's plans to profit from the ROW via the proposed Code provisions.  Specifically, the City's counsel admitted that the *Barriers Order* "would seriously and adversely impact [the City's] proposed code and the City's ability to manage our ROW."  (App. Ex. L.)

32.     On or about September 18, 2018, the City's mayor wrote to the FCC Secretary Marlene Dortch imploring her to oppose the adoption of the *Barriers Order* and challenging the $270 presumptively valid fee for small cell attachments—not because it failed to allow the City to recover its costs—but as insufficient to cover "market value."  (App. Ex. M at 3.)

33.     After the FCC rejected such arguments and adopted the *Barriers Order*, rather than revise its draft Code to charge fees based on its own costs caused by the deployment of the facilities, in or about December 2018, the City continued to focus on fee structures imposed by other municipalities.  (*See* App. Exs. N, O.)

34.     Ultimately, drafts of the Code show that the City did little more than remove buzzwords—for example, replacing "fair market value rental compensation" with "license fee." (App. Ex. J at COR 003598, COR 003619.)

35.     Much of the actual fee scheme in the final version of the Code remained substantially similar to what the City had proposed all along to generate revenue and "profit" from what it perceived as the market value of the ROW, instead of recovering its costs.  (*Compare* App. Ex. J at COR 003619 at §§ B.1, B.2, B.4, *with* App. Ex. P (Code) at § 106-15(B)(1)-(B)(2).)

## III.    SUMMARY OF FEES CHARGED BY THE CITY PURSUANT TO THE CODE

### A.    The Code's One-Time Permit and Registration Fees

36.     Pursuant to the Code, the City charges a one-time permit fee for work within the ROW at a rate of $2,000 per existing pole and $2,500 per each replacement pole.  (App. Ex. Q at 3 ¶ 11; App. Ex. P (Code) at § 1016-15(F).)

37.     Mr. Tobias testified that "there may be some other permitting fees that are associated with such an application" beyond this permit fee.  (App. Ex. B at 70:11-20.)

38.     The City's Mayor stated in a submission to the FCC that the permit fee was intended to cover "the comprehensive services required for each application, including clerical time for accepting and processing an application, engineering review of the application, plans and drawings, site inspections as described above, attendance at public meetings, preconstruction meetings with contractors, review of as-built documents and follow-up inspection of involved cities, and [the City] concluded that the actual costs to the City are approximately $2,000."  (App. Ex. M at 3; App. Ex. B at 71:2-75:4, 77:10-78:2.)

39.     In other words, the City purports to recover its claimed costs for these activities through one-time fees, but then also recovers the same claimed costs for those same activities—which the City admits only occur during the application/installation process—each and every year thereafter through the Code's annually recurring fees.  (*Id.*)

40.     These same activities that form the basis for these one-time fees also are used by the City to justify its recurring fees.  (App. Ex. B at 71:2-75:4, 77:10-78:2; App. Ex. C at 259:14-

260:6; App. Ex. A at Ex. A ¶¶ 57-59; App. Ex. F at 2; App. Ex. R at 1-2, 4-7, 9-10; App. Ex. E at § 9.)

41.     In addition to the permit fee, which by itself exceeds the FCC's presumptively valid fee amount, applicants are also required to pay an initial registration fee of $1,000 to cover "administrative costs of processing registration information and materials, including all subsequent information updates required during the term of a master license agreement."  (App. Ex. P (Code) at § 106-15(A).)

42.     In addition, the City requires a provider to enter a master license agreement with the City.  (App. Ex. P (Code) at § 106-4.)

43.     Upon the expiration of a master license agreement, the City imposes another $500 fee.  (App. Ex. P (Code) at §106-15(A).)

**B.     The Code's Recurring Fees**

44.     Pursuant to a section of the Code entitled "Right-of-way compensation," the City also imposes various fees that recur on an annual basis.  (App. Ex. P (Code) at §106-15(B).)

45.     Section 106-15(B) states that the fees are to be paid to the City for, among other things, "the value of the right of way and the municipal facilities."  (App. Ex. P (Code) at §106-15(B).)

**Pole Attachment Fees.**

46.     For each small cell attached to a standard pole, the Code imposes a $1,500 fee. (App. Ex. P (Code) at § 106-15(B)(4).)

47.     For each small cell attached to a smart pole, the Code imposes a $1,000 fee if the pole was installed by the licensee and, if installed by the City, "such amount as set forth in a master license agreement."  (App. Ex. P (Code) at §106-15(B)(4).)

17

48.     Where the pole is replaced by the provider, the new pole then becomes property of the City, further reducing the City's costs on the replaced pole.  (App. Ex. P (Code) at §106-15(B)(4).)

**Backhaul Fees.**

49.     In the first year of deployment, for underground installations, the fee for open trenching requires the provider to pay "$10,000 for up to 2,500 feet of telecommunications facilities per contiguous site, per conduit or multiple conduits up to five inches total in diameter in the right-of-way."  (App. Ex. P (Code) at § 106-15(B)(1)(a).)

50.     Beyond 2,500 feet, the City charges on a per-foot basis: $1.50 per foot through 12,500 feet and $0.75 per each additional foot.  (App. Ex. P (Code) at § 106-15(B)(1)(a).)

51.     If installation is through directional boring, the provider pays the City $500 per site plus the same per-foot fees: $1.50 per foot from 2,500 to 12, 500 feet and $.075 beyond 12,500 feet.  (App. Ex. P (Code) at § 106-15(B)(1)(c).)

52.     For aerial installations, the Code imposes fees of $10,000 for up to 2,500 feet of telecommunications facilities, $1.50 per foot for 2,500 through 12,500 feet of telecommunications facilities and equipment and $0.75 per foot thereafter.  (App. Ex. P (Code) at § 106-15(B)(2).)

53.     For each year after the year of installation, the City considers any existing conduit to be an "existing facility."  (App. Ex. A at Ex. A ¶ 30; App. Ex. B at 87:19-88:24.)

54.     Instead of charging on a per-site basis, the City charges on a per-foot basis based on the provider's total network footage in the ROW.  (App. Ex. A at Ex. A ¶ 30; App. Ex. P (Code) at § 106-15(B)(1)(a-c); App. Ex. B at 86:3-91:5; App. Ex. S.)

55.     The Code provides fees of $5,000 for up to 2,500 feet of existing facilities, an additional $1 per foot between 2,501 and 12,500 feet, and an additional $0.50 per foot for facilities

with footage in excess of 12,500 feet.  (App. Ex. P (Code) at § 106-15(B)(1)(a-c); App. Ex. P (Code) at § 106-15(B)(2); App. Ex. B at 86:3-91:5; App. Ex. S.)

**Additional Fees.**

56.     Section 106-15(E) requires that the "Licensees shall pay the actual costs, including but not limited to the legal and engineering fees, of any expert consultant the City may reasonably require for review of applications submitted pursuant to this chapter."  (App. Ex. P (Code) at § 106-15(E).)

57.     Section 106-15(F) allows for additional registration costs and permit fees.  (App. Ex. P (Code) at § 106-15(F).)

58.     Section 104-57(H) imposes fees for certain excavation in the ROW.  (App. Ex. P (Code) at §104-57(H).)

59.     Section 104-57(B) requires companies performing work in the City to pay an annual maintenance fee.  (App. Ex. P (Code) at §104-57(B).)

60.     Section 104-20 imposes 15-year extended maintenance fees and permit fees for certain excavations.  (App. Ex. P (Code) at §104-20.)

## IV.     THE CITY'S SPREADSHEET

61.     Verizon pursued from the City narrowly tailored discovery regarding whether its fees are a reasonable approximation of its objectively reasonable costs, as per the *Barriers Order*. (App. Ex. T at Interrog. No. 1; App. Ex. U at RFP No. 1.)

62.     The City admitted that "[t]he City . . . does not specifically and independently track all costs related to telecommunications in the right of way."  (App. Ex. V.)

63.     The City relies on a two-tabbed Microsoft Excel spreadsheet purporting to represent an analysis of the City's "costs" (the "Spreadsheet").  (App. Ex. K at Interrog. Resp. No. 1, RFP Resp. Nos. 1, 3.)

19

64.     The City contends that the Spreadsheet is:  "an analysis of recurring annual costs resulting from the installation and maintenance of small cell wireless facilities in the City right of way . . . and recurring annual costs related to installation and maintenance of fiber and fiber conduit in the right of way, both aerial and underground."  (App. Ex. K at Interrog. Resp. No. 1.)

65.     The City claims that "[t]his analysis was performed . . .  in an ongoing fashion, during the drafting of the City Code Chapter 106, following its adoption, and during the pendency of this action."  (App. Ex. W at 5.)

## A.     The City Created The Spreadsheet After Enacting The Code And In Anticipation Of Litigation

66.     The Spreadsheet was not created until April 17, 2019—after the City adopted the Ordinance that amended the Code in February 2019, and after the Ordinance's effective date of April 1, 2019.  (App. Ex. B at 145:5-23, 147:24-149:6; App. Ex. X; Dkt. 23 ¶ 1.)

67.     Mr. Tobias could not identify any portions of the Spreadsheet's analysis that were performed prior to the adoption of the Code.  (App. Ex. B at 146:15-147:3.)

68.     Although Mr. Tobias may have starting working on preliminary steps of his analysis before April 2019, *i.e.*, gathering information, he testified that there was not a "prior iteration" of the Spreadsheet.  (App. Ex. B at 147:24-148:16.)

69.     Mr. Tobias testified that the Spreadsheet itself was prepared in anticipation of litigation from Verizon and others.  (App. Ex. Y at 73:17-85:20; App. Ex. B at 157:8-14.)

70.     Regarding the Spreadsheet, Mr. Tobias testified:  "When we were doing the final analysis, what I was trying to get to was to make sure that our $1,500 number was reasonable or below our actual cost because that was the driver of the final exercise as it related to the lawsuit." (App. Ex. B at 157:8-14.)

20

71.    A "Telecommunications Legislative Package" prepared by the City notes in a section titled "Concerns":

> 1. Push-back from the industry: We have already heard from Charter and Verizon objecting to ROW fees and anticipate considerable push-back from Frontier and others.
>
> 2. Legislation or Regulation: A simple ruling by the FCC or adoption of Federal or State legislation could render portions of the ordinance unenforceable or require substantial amendments.
>
> 3. Litigation: There is always a risk of litigation, especially considering the deep pockets impacted by this legislation.

(App. Ex. I at 3.)

### B.    Summary Of The Spreadsheet's Conclusions

72.    The Spreadsheet lists numerous tasks, categorizing such tasks by City department, that allegedly relate to small cells and backhaul facilities.  (*See generally* Ex. R.)

73.    For each task, the Spreadsheet allocates a fraction of existing full time City employees' time, or full time equivalency (FTE), multiplied by corresponding approximate annual compensation for those employees in order to approximate the "cost" to the City.  (App. Ex. A at Ex. A ¶ 35.)

74.    The Spreadsheet suggests that 1,118 City employees from 15 departments must work a total of 49,805 hours per year, which would be equal to 192 hours per day, on tasks related to small wireless and fiber backhaul facilities.  (App. Ex. A at Ex. A ¶ ES9.)

75.    The number of work hours in the Spreadsheet does not change based on the number of applications received or installations performed.  The City assumes its employees would work the same number of hours in the event of a single small cell installation, 200 small cell installations, or 300 small cell installations.  (App. Ex. B at 154:5-165:25; App. Ex. R at 10.)

76.     In other words, the Spreadsheet indicates that the City employees would work the same number of hours and earn the same salaries (*i.e.*, incur the same cost) regardless of whether or how many telecommunications installations occur.  In addition, and without any substantiation, the Spreadsheet purports to track costs that have some, attenuated nexus to telecommunications, but does not track costs that would be incurred as a result of the deployments at issue.  (App. Ex. A at Ex. A ¶¶ ES9, 60-63.)

77.     The Spreadsheet nevertheless allocates these FTE percentages to its purported maintenance of small cell attachments and fiber backhaul using an undefined ratio that varies from task to task and the City has not explained how the ratio was derived or why it varies.  (App. Ex. A at Ex. A ¶ 35.)

78.     The City has not explained how that ratio was derived, why it varies from task to task, or why it is in any way accurate.  (App. Ex. A at Ex. A ¶ 35.)

79.     The Spreadsheet then applies the FTE percentages to the loaded salaries (wages and benefits) for each City position that allegedly completes these tasks to generate annual estimates of personnel costs.  (App. Ex. A at Ex. A ¶ 35; App. Ex. K at Interrog. Resp. No. 1; *see generally* App. Ex. R.)

80.     For fiber backhaul facilities only (the second tab), the Spreadsheet also allocates varying percentages of existing and planned capital costs.  (App. Ex. C at 295:4-298:24; App. Ex. R at 1-5.)

81.     The Spreadsheet provides that small cell attachment installations to City poles cause the City to incur personnel costs totaling $1,314,218 per year.  (App. Ex. R at 10.)

82.     Without any substantiation, the Spreadsheet purports to track costs that have some, attenuated nexus to telecommunications, but does not track costs that would be incurred as a result of the deployments at issue.  (App. Ex. A at Ex. A ¶¶ ES9, 60-63.)

83.     Mr. Tobias testified that this annual cost related to the 88 small cells that were already installed in the City when the Spreadsheet was prepared.  (App. Ex. C at 321:24-322:3.)

84.     According to Mr. Tobias, this means that each small cell attachment cost the city $14,934.  (App. Ex. C at 321:25-322:3.)

85.     The Spreadsheet then assumes that there may be 200 or 300 installations in future years and further assumes that the aggregate annual costs would stay the same, resulting in $6,571 per pole for 200 attachments and $4,381 per pole for 300 attachments.  (App. Ex. R at 10.)

86.     Mr. Tobias testified that if the number of installations increased, the costs would increase accordingly—*e.g.*, if there were 1800 small cells, Mr. Tobias testified that costs could balloon to "10 million, 15 million, 20 million" dollars, but he did not calculate such amounts. (App. Ex. C at 326:2-16.)

87.     The Spreadsheet lists fiber backhaul in the ROW as causing Rochester to incur $5,285,908 in costs per year.  (App. Ex. R at 5.)

88.     For backhaul, the City allocates not only the cost of personnel, but also allocates an additional $4.3 million in capital expenditures as City costs allegedly caused by backhaul facilities. (App. Ex. R at 5.)

89.     Spread equally over the 431,567 feet of existing conduit and 431,253 feet of existing fiber in the City (*i.e.*, a total of 862,819 feet), the City estimates that each foot of fiber backhaul causes the City costs of $6.13.  (App. Ex. R at 5.)

C.    **The Spreadsheet Does Not Approximate "Actual" Costs And Its Estimates Are Unreliable**

90.    The City admits that it did not track any of its actual costs associated with telecom installations.  (App. Ex. V at 1.)

91.    The Spreadsheet is based on Mr. Tobias' conversations with City employees, asking them to tell him what they do and "how much of [their] day is done doing that."  (App. Ex. B at 127:22-128:6, 124:22-25 ("Of every one of those activities that are on that list, we called people – first of all, we sent out, you know, a request saying, hey guys, we need help.").)

92.    From those conversations, Mr. Tobias would then attempt to approximate the percentage of working time that each employee spent on telecommunications generally.  Mr. Tobias testified:  "If there was an inspector and that inspector inspects multiple things, I would say, okay, if you do a hundred inspections a week, how many of those are for this, and then they would tell me.  Then they may say to me, oh, I do ten out of a hundred.  And I would say, oh, so you spend ten percent of your time on that?  They would say yes or they may say no, no, no. . . . It was from those interviews and those conversations that we were able to come up with those allocations."  (App. Ex. B at 128:7-24.)

93.    The City did not rely on, or otherwise keep, any documentation of how its employees allocated their time among various tasks.  (App. Ex. B at 50:21-51:8.)

94.    Mr. Tobias did not speak with every City employee—rather, he at times spoke to a "representative sample;" for example, if there are "five engineer[s], maybe [he] spoke to two of them."  (App. Ex. B at 136:21-137:12.)

95.    When asked if he kept records of the conversations that formed the basis for the City's allocation of costs, Mr. Tobias testified:  "I will say that I'm sure that there's somewhere

that maybe I wrote on a piece of paper or in a pad or on an earlier version of a spreadsheet that maybe I got that said, hey, da, da, da, da."  (App. Ex. B at 126:16- 127:11.)

96.    Mr. Tobias did not keep track of the people that he spoke with to gather information. (App. Ex. B at 136:4-9.)

97.    Mr. Tobias conceded that the City has no backup worksheets, notes, or other documents to support the figures in the Spreadsheet.  (App. Ex. B at 126:13-25, 144:12-17.)

98.    In another action captioned *Crown Castle Fiber LLC v. City of Rochester*, No. 6:20-cv-06866-EAW-MWP (W.D.N.Y.) (the "Crown Castle Action"), Mr. Tobias testified that he took notes of conversation with City personnel in the process of creating the Spreadsheet but did not save those notes.  (App. Ex. Y at 156:7-157:1 ("Q: And how did you collect and memorialize those conversations? Did you take notes? A: I did. But it – yeah. The answer is yeah, I took notes. Q: Did you save those notes? A: No …."").)

99.    Mr. Tobias testified that at least some underlying documentation for the Spreadsheet "got tossed or overwritten."  (App. Ex. B at 146:6-14.)

100.    Mr. Tobias admitted that City employees do not keep track of their time in the normal course of business.  (App. Ex. B at 50:21-51:8.)

101.    Mr. Tobias conceded that the City has no backup worksheets, notes, or other documents to support the figures in the Spreadsheet.  (App. Ex. B at 126:13-25, 144:12-145:4.)

102.    Explaining how he assessed the reasonableness of the allocation of architectural permitting costs, for example, Mr. Tobias stated that "the director of that unit was probably involved when I said, hey, is this reasonable?  This is what we've come up with.  Do you think that all of the things that you do, you know, is this an appropriate amount of time that we've

allocated for that particular function?  And there is somebody that said, yeah, that's probably reasonable."  (App. Ex. B at 151:21-152:7.)

103.    Mr. Tobias testified that he may have shared drafts of the Spreadsheet "by email" with some people, but "some of them, we sat down in a room and said, hey, what do you think about this" and "hey, is this reasonable?"  (App. Ex. B at 149:23-151:25.)

104.    The only "quality control" that Mr. Tobias employed was having himself and various other city employees assess whether the estimates that he came up with were "reasonable." (App. Ex. B at 151:21-152:7.)

105.    When asked if he did "anything to make sure all of the costs [he was] counting were objectively reasonable," Mr. Tobias testified that he relied on his "common sense" and his "smell test."  (App. Ex. C at 326:24-328:1.)

**D.    The City Does Not Distinguish Between Recurring And Non-Recurring Costs And Results In Repeatedly Collecting The Same One-Time Costs**

106.    Mr. Tobias does not know which of the activities identified in the Spreadsheet as recurring activities will actually recur and which will not.  (App. Ex. B at 164:2-23.)

107.    Mr. Tobias did not perform any analysis to determine which activities occur on an up-front or one-time basis in the year of installation versus those that occur later and/or on a recurring basis.  (App. Ex. C at 259:7-260:10.)

108.    Thus, his analysis assumes that all activities recur each year, despite the fact that City records indicate the opposite—*i.e.*, that any City tasks (such as permitting) only occur once, on the front-end, prior to installation.  (App. Ex. F at 2 ("the permit office is done [once the permit is issued] unless there is an issue or a complaint[].")

109.    The Spreadsheet erroneously counts all of the "the comprehensive services" that the City's Mayor described as occurring during the application/pre-installation process ("accepting

and processing an application, engineering review of the application, plans and drawings, site inspections . . ., attendance at public meetings, preconstruction meetings with contractors, review of as-built documents and follow-up inspection of involved cities") as if those same "comprehensive services" are performed with respect to each installation each and every year after the installation is complete.  (App. Ex. A at Ex. A ¶¶ 57-59; App. Ex. M at 3; App. Ex. B at 71:2-75:4, 77:10-78:2; App. Ex. F at 2; App. Ex. E at § 9.)

110.   Mr. Tobias listed post-installation costs that the City could potentially incur, including: "[c]omplaint investigation and restorations, reinspections, field inspections, construction meetings and scheduling, lighting, A&E design, and construction, response to inquiries, are all things that happen even after the installation is complete."  (App. Ex. B at 160:8-17.)

111.   None of those costs—"[c]omplaint investigation and restorations, reinspections, field inspections, construction meetings and scheduling, lighting, A&E design, and construction, response to inquiries, are all things that happen even after the installation is complete"—are incurred as a result of a specific installation.  (App. Ex. B at 161:21-162:21, 164:2-18.)

E.   **The City Has Not Measured Its Incremental Costs, or Costs That Are "Caused By" Telecommunications Equipment in The ROW**

112.   The City's interrogatory responses described the Spreadsheet as providing "the approximate *incremental* personnel, operating and/or capital costs associated with installation and maintenance of wireless facilities in the right of way."  (App. Ex. K at Interrog. Resp. No. 1 (emphasis added).)

113.   "Incremental" in the context of a cost analysis, of course, means "the additional costs caused by a change in activity."  (App. Ex. A at Ex. A ¶ 55.)

114.    Such costs are often referred to as "differential costs" "because they represent the difference between total expenditures with and without a change in activity," or "avoidable costs" because the entity would not incur these costs but-for the change in activity."  (*Id.*)

115.    Mr. Tobias admitted at his deposition that the Spreadsheet does not reflect incremental costs caused by the facilities at issue here; rather, he testified that he misused the word "incremental" in the interrogatory response.  (App. Ex. B at 124:3-9.)

116.    Mr. Tobias further confirmed that nothing in the Spreadsheet was actually an "incremental" cost caused by the deployment of small cell or backhaul facilities, because even if there were no small cell attachments in the City, neither the salaries that formed the basis for the amounts reflected in the Spreadsheet nor the overall City budget would be reduced.  (App. Ex. B at 130:9-17, 135:14-17.)

117.    The Spreadsheet thus relies on the premise that the City incurs the same total annual costs regardless of how many attachments it oversees—a premise fundamentally inconsistent with measuring incremental costs caused by the deployment of facilities.  (App. Ex. A at Ex. A ¶¶ 37, 56.)

**Inspections.**

118.    The Spreadsheet includes alleged costs related to inspections.  (App. Ex. R at 1-3, 6-9.)

119.    Mr. Tobias testified that "I can't tell you what the recordkeeping is on" inspections.  (App. Ex. B at 101:8-10.)

120.    Mr. Tobias also testified that he had no personal knowledge of any inspections of telecommunications facilities taking place.  (App. Ex. B at 106:22-107:4.)

121.    Mr. Tobias testified that whatever knowledge he had regarding inspections comes from "talk[ing] to the people who do the work."  (App. Ex. B at 106:22-107:4.)

122.     Those people, according to Mr. Tobias, might occasionally inspect small cells when they already happened to be in the area, for example, to perform pavement work.  (App. Ex. B at 100:19-101:8.)

123.     Mr. Tobias testified, employees may, in the course of performing other duties, inspect a pole "to make sure that the streetlight is operational," or to do a "check after particularly difficult storms, weather events, and things of that sort" by "folks that are . . . out there regardless," or in connection with a downed pole caused by a motor vehicle accident.  (App. Ex. B at 101:16-19, 102:14-103:14, 97:3-23; *see also* App. Ex. Z at 140:9-142:18.)

124.     The inspections that took place, Mr. Tobias explained, were "pretty much inspections of the pole" as opposed to "specific to the small cell attachment."  (App. Ex. B at 105:13-22.)

125.     The only inspections cited to by Mr. Tobias were not caused by small cell deployments.  (App. Ex. A at Ex. A ¶¶ 44-46.)

**Street Lighting.**

126.     In the Spreadsheet Mr. Tobias allocates "Street Lighting" personnel expenses "for emergency response and repair and things of that sort" to pole attachments and fiber backhaul.  (App. Ex. R at 2, 7; App. Ex. C at 266:14-16.)

127.     The City's document titled "Telecom Fee Schedule Calculation" indicates that the expenses incurred by the Street Lighting department are exclusively for "operating, maintaining, upgrading & acquiring" streetlights.  (App. Ex. AA at COR 000677.)

**Fire, Police, Emergency.**

128.     The City allocates part of its annual salary overhead for fire, police, and dispatch departments to pole attachments and fiber backhaul.  (App. Ex. R at 4, 9.)

129.    The City would pay those same salaries to those City employees regardless of any small cell attachments or fiber deployments.  (App. Ex. B at 130:3-13, 133:21-24; App. Ex. A at Ex. A ¶ 48).

130.    Mr. Tobias admitted that, in many safety-related incidents involving poles—*e.g.*, a car colliding with a pole—the City might have to deploy one or multiple departments regardless of whether there was a small-cell attachment on the pole or not.  (App. Ex. C at 221:4-16; App. Ex. Z at 140:9-142:18.)

**Water Department.**

131.    The Spreadsheet includes a portion of the City's Water Department employees' salaries.  (App. Ex. R at 4, 9.)

132.    Mr. Tobias testified that "the water department is the division within the City that does the staking out when the permits department gets a request for someone to intrude into the right-of-way" and the water department will paint the ground to indicate where not to dig.  (App. Ex. C at 263:15-22.)

133.    Such activities are caused by the third party seeking to intrude into the ROW, not by the telecom provider.  (App. Ex. A at Ex. A ¶ 49.)

134.    The third party who applies for a permit to intrude into the ROW is subject to a permit fee that covers all costs associated with that permit, including any staking out by the water department.  (App. Ex. Q at 1; App. Ex. P (Code) at § 104-25; App. Ex. A at Ex. A ¶ 49.)

135.    Mr. Tobias testified that that no one confirmed whether such "staking out" ever took place with respect to the 88 small cells already installed in the City on which Spreadsheet is based, or will take place with respect to any future installations.  (App. Ex. C at 278:10-16.)

**Architecture and Engineering.**

136.    The City allocates a portion of its "architecture and engineering" costs to fiber backhaul as "A&E Ongoing" costs.  (App. Ex. R at 5; App. Ex. C at 299:21-300:11.)

137.    The City's Bureau of Architecture and Engineering lists the costs of 173 projects from 2014 to 2018, which include bridges, an underpass, trail landscaping, a cemetery, a water play center upgrade, repair of city-owned parking garages, milling and surfacing roads, and other projects.  (App. Ex. BB.)

138.    These projects are not caused by fiber backhaul deployments.  (App. Ex. A at Ex. A ¶ 50.)

139.    These projects are treated as caused by fiber backhaul deployments in the Spreadsheet.  (App. Ex. A at Ex. A ¶ 50; App. Ex. C at 299:22-300:11.)

**Street Design Department.**

140.    The City allocates portions of salaries per year for the Street Design Department to pole attachments and fiber backhaul.  (App. Ex. R at 3; App. Ex. R at 8.)

141.    The City provided no evidence that the Street Design Department needs to be involved in the installation and maintenance of pole attachments and fiber backhaul.  (App. Ex. A at Ex. A ¶ 52.)

142.    Mr. Tobias denied that telecommunications facilities cause the City to undertake street design activities.  (App. Ex. CC at 377:23-382:8.)

**Equipment.**

143.    The City allocates annual amounts for equipment costs.  (App. Ex. R at 4, 9.)

144.    Service providers and their contractors ordinarily provide their own equipment and do not use the City's equipment in deploying small cells or fiber backhaul, and the City does not

undertake any tasks in connection with that deployment that would cause it to use such equipment. (App. Ex. A at Ex. A ¶ 53.)

## V.   VERIZON'S EXPERT OFFERS UNREBUTTED OPINIONS DEBUNKING THE SPREADSHEET

145.    Verizon proffered an expert witness, Christian Dippon, who has expertise in complex litigation and regulatory matters in communication including Internet and high-tech sectors.  (App. Ex. A at ¶ 3; App. Ex. A at Ex. A ¶¶ 1-4.)

146.    Mr. Dippon is an economist with extensive experience in the telecommunications sector.  (App. Ex. A at ¶ 3; App. Ex. A at Ex. A ¶¶ 1-4.)

147.    Mr. Dippon issued an expert report setting forth his opinions in this matter and will testify to the same if called at trial.  (App. Ex. A at ¶ 2; App. Ex. A at Ex. A.)

148.    Mr. Dippon opined that "the annual pole attachment and fiber backhaul fees specified in the Rochester City Code are *not* realistic or reasonable approximations of objective reasonable costs incurred by the City caused by its management of existing Small Wireless Facilities on City-owned street furniture and associated fiber backhaul facilities in the City's ROW."  (App. Ex. A at Ex. A ¶ 67.)

149.    Mr. Dippon further opined that the Spreadsheet is comprised of costs that have no causal connection to small wireless facility pole attachments or fiber backhaul facilities because the City allocated "a portion of City employees' salaries and City capital projects despite the fact that these costs are not caused by the deployment of small cells or related fiber backhaul."  (App. Ex. A at Ex. A ¶ 43)

150.    Mr. Dippon opined that the Spreadsheet is a not a calculation of incremental costs. (App. Ex. A at Ex. A ¶¶ 55-56.)

151.    Mr. Tobias's testimony that the City would not avoid any of the costs if there were zero pole attachments or fiber backhaul deployed in the City, Mr. Dippon explained, "not only confirms that the City did not measure incremental cost but also that the City does not incur any incremental costs due to pole attachment and related backhaul facilities."  (App. Ex. A at Ex. A ¶ 56.)

152.    Mr. Dippon opined that, by including costs that "are nonrecurring and that the permit fee already recovers," the Spreadsheet double counts the City's costs and Mr. Dippon identified a number of such costs.  (App. Ex. A at Ex. A ¶¶ 57-59.)

153.    Mr. Dippon highlights a number activities listed in the Spreadsheet that are already accounted for in the City's permitting costs.  (App. Ex. A at Ex. A ¶¶ 58-59.)

154.    Mr. Dippon also opined that the Spreadsheet relies on objectively unreasonable costs.  (App. Ex. A at Ex. A ¶ 60.)

155.    Mr. Dippon opined: "First, it is not objectively reasonable that some 15 different municipal departments must be involved in processing a permit for a relatively small piece of electronics on a streetlight, let alone managing its continued use and occupancy once installed. Such a claim is also inconsistent with the City's [*ROW Rules*], which make it clear that beyond the up-front permitting process the City is at most minimally involved in the deployment effort for small cells and backhaul connectors."  (App. Ex. A at Ex. A ¶ 60.)

156.    Mr. Dippon opined: "Second, it is not objectively reasonable that 1,118 City employees must be involved in managing the maintenance and use of the ROW by small cell and fiber backhaul facilities."  (App. Ex. A at Ex. A ¶ 60.)

157.    Mr. Dippon opined: "Third, … it is not objectively to claim the equivalent of a team consisting of 14 full-time City employees for managing the use and occupancy of the ROW by

existing pole attachments and a team of 10 full-time City employees for managing existing fiber

backhaul.  This would imply that *each* pole attachment requires 97 hours of City work per year

after installation.  That is  unreasonable on its face and unsupported by any documentation the City

has provided."  (App. Ex. A at Ex. A ¶ 60.)

158.    Mr. Dippon opined: "Fourth, it is also not objectively reasonable to allocate some

arbitrary portion of existing capital expenses to fiber backhaul facilities.  For instance, the City

allocates $2,630,734 of its 2020 A&E expenses to existing fiber backhaul.  The City's A&E

expenses are for various ongoing projects, including active projects involving bridges,

landscaping, building upgrades, streets, new construction, street lighting, and mapping upgrades.

None of these costs is the result of managing the use and occupancy of the ROW by existing fiber

backhaul facilities."  (App. Ex. A at Ex. A ¶ 60.)

159.    Mr. Dippon opined that, after "removing [the] costs not caused by existing small

cells and fiber backhaul as well as the double-counted costs" contained in the Spreadsheet, the

City's costs fall below the FCC's $270 safe harbor rate.  (App. Ex. A at Ex. A ¶ 68.)

160.    The City did not disclose any rebuttal expert opinion, did not depose Mr. Dippon,

and discovery all discovery ended September 1, 2021.  (App. Ex. DD at ¶¶ 33-34.)

161.    The plaintiffs in a related action captioned *ExteNet Sys., Inc. v. City of Rochester*,

No. 6:20-cv-07129-EAW-MWP (W.D.N.Y.) (the "ExteNet Action") also submitted an unrebutted

expert report in which its expert, Patricia D. Kravtin, in addition to identifying the myriad flaws in

the Spreadsheet, opined that:

> In my over forty years of experience in regulatory cost study and cost allocation
> development, rarely have I seen such an undocumented, unsupported, non-
> transparent, and internally inconsistent compilation of cost figures as presented in
> the [Spreadsheet] provided in this litigation.  And certainly, never in the context
> where the applicable standard to be met, along with the public interest rationale for
> the standard, are so clearly set forth as they are in the [*Barriers Order*], as the earlier

sections of my Report explain.  What the City has produced and claims to represent as its supporting ROW cost analysis is, at best, an ad hoc compilation of disparate, unsupported, inconsistent, unverified, and non-replicable numbers presented on two tabs of in the [Spreadsheet.]

(App. Ex. EE at ¶¶ 59-60.)

Dated: New York, New York        KELLEY DRYE & WARREN LLP
          November 18, 2021

                                 By:   /s/ Damon W. Suden
                                       Damon W. Suden
                                       3 World Trade Center
                                       175 Greenwich Street
                                       New York, NY 10007
                                       Tel: (212) 808-7800
                                       Email: dsuden@kelleydrye.com

                                       Lauri A. Mazzuchetti (*pro hac vice*)
                                       Robert N. Ward
                                       One Jefferson Road, 2nd Floor
                                       Parsippany, NJ 07054
                                       Tel: (973) 503-5900
                                       Email: lmazzuchetti@kelleydrye.com
                                              rward@kelleydrye.com

                                       *Attorneys for Plaintiff*
                                       *Cellco Partnership d/b/a Verizon Wireless*