UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

CELLCO PARTNERSHIP D/B/A VERIZON
WIRELESS,

                Plaintiff,

      v.

CITY OF ROCHESTER,

           Defendant.

_____

6:19-cv-06583-EAW-MWP

_____

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF
ITS MOTION IN LIMINE TO PRECLUDE USE OF THE CITY OF ROCHESTER'S
COST SPREADSHEET AT TRIAL**

_____

KELLEY DRYE & WARREN LLP
3 World Trade Center
175 Greenwich Street
New York, NY 10007
Tel: (212) 808-7800

Attorneys for *Plaintiff*
*Cellco Partnership d/b/a Verizon Wireless*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ....................................................................................... 1

PROCEDURAL AND FACTUAL BACKGROUND.................................................... 3

I.      THE BARRIERS ORDER.................................................................................... 3

II.     THE CITY'S SPREADSHEET ............................................................................ 4

III.    SUMMARY JUDGMENT .................................................................................. 6

IV.    THE CREATION OF THE SPREADSHEET ................................................. 7

      A.    The City Was Aware That Litigation Was A Possibility As Far Back As 2018................................................................................................................... 7

      B.    The Possibility Of Litigation And Demands From Verizon And Others To Justify Its Fees Is The Driving Force Behind The City's Ultimate Creation Of The Spreadsheet In April 2019 .................................................... 10

ARGUMENT.................................................................................................................. 16

I.      THE SPREADSHEET IS INADMISSIBLE HEARSAY ............................. 16

      A.    The Spreadsheet Is Not A Public Record ......................................... 16

            1.    The Spreadsheet is not a record or report of City activities.................... 17

            2.    City employees had no duty to, and did not, track their time at work .................................................................................... 18

      B.    The Spreadsheet Was Prepared In Anticipation of Litigation ............................ 19

      C.    Additional Circumstances Of Its Creation Indicate A Lack of Trustworthiness In The Spreadsheet.................................................... 21

CONCLUSION............................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Accelerating Wireless Broadband Deployment by Removing Barriers to
Infrastructure Investment*, 33 FCC Red 9088 (2018) ........................................................1, 4

*Beech Aircraft Corp. v. Rainy*,
488 U.S. 153 (1988) ........................................................................................................20, 22

*City of New York v. Pullman Inc.*,
662 F.2d 910 (2d Cir. 1981) ..................................................................................................23

*City of Portland v. United States*, 969 F.3d 1020 (9th Cir. 2020) ...................................9

*Coleman v. Home Depot*,
306 F.3d 1333 (3d Cir. 2002) ................................................................................................22

*Glowczenski v. Taser Intern., Inc.*,
928 F. Supp. 2d 564 (E.D.N.Y. 2013) ...................................................................................19

*King v. Town of Wallkill*,
302 F. Supp. 2d 279 (S.D.N.Y. 2004) ....................................................................................20

*In re MetLife Demutualization Litig.*,
262 F.R.D. 217 (E.D.N.Y. 2009) ...........................................................................................18

*Miller v. Caterpillar Tractor Co.*,
697 F.2d 141 (6th Cir. 1983) .................................................................................................24

*NES Fin. Corp. v. JPMorgan Chase Bank*,
891 F. Supp. 2d 558 (S.D.N.Y. 2012) ....................................................................................16

*U.S. v. Check*,
582 F.2d 668 (2d Cir. 1978) ..................................................................................................16

*United States v. Awad*,
No. 06 Cr. 600, 2007 WL 1988382 (S.D.N.Y. July 3, 2007) .................................................21

*United States v. El-Mezain*,
664 F.3d 467 (5th Cir. 2011) .................................................................................................24

*United States v. Feliz*,
467 F.3d 227 (2d Cir. 2006) ..................................................................................................20

*United States v. James*,
    712 F.3d 79 (2d Cir. 2013)......................................................................20

*United States v. Quezada*,
    754 F.2d 1190 (5th Cir. 1985) ........................................................18, 24

*United States v. Stone*,
    604 F.2d 922 (5th Cir. 1979) ..................................................................20

*In re Vitamin C Antitrust Litig.*,
    No. 05-CV-0453, 2012 WL 4511308 (E.D.N.Y. Oct. 1, 2012)........20, 22

*Wong Wing Foo v. McGrath*,
    196 F.2d 120 (9th Cir. 1952) ..................................................................24

**Statutes**

47 U.S.C. § 253 ...............................................................................................4

**Other Authorities**

Fed. R. Evid. 801 ...........................................................................................16

Fed. R. Evid. 803 ...........................................................................................16

5 Weinstein's Federal Evidence 803.10...................................................18, 19

7 Handbook of Fed. Evid. 803:8 (9th ed) ...........................................18, 19, 24

Plaintiff Cellco Partnership d/b/a Verizon Wireless ("Verizon") submits this memorandum of law in support of its motion *in limine* to preclude the City of Rochester (the "City") from offering into evidence a spreadsheet, and all underlying evidence, purporting to set forth the City's costs associated with the installation and maintenance of small cell wireless facilities and fiber in the City's right of way on the grounds that the document is inadmissible hearsay.

## PRELIMINARY STATEMENT

As this Court previously held, under the FCC's Barriers Order,[1] it is the City's burden at trial to prove that the fees charged in its municipal code related to the deployment of telecommunications facilities in the right of way (the "Code")[2] are limited to a reasonable approximation of the City's objectively reasonable and actual costs caused by the deployment of those facilities. (Dkt. 65 at 20-22.) To attempt to meet this burden, the City has proffered one document: a spreadsheet that purports to set out the City's "recurring annual costs" associated with small cell and fiber installations (the "Spreadsheet").[3] The Spreadsheet, however, does not reflect the City's actual or recurring costs caused by telecom deployments at all. Rather, it purports to allocate existing personnel costs by estimating how much time City employees might work on telecom-related matters and multiplying that percentage by the employees' annual compensation. But the City admitted that it would pay those employees the same compensation regardless of whether they worked on telecom matters. Those are not the kinds of costs contemplated by the Barriers Order. But, even if the Spreadsheet had addressed actual costs caused by the telecom

---

[1] *In re Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Investment*, 33 FCC Rcd 9088, ¶¶ 55, 79-80, 131, n.234 (2018).

[2] *See* Telecommunications Code of the City of Rochester, Chapter 106, *available at* https://www.ecode360.com/8678750.

[3] The City identified the native version of the Spreadsheet as Bates number COR 000011 and Exhibit 500 on its trial exhibit list. (Dkt. 76 at 4.)

deployments, it should still be excluded because it is inadmissible hearsay.

It is undisputable that the Spreadsheet is hearsay. It is an out of court statement being introduced by the City to prove its contents—*i.e.*, that the costs in the Spreadsheet are the City's actual costs associated with telecom deployments in the right of way. Thus, it is only admissible if it satisfies one of the hearsay exceptions. Based on the record presented on summary judgment, the Court stated that the Spreadsheet could be a public record that may be admissible under the exception in Federal Rule of Evidence 803(8)(A)(i), and therefore could not be deemed categorically inadmissible at the summary judgment stage. The Court noted: "To be clear, the Court is not definitively determining that the spreadsheet would be admissible at trial. It simply cannot conclude on this record that the spreadsheet is inadmissible." (Dkt. No. 65 at 28.) The full discovery record, however, shows that the Spreadsheet does not qualify for the public record exception for several reasons.

*First*, the Spreadsheet is not a mere compilation of information gathered from other City employees, as would be required to qualify as a public record. Rather, it consists of a series of subjective estimates and mathematical calculations based on various suppositions about how to apportion time and costs across different tasks. Moreover, the underlying data about how much time was spent on various tasks was gathered orally by Louie Tobias, the Director of Telecommunications, from City employees who had no official duty to track such information or to keep accurate records, thus undermining the whole purpose of the public record exception.

*Second*, the Spreadsheet was prepared in anticipation of litigation, rendering it inadmissible as a public record. The Court previously held that, based on the summary judgment record, it was not established that the document was created in anticipation of litigation. But the full record shows otherwise. The City was aware of the possibility of litigation over its plans to amend the

Code as early as Summer 2018, and push back from the industry only intensified as the Barriers Order was issued and the City moved forward with its plans. In meetings with the City, Verizon explicitly warned the City that if it passed the Code it would be challenged in court. Other carriers warned of the same. In fact, the Spreadsheet was created days after receiving inquiries from Verizon and others demanding justification for the fees and complaining that the Code did not comply with federal law. All this time, the City did not hide its disagreement with the Barriers Order. In fact, the City participated in the administrative process to oppose the Barriers Order and, through the National League of Cities, participated in litigation to overturn it.

*Finally*, Federal Rule of Evidence 803(8)(B) provides that a public record is inadmissible if the source of information or other circumstances demonstrate a lack of trustworthiness. Here, there are many circumstances that undermine the Spreadsheet's trustworthiness. It was prepared in an informal, haphazard, and urgent manner—not in the normal course of the City's affairs. In fact, the people providing information to Mr. Tobias were confused by the entire exercise It was also prepared *after* the City already adopted the Code—long after the City settled on the amount of the fees—and the City admits that the purpose of the Spreadsheet was to come up with costs to justify the fees it had already set, with the City elsewhere admitting that the fees were intended to generate revenue and profit from the value of its right-of-way—not recover its costs. In addition, the City does not have any records from which the data in the Spreadsheet could be verified. In these circumstances, the Spreadsheet should not be admitted as a public record.

## PROCEDURAL AND FACTUAL BACKGROUND

### I. THE BARRIERS ORDER

Section 253(a) of the Telecommunications Act, which courts have long-recognized as a "broad preemption of laws that inhibit competition," provides that "[n]o State or local statute or

regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." 47 U.S.C. § 253(a). While municipalities may "require fair and reasonable compensation . . . on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way," 47 U.S.C. § 253(c), they may not charge excessive fees that amount to a prohibition of service.

As this Court previously held, the FCC has expressly interpreted "fair and reasonable compensation" as used in Section 253(c) to "refer to fees that represent a reasonable approximation of actual and direct costs incurred by the government, where the costs being passed on are themselves objectively reasonable." (Dkt. 65 at 19 (citing Barriers Order at 9115).) The FCC also stated that only "costs specifically related to and caused by the deployment" of telecom facilities are recoverable. Barriers Order ¶ 50, n.131. Thus, to comply with federal law, the fees being charged by the City must be a reasonable approximation of the City's costs, the costs must be actual and direct costs caused by the deployment of telecom facilities, and the costs themselves must be objectively reasonable.

This Court also held that the "[t]he Small Cell Order further unequivocally places the burden of demonstrating that the fees at issue are a reasonable approximation of costs on the municipality." (Dkt. 65 at 21.) Thus, the City can only prevail at trial if it can prove that its fees meet the federal cost-based standard set out above.

## II.    THE CITY'S SPREADSHEET

In order to compare the fees charged by the Code to the City's actual costs—which is what the Barriers Order requires—Verizon sought to discover information from the City about its costs associated with the installation of telecom facilities in the right of way. (*See* Declaration of Damon Suden ("Suden Decl.") Ex. A at Interrog. No. 1; *id.* at RFP No. 1.) The City ultimately admitted,

however, that it "does not specifically and independently track all costs related to telecommunications in the right of way." (*Id.* Ex. B.) The City, in fact, did not produce records tracking any such actual costs.

Lacking any record of its actual costs against which it could compare its fees, the City instead produced a spreadsheet purporting to represent an "analysis" of the City's purported "costs." (*Id.* Ex. A at Interrog. Resp. No. 1, RFP Resp. Nos. 1, 3.) The City contends that the Spreadsheet is:

> an analysis of recurring annual costs resulting from the installation and maintenance of small cell wireless facilities in the City right of way … and recurring annual costs related to installation and maintenance of fiber and fiber conduit in the right of way, both aerially and underground.

(*Id.* Ex. C at RFP No. 1.) The Spreadsheet lists numerous tasks, categorizing them by City department, that allegedly relate to small cells and fiber facilities. (*See generally* Suden Decl. Ex. D.) For each task, the Spreadsheet allocates a fraction of existing City employees' time, or full time equivalency, multiplied by that employee's approximate annual compensation in order to supposedly arrive at the "cost" to the City related to telecom facilities in the ROW. (*See* Dkt. 58-2 at ¶ 73; Dkt. 61-4 at ¶ 73.) Mr. Tobias allocated the costs between small cell attachments and fiber using a ratio that varies from task to task, but stated that there is actually unquantified "bleed-over" between the two. (Suden Decl. Ex. E at 92:16-93:9; *id.* Ex. F at ¶ 35.) For fiber facilities only, the Spreadsheet also allocates varying percentages of existing and planned capital costs. (*Id.* Ex. G at 295:4-298:24; *id.* Ex. D at 1-5.) The Spreadsheet then arrives at a rather remarkable bottom line—suggesting that 1,118 City employees from 15 departments must work a total of 49,805 hours per year, which would be equal to 192 hours per day, on tasks related to small wireless and fiber backhaul facilities. (*Id.* Ex. F at ¶ ES9.) The City did not provide any documentation to support that level of activity. Moreover, the Spreadsheet is based on the absurd

premise that the City's purported costs do not vary with the number of applications received or installations performed—that is, that the City's employees would work the same number of hours (nearly 50,000 per year, which is 192 hours per day) in the event of a single small cell installation, 200 small cell installations, or 300 small cell installations. (*See* Dkt. 58-2 at ¶ 75; Dkt. 61-4 at ¶ 75.)

## III.    SUMMARY JUDGMENT

On summary judgment, Verizon sought to exclude the Spreadsheet on several grounds, including that it is inadmissible hearsay. (Dkt. 58.) The City opposed the motion, arguing only that the Spreadsheet was a recorded recollection under FRE 803(5). The City did not raise any other hearsay exceptions. (Dkt. 61-5 at 18.) Verizon explained that the recorded recollection exception did not apply because a recorded recollection of an oral conversation with another person is still inadmissible hearsay. (Dkt. 62 at 7.)

In its decision, the Court did not address FRE 803(5), but instead found that, based on the summary judgment record, the Spreadsheet could be a public record under Federal Rule of Evidence 803(8)(A)(i). (Dkt. 65 at 24.) The Court noted that the Spreadsheet "appears to be in significant part a compilation of statements by various departments within the City regarding activities those departments perform and how long those activities take." (Dkt. 65 at 24.) "These statements appear on their face to fall within the plain language of Rule 803(8)(A)(i)." *Id.* The Court recognized, however, that the public record exception may not apply to documents prepared in anticipation of litigation, but held that "the current record does not warrant a finding that the City employee statements memorialized in the spreadsheet were made for litigation purposes." (Dkt. 65 24-25.) The Court concluded that it was "not definitively determining that the spreadsheet

would be admissible at trial. It simply cannot conclude on this record that the spreadsheet is inadmissible." (Dkt. No. 65 at 28.)

Verizon never had the opportunity to brief the issue of whether the Spreadsheet qualified as a public record under Rule 803(8)(A)(i) because the City never raised the issue in its motion or in opposition to Verizon's motion for summary judgment. Thus, the record on summary judgment was not complete as it pertains to the public record exception. A more fulsome examination of the record is presented here, which demonstrates that the Spreadsheet is not admissible as a public record.

## IV. THE CREATION OF THE SPREADSHEET

The Spreadsheet was not created until April 17, 2019—well after the City adopted the ordinance that amended the Code in February 2019, and *after* the Ordinance's effective date of April 1, 2019. (Suden Decl. Ex. H at 145:5-23, 147:24-149:6; *id.* Ex. I; *id.* Ex. J; Dkt. 23 ¶ 1.) Indeed, the City had already settled on the Code's fee levels before beginning any purported cost-related analysis in January 2019. (*See* Suden Decl. Ex. K at 4-6 (challenging the Code's fee levels).) Leading up to the creation of the Spreadsheet, the City—including the Spreadsheet's author, Louis Tobias—was repeatedly warned that the newly enacted Code would lead to litigation and the Spreadsheet was created specifically for the purpose of defending against such legal attacks.[4]

### A. The City Was Aware That Litigation Was A Possibility As Far Back As 2018

Before the Barriers Order was even issued, the City anticipated that, if the FCC adopted a cost-based standard for fees, then the City's plans for enacting a new Code would likely result in

---

[4]     Mr. Tobias was the City's designee pursuant to a Rule 30(b)(6) deposition notice covering the creation and content of the Spreadsheet and is the only witness on the City's witness list.

litigation. In July 2018, City personnel held a meeting, the "outline" of which was titled "Telecommunications Legislative Package" and concerned the anticipated amendments to the Code. (*See id.* Ex. L; *id.* Ex. M.) That document included a section titled "Concerns" that highlighted the "considerable push-back" the City was preparing to meet from carriers like Verizon and the ensuing "risk of litigation":

> 1. Push-back from the industry: We have already heard from Charter and Verizon objecting to ROW[5] fees and anticipate considerable push-back from Frontier and others.
>
> 2. Legislation or Regulation: A simple ruling by the FCC or adoption of Federal or State legislation could render portions of the ordinance unenforceable or require substantial amendments.
>
> 3. Litigation: There is always a risk of litigation, especially considering the deep pockets impacted by this legislation.

(*Id.* Ex. M at 3.) The attendees for that meeting who received the outline included several individuals that would later play roles in the Spreadsheet's creation: Johanna Brennan (City counsel), Anthony Orphe (Department of Environmental Services), Kamal Crues (City engineer), Kabutey Ocansey (Department of Environmental Services), and the architect of the Spreadsheet, Louie Tobias. (*See id.* Ex. L.) On September 5, 2018, a revised version of the outline containing the same concerns over "push back" from the industry and litigation over the Code was circulated in anticipation of a follow up meeting on September 11, 2018. (*See id.* Ex. N; *id.* Ex. O.) Again, Mr. Tobias was among the recipients of the outline. (*See id.* Ex. N.)

Meanwhile, the City directly participated in the Barriers Order rulemaking process, filing a letter from the City's mayor to the FCC Secretary Marlene Dortch opposing the adoption of the Barriers Order and challenging the $270 presumptively valid fee for small cell attachments—not

---

5        "ROW," in this document and throughout this brief, referring to "right-of-way."

8

because it failed to allow the City to recover its costs, but as insufficient to cover the "market value" of the City's ROW. (*Id.* Ex. P at 3.) The City also participated in the process indirectly through its membership in the National League of Cities, which submitted multiple comments to the FCC opposed to the Barriers Order. *See* Barriers Order at App'x B.

After the Barriers Order was issued, Verizon and City representatives held two meetings between October and November 2018. On October 9, 2018, Verizon employees, including Mark Coon (Senior Manager of Real Estate and Regulatory at Verizon), and outside counsel met with City personnel, including Ms. Brennan, Mr. Orphe, Mr. Crues, Mr. Ocansey, and Mr. Tobias. (Declaration of Mark Coon ("Coon Decl.") ¶ 6.) During that meeting, Mr. Tobias expressed his disapproval of the Barriers Order and the presumptive rates it set forth because he believed the carriers could afford to pay much higher fees. (*Id.* ¶ 7.) Ms. Brennan also stated that the City opposed the Barriers Order and mentioned the possibility of the City challenging it in court.[6] (*Id.* ¶ 8.) On November 20, 2018, Verizon and City representatives (including Mr. Tobias) held another meeting during which the City again expressed its disagreement with the Barriers Order and belief that it would be overturned. (*Id.* ¶ 9.) During the course of these meetings, Verizon advised the City that the Code would be challenged in court if it was enacted with fees in excess of the presumptively reasonable rates. (*Id.* ¶ 10.) Thus, by the Fall of 2018, the City was well aware that its plan to amend the Code was opposed by multiple carriers and would likely result in litigation.

---

[6]     The National League of Cities, which Rochester is a member of, joined the Hobbs Act litigation challenging the Barriers Order—this litigation was not resolved until 2020, well after the Spreadsheet was created and the present litigation began. *See, e.g.*, *City of Portland*, No. 18-72689 (9th Cir.), Dkt. 174 at 2, 23 (identifying National League of Cities as petitioner); *American Public Power Assoc. v. FCC*, No. 19-70339 (9th Cir.), Dkt. 4 (February 15, 2019 appearance by National League of Cities); *City of Seattle v. FCC*, No. 19-70136 (9th Cir.), Dkt. 57 (April 17, 2019 submission by National League of Cities identifying various consolidated actions); *City of Portland v. United States*, 969 F.3d 1020 (9th Cir. 2020) (deciding consolidated challenges in August 2020).

Through December 2018, the City ignored repeated requests by Verizon to review the draft Code and Mr. Tobias cautioned against sharing the City's planned fee structure with Verizon. (*See* Suden Decl. Ex. Q (Verizon repeatedly following up on request for draft Code); *id.* Ex. R at 1 (Mr. Tobias replying to Ms. Brennan, Mr. Crues, Mr. Ocansey, and Mr. Orphe: "I would NOT share our fee structure").) On December 27, 2018, Ms. Brennan sent a law firm article regarding the Barriers Order to, among others, Mr. Crues and Mr. Tobias. (*Id.* Ex. S; *id.* Ex. T.) Ms. Brennan said, in part: "I hope this article is useful and that we can refer to it when drafting our Rules and Regs." (*Id.* Ex. S.) The article advises municipalities that in light of the Barriers Order they should, among other things, undertake a cost analysis because "such a study may protect you in the event you are challenged for assessing higher fees than the presumptively reasonable fees specified in the [Barriers] Order." (*Id.* Ex. T at 4.) The next day, Mr. Orphe replied to the group suggesting that they perform a cost analysis for permit fees "in light of this article." (*Id.* Ex. U at 2.)[7]

### B. The Possibility Of Litigation And Demands From Verizon And Others To Justify Its Fees Is The Driving Force Behind The City's Ultimate Creation Of The Spreadsheet In April 2019

In early January 2019, the City (including Mr. Tobias) received two letters warning of potential litigation.

*First*, on January 10, 2019, Verizon sent a letter from inside counsel explaining why the proposed Code would violate federal law and requesting that the City not enact it. The letter mentions "litigation" three times, including in the first paragraph:

The Amendment is also in direct conflict with applicable law, including recent developments in federal law relating to the siting of small wireless facilities ("small cells"), and would create ambiguities or inequities **likely to generate future**

---

[7] In or about December 2018, the City had continued to focus, not on its costs, but on fee structures imposed by other municipalities. (Suden Decl. Exs. V, W, and X.)

**litigation**.

(*Id.* Ex. K at 1 (emphasis added).)  That same day, Ms. Brennan forwarded Verizon's letter, twice—in one email, noting, "The opposition has started"; and in the other, warning, "Here is the industry's first salvo."  (*Id.* Ex. Y; *id.* Ex. Z.)  Mr. Tobias also forwarded the letter to Mr. Orphe and Mr. Ocansey.  (*Id.* Ex. AA.)

*Second*, on January 13, 2019, CenturyLink sent the City a letter opposing the enactment of the Code.  (*Id.* Ex. BB.)  In the letter, CenturyLink warned: "further discussion could narrow the scope of the issues needing to be addressed, eliminate ambiguities or inequities **that are likely to generate future litigation**, and mitigate the impact it will have on companies, like CenturyLink, who are invested in building telecommunications infrastructure for broadband networks in Rochester."  (*Id.* at 2 (emphasis added).)  The next day, Mr. Tobias forwarded the letter to, among others, Mr. Ocansey and Mr. Orphe.  (*Id.* Ex. CC at 1.)

Only after receiving these two letters referencing litigation did the City begin work underlying what ultimately would lead to the Spreadsheet.  Indeed, hours after receiving a copy of the second letter, Mr. Ocansey sent an email—subject "ROW Costs" and marked "High" importance—to John Gaudioso with a copy to, among others, Mr. Tobias.  (*Id.* Ex. DD at 3.)  Mr. Ocansey explained that Mr. Tobias. "along with a team of DES staff … *and Law* (Johanna Brennen)" (emphasis added) were leading an initiative to enact a new Code and as part of that project they needed to "quantify some of our current operating and capital costs for work done in our right of ways."  (*Id.*)  He spoke of the analysis in the future tense, explaining that the "analysis should be all encompassing: labor, materials, etc." and he asked if the underlying information necessary for that analysis was "readily" available or if they would have to pull it together.  (*Id.*)  Notably, the request was not limited to costs associated with the deployment of telecom facilities.

A City employee from the water department, obviously not familiar with this sort of request, responded that he needed "clarification on the goal of this exercise and what sort of information" Mr. Ocansey was looking for. (*Id.* Ex. EE at 1.)

Two days later, on January 16, 2019, Mr. Gaudioso replied that he "just finished summarizing the ROW costs for the Telecommunications Code initiative" and included a spreadsheet of data seemingly reflecting dollar amounts spent on various activities. (*Id.* Ex. DD at 2-3; *id.* Ex. FF.) According to Mr. Guadioso, he "included all work activities that are involved in the performance of work in the ROW." (*Id.* Ex. FF.) Notably, where work was only partially performed in the ROW, Mr. Guadioso simply estimated the percent of time spent in the ROW. (*Id.*) No effort was made by Mr. Guadioso to distinguish between work related to the deployment of telecom facilities in the ROW versus non-telecom work. Mr. Tobias responds that this "is excellent info." (*Id.* Ex. GG at 1.)

The next day, on January 17, 2019, Mr. Ocansey emailed Mr. Tobias, suggesting that Mr. Tobias "may want to sit with [Phillis Oliver]/[Ned Kelley] to have them quantify the Street Lighting costs as well as the ROW costs for street work (milling, etc) that they manage." (*Id.* Ex. HH at 1.) Again, none of this data was specifically related to the deployment of telecom facilities.

On January 22, 2019, Mr. Tobias sent an email to numerous City officials including the Mayor[8] providing them with access to various documents, including letters from carriers opposing the Code (including the letters from Verizon and CenturyLink that threatened litigation), the City's letter opposing the Barriers Order, and drafts of the Code and a flowchart of its fees. (*Id.* Ex. II.) The files did not include any cost analysis. On February 7, 2019, Mr. Tobias received and forwarded Verizon's February 7, 2019 proposed edits to the Code. (*Id.* Ex. JJ at 1; *id.* Ex. KK.)

---

[8]     Ms. Brennan, Mr. Orphe, Mr. Crues, and Mr. Ocansey were among the recipients. (Suden Decl. Ex. II.)

On February 13, 2019, Mr. Tobias received and forwarded CenturyLink's proposed edits to the Code. (*Id.* Ex. LL at 1; *id.* Ex. MM.) These edits from the industry warned the City that its proposed fees "would conflict with federal law." (*Id.* Ex. KK at 14 n.14; *id.* Ex. MM at 14 n.14.)

On April 15, 2019, after the Code was enacted, Verizon sent a letter from its inside counsel requesting that the City "provide [Verizon] with support for the City's position" that the Code's fees are cost-based in compliance with federal law. (*Id.* Ex. NN at 2.) Mr. Tobias was aware of the letter—he was one of the initial recipients, and he forward it with the comment "Verizon Letter for those who [have] not seen it," and City counsel Johanna Brennon emailed it to Mr. Tobias, asking, "can you meet soon to discuss this" because the City "need[s] to respond to Verizon with a verification of [the City's] costs." (*Id.* Ex. OO at 1; *id.* Ex. PP at 1.)

On April 17, 2019, just two days after the inquiry from Verizon, Mr. Ocansey set a meeting for April 22, 2019, to discuss ROW costs, including the information recently provided to Mr. Tobias. Mr. Ocansey circulated a calendar invitation—subject: "Right Of Way Costs Analysis for Telecommunications"—with the note: "We need to convene to discuss ROW costs as impacted for the Telecommunications Code Ordinance. I believe some of you have previously provide some analysis to Louie [Tobias] – please bring that information again – for others we'll discuss what information will be needed." (*Id.* Ex. QQ.) Mr. Ocansey sent the invitation to, among others, Mr. Orphe, Mr. Guadioso, Mr. Kelley, Mr. Considine, and Mr. Tobias. (*Id.*)

Later the same day, Mr. Ocansey requested additional cost information noting "some urgency" because "Mayor/Law" requested the information by the following week:

> In preparation for Monday's meeting can I get you guys ***to start to quantify your respective budgets ROWs costs*** – similar to the attached that John G provided for Operations.
>
> See what you can come up with then we can discuss what 'gaps' may be missing at Monday's meeting.

> There is some urgency to this as the Mayor/Law has requested this information by next week.[9]

(*Id.* Ex. DD at 2 (emphasis added).)

At this point, after it had settled on the amounts it would charge in fees and after adopting the Ordinance, the City still had not determined what its associated costs were nor developed the cost analysis that would become the Spreadsheet. To the contrary, throughout the day, the group emailed back and forth about how to come up with that cost information—including the format the cost information should be provided in and what costs should be included (for example, whether to include budgeted or incremental costs and which costs actually relate to ROW use).[10]

(*Id.* at 1-2.)

Ultimately, City officials made clear that their goal was to come up with something to justify the fees the City already had settled on—not to determine what its costs actually were. Specifically, Mr. Ocansey explained the purpose of "the exercise here is that [the City] wants to justify [its] costs incurred for telecommunications rental fees as prescribed in the new ordinance – so [the City is] trying to capture ALL [its] costs as expensed/budgeted." (*Id.* at 1.)

Facing questions about what to include, Mr. Tobias explained: "Provide the MOST information with detailed descriptions we can remove the things that don't apply!" (*Id.*) As with earlier iterations, no effort was made by anyone to determine which of the supposed "costs" were caused by the deployment of telecom facilities in the ROW—rather, Mr. Tobias merely requested the "MOST" information he could get about work in the ROW without regard to whether it had

---

[9]    Separately, Mr. Kelley emailed Mr. Tobias asking about what cost figures Mr. Tobias had for Mr. Kelley so that Mr. Kelley could prepare for the meeting. (Suden Decl. Ex. SS.)

[10]    These April 17, 2019 messages include Mr. Tobias and combinations of, among others, Ms. Oliver, Mr. Considine, Mr. Gaudioso, and Mr. O'Connor.

14

anything to do with telecom deployments.  (Suden Decl. Ex. DD; *see also id.* Ex. RR at 153:17-154:10 (Mr. Tobias testified he merely asked "what [city employees] are out there doing and, you know, what does that entail" but he did not ask them to tell him "how much time you spend on non-small cells," and that level of detail would not be found in the Spreadsheet); *id.* Ex. RR at 89:10-15 (Q: "You left it to the discretion of the individual department heads to sort of respond and say, These are the costs that we have in our department? A: "I asked them to be as comprehensive as they possibly could, but yes.").)

The Spreadsheet at the center of this litigation was created that same day—April 17, 2019. (*Id.* Ex. H at 145:5-23.)  Mr. Tobias could not identify any portions of the analysis in the Spreadsheet that were performed prior to the adoption of the Code.  (*Id.* at 146:15-147:3.)

This record makes clear that the Spreadsheet is not a compilation of routinely reported, objective information obtained from other City employees.  It is a complicated, subjective analysis performed by Mr. Tobias in which he made judgments about how much of the time in the ROW was spent on telecom related tasks and how to apportion that time between small cell and fiber installations.[11]  Regarding the Spreadsheet, Mr. Tobias testified: "When we were doing the final analysis, what I was trying to get to was to make sure that our $1,500 number was reasonable or below our actual cost because that was the driver of the final exercise as it related to the lawsuit." (*Id.* Ex. RR at 157:8-14.)  In other words, the Spreadsheet reflects Mr. Tobias' attempt to slice and dice the information he received from others so that it could be used to justify the fees in the

---

[11]    Mr. Tobias testified that he did not ask "how much time you spend on small cells and how much time you spend on non-small cells" and "that level of detail is not included on either of [the Spreadsheet's tabs]" (Suden Decl. Ex. RR at 153:12-154:20); rather he generally asked "what you're doing out there" and then allocated purported costs as relating to small cell or fiber based on varying "approximations" he concedes include "bleed over" between the two categories.  (*Id.* Ex. E at 92:16-93:9; *see also id.* at 132:10-17 (misallocations would not necessarily be fixed because "[t]hat level of detail was not the level to which [they] engaged to get this analysis"); *id.* at 93:5-9 (allocations were "not exact").).)

anticipated litigation. The Spreadsheet is the final result of that exercise.

**ARGUMENT**

**I.     THE SPREADSHEET IS INADMISSIBLE HEARSAY**

There is no real dispute that the Spreadsheet is hearsay, the only question is whether an exception applies. (*See* Dkt. 65 at 23-26.) "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801; *see also, e.g.*, *U.S. v. Check*, 582 F.2d 668, 680 (2d Cir. 1978). The Spreadsheet consists of an analysis performed by Mr. Tobias, based on information he gleaned from conversations with unidentified people for which there are no notes, documents, or other supporting records. The City offers the Spreadsheet to prove the truth of its content—namely, that the costs reflected in the document were in fact incurred by the City in the amounts indicated, by the City personnel listed, and in connection with the activities described. This is hearsay. *See, e.g.*, *NES Fin. Corp. v. JPMorgan Chase Bank*, 891 F. Supp. 2d 558, 559 (S.D.N.Y. 2012) (report that contained "out-of-court statements by unidentified individuals" was inadmissible hearsay.").

In its order denying summary judgment, the Court previously stated, based on the record presented at the time, that the Spreadsheet could potentially be admissible at trial as a public record under FRE 803(8)(A)(i). Rule 803(8) provides that a "record or statement of a public office" that "sets out . . . the office's activities" is not excluded as hearsay provided "the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness." Fed. R. Evid. 803(8)(A)(i), (B). As explained below, however, the Spreadsheet does not qualify as a public record for several reasons.

**A.     The Spreadsheet Is Not A Public Record**

The Spreadsheet is not a compilation of routine, objective data City employees were under a duty to track. Rather, it is a subjective analysis by Mr. Tobias based on after-the-fact guesswork

by City employees of the time they spend working in the right of way.  It does not qualify as a public record.

### 1.     The Spreadsheet is not a record or report of City activities

The public records exception in Rule 803(8)(A)(i) was intended to cover "records containing simple assertions of fact regarding the function of the official agency," such as accounting records, dockets of courts or legislative bodies, certificates of title, birth and death records, and deeds.  *See* 1 Federal Evidence 803.42 (listing examples of public records).  Such documents qualify as public records for admission under the Rule because they are "uncomplicated and concern factual matters involving the internal function" of the public office.  *Id.*

This Court previously held that the Spreadsheet appeared to be a "compilation of statements" from City departments about the activities they perform.  (Dkt. 65 at 24.)  But the City describes the Spreadsheet differently, as an "*analysis* of recurring annual costs" associated with various telecom installations in the ROW.  (Suden Decl. Ex. C at RFP No. 1. (emphasis added).)  This "analysis" is not a report or statement of City activities—it is rather akin to an expert report.  In other words, Mr. Tobias did not merely write down information obtained from other City employees into the Spreadsheet.  Rather, he took information provided and made subjective judgments about what to include and what to discard, how to apportion hours between activities related to small cell installations versus fiber installations, how to apportion the hours and costs across different job functions within a department, and other decisions that simply do not reflect the activities of the City or its various departments.  (*Id.* Ex. H at 128:7-24, 126:16-127:11; *id.* Ex. G at 326:24-328:1.)

For example, Mr. Tobias asked other City employees to send him the "MOST" information they could that was possibly related to work in the ROW so that he could then decide what

information to use and what to discard.  (*Id.* Ex. DD.)  He then, without noting who he spoke with, the questions asked, answers provided, or any documents or records relied on, approximated the percentage of working time that each employee spent on tasks that may relate to telecommunications generally.  (*Id.* Ex. H at 126:13-127:11, 128:7-24, 136:4-9, 144:12-17.)  From there, Mr. Tobias arrived at the unverifiable conclusions in the Spreadsheet, with the quality control of his "smell test."  (*Id.* Ex. G at 326:24-328:1; *id.* Ex. H at 157:8-14.)  Mr. Tobias confirmed that his further varying allocations of purported costs between small cell and fiber includes unidentified "bleed-over."  (*Id.* Ex. E at 92:16-93:9; *id.* Ex. F at ¶ 35.)

Thus, Mr. Tobias did not simply report the information he learned from other people—he manipulated data to suit his needs.  This type of document is far afield from the simple and uncomplicated record of government activities envisioned by Rule 803(8)(A)(i).  *See, e.g., United States v. Quezada*, 754 F.2d 1190, 1194 (5th Cir. 1985) (holding that deportation record containing date and location of deportation was reliable because it contained "routine, objective observations, made as part of the everyday function of the preparing official").

## 2. City employees had no duty to, and did not, track their time at work

The public record exception "is grounded on the presumption . . . that 'public officials perform their duties properly without motive or interest other than to submit fair and accurate reports.'"  *In re MetLife Demutualization Litig.,* 262 F.R.D. 217, 237 (E.D.N.Y. 2009) (quoting *Bradford Trust Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 805 F.2d 49, 54 (2d Cir. 1986)).  "[T]he guarantee of accuracy of public records admissible under Rules 803(8)(A)(i) and (ii) rests upon an official duty, i.e., a duty imposed by law upon a public official, to make an accurate record…."  7 Handbook of Fed. Evid. 803:8 (9th ed.); 5 Weinstein's Federal Evidence 803.10 ("[W]hen public reports include statements of third parties who themselves have no public

duty to report what they observe" the record must be excluded unless some other exception applies). "All persons furnishing and recording information must be under an official duty to do so. If the supplier of the information is not under such a duty to do so, an essential link is broken; the assurance of accuracy does not extend to the information itself, and the fact that it may be recorded with scrupulous accuracy is of no avail." *Id.*; *Glowczenski v. Taser Intern., Inc.*, 928 F. Supp. 2d 564, 578 (E.D.N.Y. 2013) (holding that the information relied on in the public record must have been provided pursuant to official duty).

Here, the City employees who provided information to Mr. Tobias about the time spent on various tasks were not under any duty to track or report the amount of time they spent on those tasks. In fact, Mr. Tobias admitted, and the City admitted, that City employees do not keep track of their time in the normal course of their duties. (Suden Decl. Ex. H at 50:21-51:8; Dkt. 61 at ¶ 100; *see also* Dkt. 61 at ¶ 101 (admitting the City has no documentation supporting the figures in the Spreadsheet).) Without a duty to track and report their time, there can be no assurance that City employees or their department heads are fairly and accurately reporting that information to Mr. Tobias as part of the exercise of justifying the newly enacted fees in the Code. In fact, the record shows that the information collected about time spent on tasks was, at best, an estimate from department heads—not an accurate report of real numbers. (*See*, *e.g.*, Suden Decl. Ex. FF ("I estimated that 25% of the work is done in the ROW for both activities").) A document consisting of estimates from City officials who had no duty to, and did not, accurately track and report their time in the first place is simply not a public record. *See* 7 Handbook of Fed. Evid. 803:8 (9th ed.); *see also* 5 Weinstein's Federal Evidence 803.10; *Glowczenski v. Taser Intern., Inc.*, 928 F. Supp. 2d 564, 578 (E.D.N.Y. 2013).

## B. The Spreadsheet Was Prepared In Anticipation of Litigation

As this Court noted, the Second Circuit has stated, in dicta, that "Rule 803(8) excludes documents prepared for the ultimate purpose of litigation." *United States v. Feliz,* 467 F.3d 227, 237 (2d Cir. 2006). In fact, the Second Circuit repeated the same maxim years later in *United States v. James*, 712 F.3d 79 (2d Cir. 2013), where the court held that public records did not trigger the Confrontation Clause because the Rule "excludes documents prepared in anticipation of litigation." *Id.* at 89; *see also King v. Town of Wallkill*, 302 F. Supp. 2d 279, 299 (S.D.N.Y. 2004) ("Even if considered a public record of the Town for purposes of the public records exception, the letter was prepared in contemplation of the present litigation and therefore remains inadmissible."); *United States v. Stone*, 604 F.2d 922, 925-26 (5th Cir. 1979) (Rule 803(8) is designed to allow admission of official records prepared for purposes independent of litigation). Courts routinely exclude documents prepared in anticipation of litigation because the assumption that officials are accurately reporting information is undermined by the prospect of litigation:

> Rule 803(8) allows the admission of public records that would otherwise constitute hearsay because of an assumption that government employees are generally reliable and non-biased and, therefore, the records are trustworthy. Where, as here, the records were prepared in connection with litigation, however, the basis for that assumption of trustworthiness vanishes.

*In re Vitamin C Antitrust Litig.*, No. 05-CV-0453, 2012 WL 4511308, at *2 (E.D.N.Y. Oct. 1, 2012); *see also Beech Aircraft Corp. v. Rainy*, 488 U.S. 153, 168 n.11 (1988) (noting the Advisory Committee included as an indication of lack of trustworthiness, "possible bias when reports are prepared with a view to possible litigation").

In its summary judgment decision, this Court held that the Spreadsheet did not appear to have been created in anticipation of litigation based on the record presented at the time. But the full discovery record described above, *see* Procedural and Factual Background Section IV, shows

that the City was concerned about the possibility of litigation back in 2018 (*see id.* at 7-8), and that concern only intensified after the FCC issued the Barriers Order and carriers stepped up their criticism of the new Code being proposed by the City (*see id.* at 8-9).  In fact, the gathering of supposed cost information and the ultimate creation of the Spreadsheet was directly caused by push back from carriers and was intended to justify the City's fee structure to those carriers in an attempt to avoid or defend against litigation.  (*See* Procedural and Factual Background Section IV.B.)

The same City personnel that played the most significant roles in preparing the Spreadsheet—Ms. Brennan, Mr. Orphe, Mr. Crues, Mr. Ocansey, and Mr. Tobias—also had the most awareness of potential litigation.  Strikingly, the person ultimately responsible for the Spreadsheet, Mr. Tobias, from the start, was consistently aware of potential litigation challenging the City's cost basis for the Code's fees.  He received City meeting outlines detailing the City's anticipation of litigation and attended those meetings (*see* Suden Decl. Exs. L, M, N, and O); he attended meetings with Verizon where potential litigation was apparent (Coon Decl. ¶¶ 5-10); he communicated and met with City counsel to prepare the purported analysis (*see* Suden Decl. Ex. OO at 1; *id.* Ex. PP at 1); he received and circulated letters from third parties warning of litigation (*See id.* Exs. AA, TT; *id.* Ex. CC at 1; *id.* Ex. BB); and he attended meetings to discuss how to respond to Verizon inside counsel's challenge to the Code's compliance with federal law.  (*Id.* Ex. PP at 1; *id.* Ex. QQ).  The Spreadsheet was prepared after those litigation threats, and in response to those threats, after the City had already settled on the fees it wanted to charge—fees that were well in excess of federal law.  Thus, on the full record, there can be no doubt that the Spreadsheet was prepared by City staff with litigation in mind.

## C.  Additional Circumstances Of Its Creation Indicate A Lack of Trustworthiness In The Spreadsheet

A public record is not admissible if the opponent of the evidence shows "that the source of information or other circumstances indicate a lack of trustworthiness."  FRE 803(8)(B); *United States v. Awad,* No. 06 Cr. 600, 2007 WL 1988382, at *3 (S.D.N.Y. July 3, 2007).  The Supreme Court has held that the "trustworthiness inquiry" functions as "the primary safeguard against the admission of unreliable evidence."  *Beech Aircraft Corp. v. Rainey*, 488 U.S. at 167.  The scope of circumstances that may indicate a lack of trustworthiness is broad, including whether a hearing was held, possible bias when a record is prepared with a view to possible litigation, the manner in which the record was completed, the sources of information utilized, and how the record was maintained.  *See id.* at 168 n.11; *In re Vitamin C Antitrust Litigation*, 2012 WL 4511308, at *2 (holding inadmissible record prepared by party that was not impartial and in anticipation of litigation).  All of these considerations indicate a lack of trustworthiness preventing the Spreadsheet from qualifying under the public records exception.

*First*, the Spreadsheet, which was prepared without a hearing and to justify fees after-the-fact, reflects possible bias.  A report may be deemed untrustworthy "if the report appears to have been made subject to a suspect motivation," including, for example, "where the public official or body who prepared the report has a bias, and the final report is consistent with that bias."  Federal Rules of Evidence Manual 1688-89 (Stephen A. Saltzburg et al. eds., 7th ed. 1998); *see also Coleman v. Home Depot*, 306 F.3d 1333 (3d Cir. 2002).  Here, the City, from the Mayor down to the author of the Spreadsheet himself, had a clearly and expressly articulated bias against the Barriers Order and in favor of maximizing revenue from what City representatives viewed as well-financed carriers.

For example, the City formally opposed the Barriers Order, with its mayor insisting that

the City must be permitted to charge the "for profit telecommunications industry" not just for costs, but for the "value" of its ROW for the benefit of its taxpayers (*id.* Ex. P at 3); City personnel tracked the rulemaking resulting in the Barriers Order, during which Ms. Brennan admitted that the Barriers Order "would seriously and adversely impact [the City's] proposed code and the City's ability to manage our ROW" (*id.* Ex. UU). From the start, the City focused on: "How can the City of Rochester profit from the new 5G transformation?" (*Id.* Ex. VV at 6.) The Barriers Order frustrated that goal, so the City was motivated to avoid its purpose and prevent what the City viewed as carriers with "deep pockets" benefiting from it. (*Id.* Ex. M at 3.)

*Second*, the irregular manner in which the Spreadsheet was prepared, and the sources of information relied upon in doing so, also indicate a lack of trustworthiness. The communications among City personnel reflect that the Spreadsheet was prepared informally and with urgency. The day after receiving a second letter warning of possible litigation, City personnel scrambled to within days generate purported cost information. (*Id.* Exs. DD, CC, FF, GG, and HH.) As to the Spreadsheet itself, it was created just two days after Verizon demanded that the City demonstrate its compliance with the Barriers Order (*Id.* Ex. H at 145:5-23), and on the same day City personnel again exchanged numerous messages about how to justify its fees "with some urgency" by the following week at the direction of the "Mayor/Law." (*Id.* Ex. DD at 2.) All of this was done without any formal procedure, guidelines, or guardrails. "This lack of formal verification or procedure itself [is] sufficient to justify the exclusion of the [Spreadsheet] as untrustworthy." *City of New York v. Pullman Inc.*, 662 F.2d 910, 915 (2d Cir. 1981) (excluding report where information relied upon was generated by interested parties and analyzed without formal procedure or verification).

*Third*, the sources of information Mr. Tobias relied on to prepare the Spreadsheet—who

specifically he spoke with, what questions were asked, what information was obtained, how he decided the allocations reflected in the Spreadsheet, or why—remain a mystery. Mr. Tobias relied on informal, undocumented conversations with unspecified City employees. The City conceded it "does not specifically and independently track all costs related to telecommunications in the right of way" (Suden Decl. Ex. B), its employees do not track their time spent on relevant functions in the normal course (Dkt. 61-4 at ¶ 100), and the City has no backup worksheets, notes, or other documents to support the figures in the Spreadsheet (Dkt. 61-4 at ¶ 101). A record prepared quickly by an author relying on information from third parties to reach conclusions that are not independently verifiable does "not possess that indicia of trustworthiness which underlies the hearsay exceptions." *Miller v. Caterpillar Tractor Co.*, 697 F.2d 141, 144 (6th Cir. 1983); *see also United States v. El-Mezain*, 664 F.3d 467, 499 (5th Cir. 2011) (record did not qualify for exception where the procedures and methods used to reach the stated conclusions were not known).

*Finally*, public records are admissible, in part, because "the record is likely to be much more reliable than the official's often hazy recollection." 7 Handbook of Fed. Evid. 803:8 (9th ed.). This is particularly applicable where the record contains "routine, objective observations, made as part of the everyday function of the preparing official." *Quezada*, 754 F.2d at 1194. In such a circumstance, "there is a great likelihood that a public official would have no memory at all respecting his action in hundreds of entries that are little more than mechanical." *Wong Wing Foo v. McGrath*, 196 F.2d 120, 123 (9th Cir. 1952). "A further necessity lies in the inconvenience of calling to the witness stand all over the country government officers who have made in the course of their duties thousands of similar written hearsay statements concerning events coming within their jurisdiction." *Id.* But here, the Spreadsheet consists of nothing more than the hazy recollections of various City employees on matters that are not routine; they are not objective

observations made as part of their everyday functions or of Mr. Tobias' everyday functions. As explained above, department heads hastily assembled estimated information that no one had a duty to track and submitted it to Mr. Tobias, who then manipulated it to try to justify the fees in the Code. Allowing such a document into evidence as a public record would turn the whole purpose of the public record exception on its head. It, and all underlying charts and data, should therefore be excluded.

## CONCLUSION

For the reasons set forth above, Verizon respectfully requests that the Court exclude the Spreadsheet and all evidence related to the Spreadsheet at trial.

Dated: New York, New York
       February 24, 2023

KELLEY DRYE & WARREN LLP

By:     /s/ Damon W. Suden
        Damon W. Suden
        3 World Trade Center
        175 Greenwich Street
        New York, NY 10007
        Tel: (212) 808-7800
        Email: dsuden@kelleydrye.com

        Lauri A. Mazzuchetti (*pro hac vice*)
        Robert N. Ward
        One Jefferson Road, 2nd Floor
        Parsippany, NJ 07054
        Tel: (973) 503-5900
        Email: lmazzuchetti@kelleydrye.com
             rward@kelleydrye.com
        *Attorneys for Plaintiff*
        *Cellco Partnership d/b/a Verizon Wireless*