UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

CELLCO PARTNERSHIP D/B/A VERIZON
WIRELESS,

                 Plaintiff,

     v.

CITY OF ROCHESTER,

                 Defendant.

6:19-cv-06583-EAW-MWP

---

CROWN CASTLE FIBER LLC,

                 Plaintiff,

     v.

CITY OF ROCHESTER,

                 Defendant.

6:20-cv-6866-EAW-MWP

---

EXTENET SYSTEMS, LLC,

                 Plaintiff,

     v.

CITY OF ROCHESTER,

                 Defendant.

6:20-cv-7129-EAW-MWP

---

**PLAINTIFFS' JOINT REPLY IN SUPPORT OF THEIR MOTIONS FOR
JUDGMENT ON PARTIAL FINDINGS, TO EXCLUDE EVIDENCE, AND FOR
DISCOVERY SANCTIONS**

# <u>TABLE OF CONTENTS</u>

**Page(s)**

PRELIMINARY STATEMENT ................................................................................ 1

ARGUMENT ......................................................................................................... 3

I.    The City Failed to Meet Its Burden of Establishing the Cost-Basis of Its Fees. ............... 3

    A.    The City Cannot Justify Its Fees Because It Did Not Have Any Method of Accounting for Its Costs. ................................................................. 4

    B.    The City Overstates the Types of Costs It Can Recoup Under the *Barriers Order*.............................................................................................. 7

    C.    The City Does Not Dispute That Telecom Providers Pay for Many of the Costs Included in the Spreadsheet. ............................................ 10

    D.    The City Fails To Comprehend That the Spreadsheet is Replete with Non-Recurring Costs.................................................................................. 11

    E.    The City Has Not Met Its Burden of Establishing That Its Supposed Costs are Objectively Reasonable ............................................................... 13

II.    The Spreadsheet is Inadmissible Hearsay That Was Created in Anticipation of Litigation, Does Not Qualify as a Public Record, and is Untrustworthy ....................... 14

    A.    The Spreadsheet Is Inadmissible Because It Was Created In Anticipation of, And While the City Was Actively Engaged In, Litigation............................ 14

    B.    The Spreadsheet is Not Admissible as a Public Record. .................................... 15

    C.    The Spreadsheet is Inadmissible Because it is Untrustworthy ........................... 17

III.    Mr. Tobias' Testimony Is Improper Expert Testimony.................................................. 18

IV.    Plaintiffs' Arguments Under the Summary Document and Best Evidence Rules Were Not Waived, and the City Does Not Rebut Them................................................... 20

V.    The City Does Not Meaningfully Rebut Its Discovery Failures..................................... 21

    A.    The City Introduced Evidence at Trial That It Failed to Provide in Discovery. .................................................................................... 21

    B.    The City Failed to Preserve Iterations of the Spreadsheet. .................................. 22

    C.    The City Failed to Preserve Notes and Inputs for the Spreadsheet...................... 23

i

VI.     Judgment Should be Entered inn Crown Castle's Favor On The Article 78 Claims....... 24

CONCLUSION ........................................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bank of China v. NBM LLC*,
    359 F.3d 171 (2d Cir. 2004).................................................................................18

*Beech Aircraft Corp. v. Rainey*,
    488 U.S. 153 (1988)........................................................................................16

*Chill ex rel. Calamos Growth Fund v. Calamos Advisors LLC*,
    417 F. Supp. 3d 208 (S.D.N.Y. 2019).................................................................19

*Cellco P'ship v. City of Rochester*,
    623 F. Supp. 3d 184 (W.D.N.Y. 2022)..............................................................20

*Ferrari Club of Am. v. Bourdage*,
    2017 WL 1498080 (W.D.N.Y. Apr. 25, 2017) ....................................................19

*Humane Soc'y v. Hanor Co. of Wisconsin, LLC*,
    289 F. Supp. 3d 692 (D.N.C. 2018) ...........................................................16, 17

*Parsons v. Honeywell, Inc.*,
    929 F.2d 901 (2d Cir. 1991)............................................................................16

*In re UBS AG Secs. Litig.*,
    No. 07-CV-11225, 2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012)...........................15

*United States v. Williams*,
    827 F.3d 1134 (D.C. Cir. 2016) .......................................................................20

**Statutes**

CPLR § 7801...........................................................................................................24

Telecommunications Code of the City of Rochester, N. Y. § 106-15(E). ....................................11

**Other Authorities**

Fed. R. Civ. P. 37(c)(1).............................................................................................18

Fed. R. Civ. P. 52 .....................................................................................................2

Fed. R. Evid. 102 .....................................................................................................20

Fed. R. Evid. 401 .....................................................................................................22

Fed. R. Evid. 403 ...................................................................................................22

Fed. R. Evid. 701 ...................................................................................................18

Fed. R. Evid. 702 ...................................................................................................18

Fed. R. Evid. 1002 .......................................................................................20, 21, 24

Fed. R. Evid. 1006 .......................................................................................20, 21, 24

*In re Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Investment*, 33 FCC Rcd 9088 (2018), *aff'd, City of Portland v. United States*, 969 F.3d 1020, 1039 (9th Cir. 2020) ....................................... *passim*

## PRELIMINARY STATEMENT[1]

The City's opposition largely ignores the factual record Plaintiffs set out in their opening memorandum, Joint Mem. at 5-24,[2] and reflects a misinterpretation of the *Barriers Order*'s[3] requirements.  As a result, the City fails to refute the points Plaintiffs made in support of their motions for judgment under Rule 52.  Thus, the motions should be granted.

Instead of engaging with the record, the City rests its entire case on the notion that the *Barriers Order* only requires an "approximation" of costs and does not require any particular type of cost accounting.  Therefore, according to the City, the Spreadsheet Mr. Tobias generated was good enough.  The City is wrong.  The use of the word "approximation" in the *Barriers Order* is *not* a catch-all safe harbor allowing local governments to justify fees based on undocumented, purely speculative estimates.

In fact, the *Barriers Order* requires that fees be a "reasonable" approximation of the costs.  Those costs must also be "objectively reasonable," "actual and direct," and "specifically related to and caused by the deployment" of the relevant telecom facilities.  *Barriers Order* ¶¶ 32, 50 n.131, 55.  Although the *Barriers Order* gives leeway to municipalities in the manner that they account for costs, it still requires that the costs actually be known and caused by the facilities at issue, so that the reasonableness of the fees can be determined.

Here, the City's claimed costs are none of those things.  The City already recoups its one-time, non-recurring costs through a $2,000 permitting fee but nevertheless seeks to recover them again through its annual recurring fees.  The trial evidence also shows that the City intended to

---

[1] All capitalized terms not otherwise defined herein are defined in the Plaintiffs' Joint Memorandum.

[2] "Joint Mem." refers to Plaintiffs' Joint Memorandum of Law in Support of Their Motions for Judgment on Partial Findings, to Exclude Evidence, and for Discovery Sanctions, filed Jul. 31, 2023, which appears on the dockets as follows: Verizon, Dkt. 104-1; Crown Castle, Dkt. 66-1; ExteNet, Dkt. 78-1.

[3] *In re Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Investment*, 33 FCC Rcd 9088 (2018) ("*Barriers Order*"), *aff'd*, *City of Portland v. United States*, 969 F.3d 1020, 1039 (9th Cir. 2020).

charge an alleged "fair market value rental" fee for use of the right-of-way ("ROW"), but when the FCC's *Barriers Order* made clear that "fair market value" fees were not allowed, the City simply changed the name of the annual fees without substantially altering the structure or amount. Mr. Tobias then went about trying to justify these fees as cost-based but faced a significant a problem: the City does not track its costs associated with telecom in the ROW. As a result, the "method" Mr. Tobias devised to justify the City's already-adopted fee amounts was haphazard, post hoc, untestable, and untrustworthy. It involved speaking with unidentified City employees, who themselves have no obligation to track their time, and apparently keep no documentation or record of the alleged costs, and then making "black box" calculations and applying a "smell test" to assign millions of dollars of alleged costs to telecom providers. The *Barriers Order* demands more than this type of *ad hoc* process for counting costs. Otherwise, the cost-based standard would devolve into pure speculation, as it did in this case. When reviewed under the proper cost-based standard the *Barriers Order* articulated, the City's exercise is plainly inadequate. Plaintiffs, therefore, should be granted judgment under Rule 52.

Judgment can also be entered for the Plaintiffs because the evidence relied upon by the City to meet its burden is inadmissible. Joint Mem. at 47-57. The City argues that the Spreadsheet is not hearsay because it reflects factual findings of a legally authorized investigation. But there is no evidence in the record of the City or State authorizing the steps Mr. Tobias took to put together the Spreadsheet. Nor does the Spreadsheet represent factual findings. Moreover, Mr. Tobias' testimony about his cost analysis is really undisclosed expert testimony and can be excluded on that ground as well. Mr. Tobias is not an expert, and the City's opposition emphasizes its conundrum by first relying on Mr. Tobias's supposed expertise to buttress his opinions, but then attempting to disclaim any reliance on him as an expert. The City

2

cannot have it both ways.

Finally, the City misstates the facts regarding its spoliation of evidence. The record shows that the City created the Spreadsheet in April 2019, continued to edit the Spreadsheet up until September 11, 2020, and then produced the final version during discovery. But all prior iterations of the Spreadsheet—i.e., all versions from April 2019 through September 2020—were destroyed as the document was edited, a process that admittedly continued while the lawsuit was pending. Similarly, Mr. Tobias admits that he destroyed any notes he took of his conversations with City employees that, supposedly, formed the basis for the Spreadsheet. And, finally, Mr. Tobias testified at length at trial about the State Street project in an effort to show the types of costs incurred by the City, but the City did not produce any documents regarding that project in discovery. All of these discovery violations warrant sanctions, including the exclusion of evidence and adverse inferences.

## ARGUMENT

### I.     The City Failed to Meet Its Burden of Establishing the Cost-Basis of Its Fees.

The City's opposition is rooted in a fundamental mischaracterization of the *Barriers Order* and the burden it places on municipalities to justify the fees they seek to impose on telecom providers. In particular, the City misconstrues the *Barriers Order* both with respect to the need for substantiated accounting methodologies and the types of costs that a City may recoup. These misunderstandings fatally undermine each of the City's attempts to justify its fees.

## A.      The City Cannot Justify Its Fees Because It Did Not Have Any Method of Accounting for Its Costs.

Plaintiffs explained in their moving brief, and the City does not dispute, that the City does not track its costs associated with telecom facilities and City employees do not track their time spent on telecom related tasks.  Joint Mem. at 12-14; 27; Opp. at 9 ("[M]unicipalities are generally in the business of providing services, not the business of tracking the municipal costs accrued as a result of third-party use of the City right of way.").[4]  It is impossible for the City to establish that its fees are a "reasonable approximation" of its costs because it does not know what its costs are.  It is also impossible for the Court to determine whether the fees approximate the costs, reasonably or otherwise, without any record of what the costs are.  Those undisputed facts are enough to grant Plaintiffs' motions.

In opposition, the City suggests that, because the *Barriers Order* does not specify a particular accounting method for substantiating cost-based fees, the City was free to adopt fees in the Code and then try and justify them using the *post hoc* Spreadsheet.   Opp. at 7-8.  Specifically, the City seems to argue that the FCC's use of the phrase "reasonable approximation" of costs to describe permissible local fees would permit any attempt—however accurate or inaccurate, serious or unserious—to approximate costs.  But, the FCC's use of the word "approximation" was not an invitation for the City to include unsubstantiated figures, mix accounting methodologies, and make "black box" guesses at what the City's costs might be—all after the City adopted fee amounts based on some other basis.  Doing so might result in an "approximation" of sorts, but not a "reasonable" one.

While the *Barriers Order* permits flexibility in accounting for costs, that flexibility is

---

[4] "Opp." refers to the City of Rochester's Memorandum of Law in Opposition to Plaintiffs' Joint Motion for Judgment on Partial Findings, to Exclude Evidence, and for Discovery Sanctions, which appear on the dockets as follows: Verizon, Dkt. 108; Crown Castle, Dkt. 70; ExteNet, Dkt. 82.

cabined by two complementary obligations set forth in the *Barriers Order*: (i) that the fees be a "reasonable approximation" of actual and direct costs, and (ii) that "only objectively reasonable costs are factored into those fees." *Barriers Order* ¶ 50. The *Barriers Order* further clarifies that, "[b]y costs, [the FCC] mean[s] those costs *specifically related to and caused by the deployment*." *Id.* ¶ 50 n.131 (emphasis added). Later, the *Barriers Order* characterizes these recoupable costs as "direct" and "direct and actual." *Id.* ¶¶ 56, 75.

By emphasizing that "fees must not only be limited to a reasonable approximation of costs, but in order to be reflected in fees, the *costs themselves* must also be reasonable," *id.* ¶ 70 (emphasis in original), the FCC made clear that local jurisdictions seeking to justify their fees under federal law must not only show that the fees are reasonable estimates of their actual costs, but also demonstrate that the costs themselves are "objectively reasonable." *Id.* ¶ 72. Further, the FCC emphasized that "reasonable" is a critical limiting factor—one that would serve to prohibit recovery of costs, even where the government has actually incurred them, where those costs are excessive or inappropriate. *See id.* ¶ 70.

While the *Barriers Order* rejected "that localities must use any *specific* accounting method to document the costs they may incur," *id.* ¶ 76 (emphasis added), that does not mean that localities can use no method at all. It is impossible to demonstrate that fees reasonably approximate direct and actual costs and that the costs are objectively reasonable without a consistent, repeatable method for calculating and comparing costs. Further, those cost calculations must be based on some fundamental tracking of costs that can be substantiated, not *post hoc*, unrecorded, undocumented conversations with unnamed employees. An estimate of costs that does not follow these basic principles is not repeatable and thus cannot be tested for reasonableness, both with respect to whether the fees approximate the costs and with respect to

whether the costs themselves are reasonable.  Indeed, if costs cannot be substantiated, a local government could use an "approximation" to include costs that would be excluded as unreasonable if they had been identified.  The FCC specifically stated, for example, that unreasonable fees for consultants cannot be recovered, *id.* ¶¶ 56, 70, so it would make no sense to allow a local government to recover those same amounts through "approximations."

Lacking any record of its actual costs, the City argues that Mr. Tobias' "method" for assessing costs was to "speak with individual employees about the nature and frequency of their work that is caused by telecommunications facilities in the right of way" and that this was "entirely consistent with the *Barriers Order*."  Opp. at 9.  But the evidence at trial shows that this "method" was not really a "method" at all—it was an *ad hoc* effort to slice and dice salary and capital cost information to justify fees that had already been enacted.  Joint Mem. at 43-45. There is no evidence that City employees told Mr. Tobias how much time they spend on work "caused by telecommunications facilities in the right of way."  Nor could they reliably do so, since the City admits they do not track these figures.  At best, employees would be giving guesses based on their subjective impressions.  Moreover, the evidence shows that City employees were asked to provide the "MOST" and "ALL" information about their time spent on work in the ROW regardless of whether it related to telecom facilities, and Mr. Tobias would then decide what to include and exclude.  Joint Mem. at 28; Ex. M.  In some cases, the decision about what to include or exclude was made by unidentified people using a methodology that Mr. Tobias himself referred to as "black box" calculations.  (Tr. 155:1-156:14.)  Mr. Tobias admits that these numbers may well be "too high."  (Tr. 151:7.)  And because Mr. Tobias destroyed his notes of these conversations, it is impossible to know what questions he actually *did* ask the employees, and whether these questions were consistent from person to person or department to

department.

Thus, the City did not meet its burden of establishing that its fees were a reasonable approximation of its "actual" and "direct" costs as the *Barriers Order* requires because the City does not track its "actual" and "direct" costs.

**B.    The City Overstates the Types of Costs It Can Recoup Under the *Barriers Order*.**

As explained in Plaintiffs' opening memorandum, the *Barriers Order* only permits recovery of costs that are "specifically related to and caused by" telecom deployments.  Joint Mem. at 28-29.  Yet, the Spreadsheet includes a wide range of alleged costs that have nothing to do with telecom deployments and would have been incurred even if there was not a single telecom facility in the City, such as police, fire, and emergency personnel salaries and the capital costs associated with the general maintenance of City streets.  Joint Mem. at 28-29.  Nothing in the *Barriers Order* suggests that such cost recovery is permitted.  To the contrary, the *Barriers Order* makes clear that it is not.

The City argues that the *Barriers Order* is not limited to "incremental costs," Opp. at 10, but this argument cannot be squared with the portions of the *Barriers Order* that the City itself cites.  Opp. at 10.  As the City recognizes, *id.* at 9, the FCC clarified that "[b]y costs, we mean those costs specifically related to and caused by the deployment"—in other words, the *incremental costs* borne by the City as the result of the deployment of telecommunications facilities.  *Barriers Order* ¶ 50, fn. 131.  "[C]osts specifically related to and caused by" is the definition of an "incremental cost."  *Id.*  In fact, the *Barriers Order* places clear guardrails about what kinds of costs qualify for recovery, including "a variety of direct and actual costs. . . such as the cost for staff to review the provider's siting application, costs associated with a provider's use of the ROW, and costs associated with maintaining the ROW itself or structures within the

ROW to which Small Wireless Facilities are attached." *Id.* ¶ 75.

Although the *Barriers Order* permits recovery of staff time to review an application, the City has stretched that one example beyond recognition—essentially seeking to recover portions of the salaries of hundreds of City employees, including police, fire, and emergency response personnel. Joint Mem. at 39-41. The City also seeks to include varying percentages of capital investment budgets as justification for its fees. The *Barriers Order* does not envision recouping the costs associated with street widening and beautification projects merely because there happen to be telecom facilities underground (or on light poles). Rather, the *Barriers Order* allows the City to recoup only those additional costs that are directly caused by the presence of those facilities.[5] And where, as here, the telecom providers are fully responsible for relocating those facilities when asked to do so, including the costs associated with excavating and repairing the street, the City might not bear *any* additional costs from the deployment of these facilities. Joint Mem. at 29-31.

While the City claims that the "spreadsheet sets forth direct City personnel and capital costs caused by telecommunications facilities in the right of way," Opp. at 8, testimony at trial revealed that Mr. Tobias included a variety of costs in his calculations that are not caused by or even connected to telecommunications facilities in the rights of way *at all*. (Tr. 73:9-74:2.) For example, Mr. Tobias took a multi-year summary of construction projects (many of which have no apparent telecom component), applied a "black box" calculation to the number, and included it in the Spreadsheet as if it were an annual expense attributable to telecom. (Tr. 155:5-156:14.) Indeed, that jumble of years' worth of unrelated construction projects accounts for a significant

---

[5] The phrase, "costs associated with maintaining the ROW itself," *Barriers Order* ¶ 75, must be read in the context of the entire sentence. It is not an opening to charge the telecom industry with the cost of all ROW maintenance. Rather, from the structure of the sentence it is clear that the FCC was referring to any additional maintenance cost that might be specifically caused by a telecom installation, such as if the City were required to perform repairs because of the existence of telecom facilities and was not already reimbursed by the telecom company.

percentage of the purported "costs" in the Spreadsheet.  (Tr. 155:5-156:14.)   The City's Opposition breezily acknowledges that "Mr. Tobias also added certain infrastructure or capital costs related to telecommunications facilities in the right of way to his linear cost analysis," Opp. at 8, but does so in a way that dramatically understates the impact of this "black box" decision— the $2.6 million allocated to these costs is more than half of the annual costs attributed to underground telecommunications facilities in the Spreadsheet.  (Tr. 297:7-10.)

Further, the obligation to include only actual costs bars the City's inclusion of projected costs for projects that may or may not occur several years in the future.  (Tr. 294:9-297:5 (Mr. Tobias explaining that the list of capital projects included some that would not be completed until July 2024 or had no construction year assigned, just "TBD").)   And the obligation to include only direct costs necessarily excludes indirect costs, thus precluding the plethora of employee time that at most tangentially involves the mere existence of telecom facilities in the ROW.  (Tr. 74:17-22, 76:15-78:4.)

Moreover, Mr. Tobias's testimony contradicts the City's litigation position that costs need not be limited to incremental costs.  He testified that he did not include certain capital expenses related to the purchase of light poles in his analysis because they would have been purchased regardless.  (Tr. 74:10-16 ("[T]hose capital costs probably were not appropriate in including in that cost analysis because the City purchased those light poles whether you put small cells on them or not, so that was excluded").)  Thus, Mr. Tobias recognized that expenses that would have been incurred anyway should not be included in the cost analysis, but he applied this limitation selectively as it suited his needs to justify the already-enacted fees set forth in the Code.

The FCC's focus on incremental costs is also supported by its conclusion that a

presumptively reasonable fee for small cell attachments is $270 per pole and that such a fee would only need to be exceeded in "very limited circumstances" where a municipality could demonstrate higher costs. *Barriers Order* ¶ 80. If the Court approved the cost analysis Mr. Tobias conducted, almost every municipality in the nation could easily exceed the presumptively reasonable fee by simply including, as the City does here, a percentage of the salaries of all city employees and a "black box" percentage of capital investment budgets.

The City also ignores that the fees for fiber installations ultimately enacted in the Code are almost exactly the same as the fees contained in the draft Code circulated before the *Barriers Order*. Then, the City called them "fair market value rental compensation" for use of the ROW. Exs. 45, 158; (Tr. 176:21-177:9). Thus, the City's own documentation shows that before the *Barriers Order*, the City viewed the fees as unconcerned with and unrelated to the City's costs. After the *Barriers Order*, the City changed the description of the fees to "cost recovery," but did not change the fees themselves. The *Barriers Order* plainly prohibits precisely these types of fees. *Barriers Order* ¶ 73 (noting that "local fees designed to maximize profit are barriers to deployment" and expressly rejecting the argument that municipalities be allowed to charge "fair market value" for ROW access). The City's label change does not make the fees lawful.

### C.   The City Does Not Dispute That Telecom Providers Pay for Many of the Costs Included in the Spreadsheet.

Plaintiffs explained that telecom providers actually pay for many of the costs reflected in the Spreadsheet. Joint Mem. at 29-31. In opposition, the City argues that "there is no proof of this" because the City is not seeking to recoup costs paid by the telecom providers but instead only "its own costs." The City gives one example, noting that the City must oversee and coordinate construction work, such as pre-construction meetings, even though the telecom providers pay for their own construction costs. Opp. at 10-11. This point ignores the litany of

costs contained in the Spreadsheet that are wholly the responsibility of the telecom providers, "such as construction, maintenance, removal, relocation, street lighting, inspections, operations, equipment, and stake outs."  Joint Mem. at 340.  Indeed, the City completely ignores the trial evidence demonstrating that telecom providers alone are responsible for many of the same activities that Mr. Tobias decided to include in his Spreadsheet.  Joint Mem. at 29-31.

The City also ignores that Mr. Tobias' testimony on this point was misleading, at best. For example, on direct, in trying to explain the costs incurred by the City, Mr. Tobias testified about the State Street project and the costs associated with relocating a pole containing a small cell attachment.  (Tr. 33:20-34:12, 287:13-17.)  The clear import was to suggest that these are the types of costs incurred by the City.  On cross, however, Mr. Tobias admitted that the cost of relocating the pole would actually be borne by the telecom providers—not the City.  (Tr. 289:16-23); *see also* Joint Mem. at 29-31.  On this point, as with a number of others, Mr. Tobias' testimony has no credibility.

### D. The City Fails To Comprehend That the Spreadsheet is Replete with Non-Recurring Costs.

While the City relies on the Spreadsheet to support its annual, recurring fees, Plaintiffs demonstrated that Mr. Tobias's analysis is unreliable because he counted both recurring and non-recurring costs.  Joint Mem. at 32.  In opposition, the City argues that "[t]he only two non-recurring costs that plaintiffs purport to identify are 'first-year, one-time' costs and the 'one-time purchase of the GIS system upgrade.'"  Opp. at 11-12.

The City essentially concedes that it already recovers first-year, one-time costs with its $2000 permit fee.[6]  As a result, it resorts to arguing that the $2000 permit fee can simply be

---

[6] The Code also allows the City to recover outside consultant costs from applicants, and does not cap or otherwise limit the size of these fees.  Telecommunications Code of the City of Rochester, N. Y. § 106-15(E).

subtracted from the $4,381 annual recurring costs Mr. Tobias calculated.  But this is bad math.  Subtracting a fee amount from a cost amount is mixing apples and oranges.  The proper way to fix this mistake, even assuming the rest of the Spreadsheet were valid, would be to add up the one-time costs and then subtract those costs from the overall costs reflected in the Spreadsheet.  Mr. Tobias already admitted that the "lion's share" of costs take place in the first year.  (Tr. 246:13-23.)  Thus, the "lion's share" of costs should be removed from the Spreadsheet.  Instead, the City proposes that the Court simply subtract $2000 (which is a fee amount, not a cost amount) from the supposed annual recurring costs of $4,381.  This results in less than half of the costs being removed, not the "lion's share."

Similarly, as to the GIS Upgrade, the City argues that the cost of the upgrade can simply be subtracted from the fiber costs reflected in the Spreadsheet.  Opp. at 11-12.  But this correction ignores that the Spreadsheet includes a variety of other one-time costs, including costs associated with hundreds of millions of dollars of capital expenses.

The City's proposed analytic Band-Aids ignore a fundamental truth: as Mr. Tobias testified at trial, the Spreadsheet does not attempt to actually capture annual, recurring costs *at all*.  Mr. Tobias conceded that the Spreadsheet was intended to be "the snapshot of what the cost was at that time," and that he does not "purport that will be the same number next year or the year after." (Tr. 298:13-17.)  There is no way to manipulate the data in the Spreadsheet to justify an annual fee, because Mr. Tobias conceded that he made no effort to ensure that the Spreadsheet measured costs that would repeat year-over-year: "[t]here may be things that get added to the list or fall off the list or reduced or increased."  *Id.*  Instead, Mr. Tobias took a moment in time, haphazardly tried to estimate the amount that the City was spending *as of that moment*, and once he got to an amount above the fees the City already enacted, stopped counting.  (Tr. 298:23-

299:04.) Because even the allegedly "recurring" costs in the Spreadsheet could change from year to year, no amount of addition or subtraction could yield a reliable approximation of actual and direct recurring costs.

> **E.     The City Has Not Met Its Burden of Establishing That Its Supposed Costs are Objectively Reasonable.**

The City's attempts to turn the burden of proof on its head. The City bears the burden of showing its fees are reasonable, and it put forth Mr. Tobias and the Spreadsheet in order to try and meet that burden. But the City failed to meet its burden. The testimony and evidence *the City* introduced offer nothing but speculation. Plaintiffs demonstrated the Spreadsheet is objectively unreasonable and unreliable. In response, the City argued that because Plaintiffs did not depose or cross-examine individual City employees, "[t]hey have nothing but speculation to call any of Mr. Tobias's time estimates into question." Opp. at 12. The City has it backwards.

Mr. Tobias spoke with unidentified City employees, destroyed all of his notes (if he had any), destroyed all prior versions of the Spreadsheet, and used the "smell test" to validate his cost estimates. (Tr. 224:16-22, 227:5-228:8, 232:8-233:22.) Plaintiffs could not have deposed City employees because there is no record of who Mr. Tobias spoke to (Tr. 226:2-16), and the City did not disclose those persons' identities. *See* Ex. D, Defendant's Second Set of Responses to Plaintiff's First Sets of Interrogatories and Request for Production of Documents, dated September 24, 2020, No. 5 (asking the City to identify any persons who performed any analysis to determine whether fees set forth in the Code relate to the City's actual or anticipated actual Costs); *see also* Ex. C, Defendant's Responses to Plaintiff's First Set of Interrogatories and Requests for Production (asking the City to identify any persons with knowledge of the methodology used by the City in creating the Spreadsheet). Further, when the Plaintiffs sought testimony under Rule 30(b)(6), it was the City that identified Mr. Tobias as the witness that

could speak on its behalf on these issues.

Moreover, that Mr. Tobias sought to rely on the input of unidentified City employees that were not called to testify at trial highlights the hearsay problems with his testimony and the Spreadsheet itself. *See* Section II.C, *infra*. Plaintiffs cannot cross examine absent and unidentified City employees. The City also ignores all of the other indicia of unreliability Plaintiffs highlighted. Joint Mem. at 43-45; *see also* Section I.C, *supra*.[7]

Rather than meet its burden to demonstrate its costs and that those costs are reasonable, the City has chosen to assert that it need only engage in the most speculative of "approximations." For all the reasons identified in Plaintiffs' Joint Mem., and above, the City's direct case fails to satisfy its burden under federal law.

## II.   The Spreadsheet is Inadmissible Hearsay That Was Created in Anticipation of Litigation, Does Not Qualify as a Public Record, and is Untrustworthy.

### A.   The Spreadsheet is Inadmissible Because It was Created in Anticipation of, and While the City was Actively Engaged In, Litigation.

The trial evidence demonstrates that the Spreadsheet was prepared in anticipation of litigation. Joint Mem. at 49-50. The facts show that the City anticipated litigation since at least summer of 2018, that Verizon and CenturyLink explicitly threatened litigation over the City's proposed new Telecom Code in January of 2019, and that the Spreadsheet itself was created in response to demands from Verizon and CenturyLink to justify the City's fees and was then edited *during this litigation*. *Id.* In its opposition, the City concedes, as it must, that "it is certainly true, given the changes that the Telecommunications Code was expected to introduce, the City anticipated that litigation was a possibility." Opp. at 13-14. That should end the

---

[7] The City also seeks to rely on its "survey" of "what other municipalities were holding out as their annual small cell fees" as evidence that Rochester's fees are not prohibitively high, because Rochester falls "in the middle" of a "range of fees from $93/facility to $7,200/facility." Opp. at 5. But the City does not address the arguments made by Plaintiffs that this survey is both inadmissible hearsay and riddled with errors. *See* Joint Mem. at 55-57.

inquiry.

The City argues, nevertheless, that the Spreadsheet should not be excluded because Verizon "never threatened litigation over the fees" but instead only threatened litigation over "small wireless siting issues." Opp. at 14. The City is wrong. Verizon's letter stated that "[t]he amendment is also *in direct conflict with applicable law*, including recent developments in federal law relating to the siting of small wireless facilities . . . and would create ambiguities or inequities *likely to generate future litigation*." Ex. Q (emphasis added); *see also* Ex. S. That Verizon identified "siting of small wireless facilities" as one area in which there were recent developments does not exclude fees for siting small cells in the ROW—in fact, the entire letter is about the *Barriers Order*, which concerns itself with fees. Moreover, in the section of the letter discussing fees, Verizon states repeatedly that the City's proposed fees "clearly violate federal law as applied to small cells." Ex. Q at 5. The threat of litigation is plain on the face of the letter and that is how Mr. Tobias understood it. (Tr. 202:8-12.)

Even if all that were not enough, the record also shows that Mr. Tobias created the Spreadsheet in April 2019 and continued to edit it *during the litigation* until it was produced during discovery. (Tr. 254:6-11.) The City ignores these facts entirely. The Spreadsheet was, therefore, prepared not just in anticipation of litigation but while litigation was actually pending.

**B.      The Spreadsheet is Not Admissible as a Public Record.**

The City fails to rebut Plaintiffs' argument that the Spreadsheet does not qualify as a public record under Rule 803(8)(A)(i), Joint Mem. at 46-48, and therefore concedes the point. Opp. at 15–19; *see In re UBS AG Secs. Litig.*, No. 07-CV-11225, 2012 WL 4471265, at *11 (S.D.N.Y. Sept. 28, 2012) (a party "concedes through silence" arguments that it fails to address). Instead, the City argues that the Spreadsheet is admissible under Rule 803(8)(A)(iii) as factual findings of a legally authorized investigation. But the Spreadsheet neither contains factual

findings nor was there a legally authorized investigation.  *See* Joint Mem. at 48-49.

*First*, the City argues that the *Barriers Order* itself authorizes the investigation Mr. Tobias conducted because it "requires that municipal compensation be cost-based" and the City is therefore "under a legal obligation—at risk of preemption by 47 USC § 253—to undertake a cost analysis and Mr. Tobias, as Director of Telecommunications, was authorized to do so." Opp. at 12.  But as a legal matter, the *Barriers Order* does not require a municipality to conduct a cost analysis.    Federal law neither requires nor empowers local governments to charge right of way fees on telecommunications providers.  Rather, it imposes limits to the extent they seek to do so.  And as to small cells, the *Barriers Order* specifically provides that a municipality can avoid the need for justifying its fees altogether by charging the presumptively reasonable fees set out in the *Barriers Order*.  Moreover, the City has not cited any State or City law authorizing the so-called investigation Mr. Tobias conducted, which distinguishes this case from the cases Plaintiffs cited where the legal basis for the investigation was clear.  Joint Mem. at 48 (citing cases).  And as a factual matter, the trial record demonstrates that Mr. Tobias' investigation was *not* legally authorized, but was instead an *ad hoc* effort, largely if not exclusively prompted by the threat of litigation, to justify fees already enacted.

*Second*, the City argues that the Spreadsheet reflects factual findings because public records are admissible under Rule 803(8)(A)(iii) even if they state a "conclusion or opinion." Opp. at 12-13, citing *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 170 (1988).  But this argument ignores that even a report containing conclusions or opinions is only admissible if the underlying facts are gleaned from public officials with a legal duty to report them.  Joint Mem. at 47-48, citing *Parsons v. Honeywell, Inc.*, 929 F.2d 901, 907 (2d Cir. 1991) and *Humane Soc'y v. Hanor Co. of Wisconsin, LLC*, 289 F. Supp. 3d 692, 715 (D.N.C. 2018).  Otherwise, the report is

double hearsay.  The City unsuccessfully attempts to distinguish the two cases cited by Plaintiffs.  As to *Parsons*, the City notes that the underlying factual matter came from third parties unaffiliated with the city who had no duty to report.  The record at trial, however, shows that City employees also had no duty to track their time related to telecom in the ROW or report it to Mr. Tobias.  (Tr. 225:3-19, 287:18-23, 150:24-151:3, 260:10-13, 268:19-24, 287:5-289:4.)  As to *Humane Society*, the City argues that the Spreadsheet does not contain any "statement" of a third party; rather, it only contains the statements of Mr. Tobias.  Opp. at 13.  But, to defend against Plaintiffs' claim that the City failed to preserve Mr. Tobias's notes of his conversations with City employees, the City argues that these notes were simply incorporated into the Spreadsheet.  Opp. at 20-21.  If true, then the Spreadsheet contains factual statements from other, unidentified City employees and is inadmissible to prove the truth of what they said just as the statements of unidentified EPA managers were inadmissible in *Humane Society*.

   **C.    The Spreadsheet is Inadmissible Because it is Untrustworthy.**

   The City argues that the Spreadsheet is trustworthy because Mr. Tobias allegedly began an investigation into costs when he first started his job at the City.  But the City has not produced any evidence of a cost analysis before the creation of the Spreadsheet.  Opp. at 14-16.  The Spreadsheet was created on April 17, 2019, the very same day Mr. Tobias received an e-mail from City counsel saying "can you meet soon to discuss this? We need to respond to Verizon with a verification of our costs."  (Tr. 213:12-23, 223:1-5.)  Moreover, edits were made up until it was produced during the litigation.  (Tr. 223:3-5, 254:6-11.)  Thus, regardless of when Mr. Tobias began his so-called investigation, the Spreadsheet is a document created and edited during litigation to attempt to justify the fees that were already enacted, undermining its

reliability and trustworthiness.  Joint Mem. at 50-51.[8]

Mr. Tobias' background also has no bearing on the trustworthiness of the Spreadsheet.
Mr. Tobias' testimony only lends credence to the fact that this Spreadsheet was not created under
trustworthy circumstances, as he was unable to confirm how he verified the actual costs he
attempted to memorialize, such as the cost of a telephone pole.  (Tr. 288:2-289:6.)  Moreover,
the City cannot rely on Mr. Tobias's experience to argue that the Spreadsheet is trustworthy
while discounting his experience in order to avoid the rules regarding expert witnesses.  *See*
Section III, *infra*.  The City also does not grapple with the other indicia of untrustworthiness
described at length in Plaintiff's opening memorandum.  Joint Mem. at 50-51.

## III.    Mr. Tobias' Testimony Is Improper Expert Testimony.

Plaintiffs demonstrated that Mr. Tobias' opinion testimony regarding the cost allocations
and whether those allocations were reasonable is improper, undisclosed expert testimony that
violates Federal Rules of Evidence 701 and 702 and Federal Rule of Civil Procedure 37(c)(1).
Joint Mem. at 51-53.  Relying on *Bank of China v. NBM LLC*, 359 F.3d 171 (2d Cir. 2004), the
City claims that Mr. Tobias is not an expert because his testimony merely "explained the
rationale and methods he used in undertaking his cost analysis—including his position that the
analysis he performed is reasonable, as are the costs considered as part of that analysis."  Opp. at
16-17.  The City's reliance on *Bank of China* is misplaced.

This Court applied *Bank of China*, as well as several other authorities cited by Plaintiffs,
in *Ferrari Club of America, Inc. v. Bourdage*, to hold that an accountant who performed a
financial investigation could only testify as a lay witness to the "procedures he employed in
gathering relevant information and documentation in connection with the financial audits, along

---

[8] Bearing on trustworthiness, it is worth mentioning that the City itself undercounted the amount of fiber in the
ground by over half.  Joint Mem. at 39.

with his finding and conclusions," but that his testimony exceeded the proper scope of a lay witness on those points where his testimony went "beyond what *happened* and tread into the territory of his view on whether the transactions were right or wrong and what his training tells him was appropriate or inappropriate." *Ferrari Club of Am. v. Bourdage,* 2017 WL 1498080, at *1, 4 (W.D.N.Y. Apr. 25, 2017). The Court found this testimony at odds with the proffering party's argument that the witness would merely testify to the "common sense" categories he created in reviewing the financial record. *Id.* *1. As in *Ferrari Club*, Mr. Tobias's testimony went beyond a description of his methods and veered into expert opinions regarding the reasonableness of both his own methods and the City's costs. (*See, e.g.*, Tr. 153:4-7, 154:4-5, 156:8-14, 160:19-25, 233:6-10.)

The City further argues that "in undertaking his work to arrive at his reasonable approximation, Mr. Tobias engaged in 'reasoning processes familiar to the average person in everyday life.'" Opp. at 17. But if this were actually true, the conclusions in Mr. Tobias' testimony and the analysis memorialized in the Spreadsheet would be of little value in justifying the City's costs since they would be the best guesses of an average person. "[C]ost allocation is plainly a matter of accounting" and the average layperson does not possess the kind of accounting acumen needed to perform this analysis. *Chill ex rel. Calamos Growth Fund v. Calamos Advisors LLC*, 417 F. Supp. 3d 208, 244 (S.D.N.Y. 2019) (emphasis in original).

The City also argues that "Plaintiffs set forth no testimony of Mr. Tobias indicating that he was relying on any special scientific or technical training or expertise." Opp. at 17. In addition to being inaccurate—Plaintiffs identified Mr. Tobias' offending testimony, Joint Mem. at 51-53—the City itself argues that Mr. Tobias was, in fact, relying on his own previous professional experience and expertise. In a bold attempt to have it both ways, in nearly the same

breath in which it argues that Mr. Tobias' analysis represents reasoning processes familiar to the average layperson, the City spends considerable effort to bolster the reliability of his analysis through a recitation of his expertise and professional qualifications.  *See* Opp. at 15-16.  But, "knowledge derived from previous professional experiences falls squarely within the scope of Rule 702 and thus by definition outside of Rule 701."  *United States v. Williams,* 827 F.3d 1134, 1156 (D.C. Cir. 2016).  And the City cannot simultaneously maintain that he did rely on his professional experience and that he also did not.  Accordingly, the Court should strike the parts of Mr. Tobias' testimony and the Spreadsheet that cross the line from lay opinions to expert analysis.

## IV.    Plaintiffs' Arguments Under the Summary Document and Best Evidence Rules Were Not Waived, and the City Does Not Rebut Them.

Plaintiffs demonstrated that the Spreadsheet also violates Federal Rules of Evidence 1006 ("FRE 1006") and/or 1002 ("FRE 1002"), Joint Mem. at 53-54—arguing that the City claims are waived, Opp. at 17.  Because of the unique facts and procedural developments in this case, the Court should allow Plaintiffs to raise these objections.   Verizon sought to preclude the Spreadsheet under FRE 1006 in its Motion for Summary Judgment, but the Court, based on the pre-trial record, held that the Spreadsheet did not appear to be a summary document.  Joint Mem. at 54, citing *Cellco P'ship v. City of Rochester*, 623 F. Supp. 3d 184, 201-02 (W.D.N.Y. 2022).  Thus, there was no reason to raise this issue again in a motion *in limine* before trial.  However, Mr. Tobias' trial testimony has confirmed that the Spreadsheet is a summary document, as Verizon originally argued, and it should be excluded under either FRE 1006 or 1002.

The Federal Rules of Evidence "should be construed so as to administer every proceeding fairly, eliminate unjustifiable expense and delay, and promote the development of evidence law, to the end of ascertaining the truth and securing a just determination."  Fed. R. Ev. 102.  Here,

the introduction of new facts by the City's witness at trial combined with the court's request that the evidentiary issues be discussed in post-trial briefings makes the renewal of objections made at summary judgment appropriate.  Moreover, there is no prejudice to the City in considering the FRE 1006 and 1002 objections at this point because they were raised on summary judgment and the City was plainly aware that Plaintiffs would seek to exclude the Spreadsheet on a number of grounds in the post-trial briefing as directed by the Court.  *See e.g.*, *Cellco P'ship v. City of Rochester*, No. 19-cv-6583, Dkt. 79 (W.D.N.Y. Feb. 24, 2023).   Therefore, the Court should consider Plaintiffs' arguments under FRE 1006 and 1002, and the City does not substantively rebut them.  Thus, the Spreadsheet should be excluded.

**V.     The City Does Not Meaningfully Rebut Its Discovery Failures.**

Plaintiffs' memorandum identified three areas in which the City's failure to meet its discovery obligations warrant sanctions, including exclusion of evidence and adverse inferences: (1) the new evidence regarding State Street projects; (2) the iterations of the spreadsheet; and (3) Mr. Tobias' notes and other input documents for the Cost Spreadsheet.  Joint Mem. at 57-63. The City's Opposition fails to rebut the central premises underlying Plaintiffs' request.

**A.     The City Introduced Evidence at Trial That It Failed to Provide in Discovery.**

The City claims that because it did not attempt to produce undisclosed documents or call undisclosed witnesses in presenting the evidence about State Street, the City met its discovery obligations.  Opp. at 18.  However, although Plaintiffs did not know about and thus did not refer to the State Street project in particular when propounding discovery, Plaintiffs sought information about costs allegedly incurred by the City in the ROW that the City would seek to rely on at trial, and the City's claim to the contrary is false.  *See* Opp. at 18; Joint Mem. at 22; *see also* Ex. D, Verizon Interrogatory 1 ("For each fee [listed in the Code], state whether You

21

contend that such fee is a reasonable approximation of the City's objectively reasonable Costs, and, if so, explain why and identify all facts and documents supporting Your contention."); (Tr. 34:5-35:24 (Plaintiffs objecting to the introduction of the State Street evidence since it was not previously disclosed to the Plaintiffs despite applicable discovery requests.).)  Moreover, Mr. Tobias never mentioned the State Street project during any of his depositions despite being asked about costs incurred by the City.

The City also claims that Mr. Tobias' testimony about State Street was provided "merely to exemplify the types of costs considered in his spreadsheet, but was not saying that the costs of the State Street project were actually part of his analysis."  Opp. at 18.  However, Mr. Tobias testified that "[t]he plans for State Street were probably put together four or five years ago."  (Tr. 120:3-4.)  Thus, it is not at all clear whether costs related to the State Street project were included in the Spreadsheet.  Moreover, even if the City was only using the State Street evidence to "exemplify the types of costs" at issue, it should have produced discovery about the project in response to Plaintiffs' demands so that Plaintiffs could properly cross-examine Mr. Tobias.  As it is, without the benefit of discovery, cross-examination confirmed that at least some of the costs Mr. Tobias implied were borne by the City in relation to the State Street project (like moving a light pole, Tr. 288:2-289:6) were actually borne by the telecom carriers.  And if the City is correct that it did not need to produce any discovery about State Street because it in no way bears on whether the City's fees are justified, then this evidence should be excluded as irrelevant, or as more prejudicial than probative.  *See* Fed. R. Evid. 401, 403.

**B.   The City Failed to Preserve Iterations of the Spreadsheet.**

In defending its failure to preserve iterations of the Spreadsheet, the City both misstates its obligations to preserve and confuses the factual timeline.  The City appears to have committed two distinct violations of its duty to preserve when it comes to the Spreadsheet: it failed to

22

preserve iterations *after litigation commenced* in August 2019, and it also failed to preserve iterations created in anticipation of litigation prior to August 2019.

In its opposition, the City claims that "as soon as litigation was commenced in August of 2019, the spreadsheet was preserved and later produced to plaintiffs in its native form."  Opp. at 20.  The City provides no support in the record for this assertion, and trial testimony contradicts it.  Mr. Tobias admitted that he continued to edit the document after it was created on April 17, 2019, (Tr. 227:16-22), and the City stipulated that the version of the Cost Spreadsheet produced to Plaintiffs was last modified on September 11, 2020, (Tr. 254:6-11), well after the litigation commenced.  No versions of the Spreadsheet were produced that pre-date September 11, 2020.  Thus, the City admitted that it did not preserve the document as soon as litigation was commenced.  The case at bar is therefore quite similar to those cited in Plaintiffs' memorandum, where "the overwriting or other loss of the ESI occurred during the course of the litigation."  Opp. At 20.

Moreover, Mr. Tobias testified that he began his analysis prior to April 2019, but no documents reflecting any such analysis were produced.  (Tr. 227:6-10.)  For the reasons stated in Plaintiffs' memorandum, the City was required to preserve any iterations of the Spreadsheet or the underlying analysis beginning in at least January 2019 because such documents were created in anticipation of litigation.  *See* Joint Mem. at 9-11, 49-50, 60.

**C.    The City Failed to Preserve Notes and Inputs for the Spreadsheet.**

The City claims that it was not required to retain Mr. Tobias' notes or other input documents used to create the Spreadsheet because he simply copied the information from these documents into the Spreadsheet.  Opp. at 20.  But it is apparent from the few documents Plaintiffs received that some information was not copied verbatim.  (*See, e.g.*, Tr. 155:1-156:14 (explaining that the "A&E Ongoing" capital budget amount included in the Spreadsheet came

from the "black box" of the A&E department).)  Further, Mr. Tobias repeatedly testified that his "process" was iterative, involving multiple conversations and refinement of the data.  (*See, e.g.*, Tr. 142:24-143:5, 149:19-20, 224:19-20, 219:24-222:17.)

The City claims that "plaintiffs do not appear to argue here that the notes contained information different from that entered into the spreadsheet," Opp. at 20, but this is precisely the point—without the notes and input documents, the Plaintiffs cannot know what was in them. And where, as here, the available evidence contradicts the City's assertions that the notes and input documents were duplicative, the City's destruction of these documents is troubling.  In any event, if the City is correct that input documents were duplicative of the Spreadsheet itself, then this only supports the argument above that the Spreadsheet should be excluded under FRE 1002 or 1006 as improper summary documents.

## VI.    Judgment Should be Entered inn Crown Castle's Favor On The Article 78 Claims.

The City renews its objections to Crown Castle's Article 78 claims made at summary judgment and in supplemental briefing, and claims that judgment may not be entered in Crown Castle's favor because "the trial to date has addressed only the federal Section 253 claims." Opp. at 21.  The City is correct insofar as Plaintiffs have not presented their cases in chief. However, as Plaintiffs explained in their Motion, "[b]ecause the New York standard is more stringent than (but inclusive of) the federal standard in that fees under state law must be both reasonable and necessary, the City's failure to meet its burden under federal law necessarily means that it has failed to show that its expenses are reasonable under New York law."  Joint Mem. at 64 (emphasis in original).  Accordingly, judgment under Art. 78 is warranted.

**CONCLUSION**

For the reasons stated above, Plaintiffs' motions should be granted in their entirety.

Dated: October 6, 2023

| KELLEY DRYE & WARREN LLP | MINTZ, LEVIN, COHN, FERRIS, GLOVSKY & POPEO, P.C. | WILEY REIN LLP |
|---|---|---|
| By: */s/ Damon W. Suden* | By: */s/ T. Scott Thompson* | By: */s/ Joshua S. Turner* |
| Damon W. Suden<br>3 World Trade Center<br>175 Greenwich Street<br>New York, NY 10007<br>Tel: (212) 808-7800<br>dsuden@kelleydrye.com | Scott A. Rader<br>919 Third Avenue<br>New York, NY 1022<br>Tel. 212-935-3000<br>SARader@mintz.com | Joshua S. Turner (*pro hac vice*)<br>Sara M. Baxenberg (*pro hac vice*)<br>2050 M Street, N.W.<br>Washington, D.C. 20036<br>Tel: (202) 719-7000<br>jturner@wiley.law |
| Lauri A. Mazzuchetti (*pro hac vice*)<br>One Jefferson Road, 2nd Floor<br>Parsippany, NJ 07054<br>Tel: (973) 503-5900<br>lmazzuchetti@kelleydrye.com | T. Scott Thompson (*pro hac vice*)<br>Jon Garvin (*pro hac vice*)<br>555 12th St. NW, Suite 1100<br>Washington, D.C. 20004<br>Tel: (202) 434-7440<br>SThompson@Mintz.com | Robert D. Gaudioso<br>SNYDER & SNYDER LLP<br>94 White Plains Road<br>Tarrytown, New York 10591<br>Tel: (914) 333-0700 |
| *Attorneys for Plaintiff Cellco Partnership d/b/a Verizon Wireless* | *Attorneys for Plaintiff Extenet Systems, LLC* | *Attorneys for Plaintiff Crown Castle Fiber* |