UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

CELLCO PARTNERSHIP d/b/a
VERIZON WIRELESS,

                Plaintiff,

      v.

CITY OF ROCHESTER,

                Defendant.
_____

**DECISION AND ORDER**

6:19-CV-06583 EAW

CROWN CASTLE FIBER LLC,

                Plaintiff,

      v.

CITY OF ROCHESTER, NEW YORK,
MALIK D. EVANS, *as the Mayor of the
City of Rochester (in his official capacity)*,
RICHARD PERRIN, *as the Commissioner,
City of Rochester Department of
Environmental Services (in his official
capacity)*, ROCHESTER CITY COUNCIL,

                Defendants.
_____

6:20-CV-06866 EAW

EXTENET SYSTEMS, LLC,

                Plaintiff,

      v.

CITY OF ROCHESTER, NEW YORK,

                Defendant.
_____

6:20-CV-07129 EAW

- 1 -

## BACKGROUND

In the above-captioned matters, plaintiffs Cellco Partnership d/b/a Verizon Wireless ("Verizon"), Crown Castle Fiber LLC ("Crown Castle"), and Extenet Systems, LLC ("Extenet") (collectively "Plaintiffs") claim that the fees charged by the City of Rochester ("the City") in the City of Rochester Telecommunications Code (the "Telecom Code") violate Section 253 of the Federal Communications Act of 1934 (the "Act"), 47 U.S.C. § 253 ("Section 253") and Section 332 of the Act, 47 U.S.C. § 332 ("Section 332").[1]  (*See* Civil Action No. 6:19-CV-06583 EAW (hereinafter the "Verizon Matter"), Dkt 1; Civil Action No. 6:20-CV-06866 EAW (hereinafter the "Crown Castle Matter"), Dkt. 1; Civil Action No. 6:20-CV-07129 EAW (hereinafter the "Extenet Matter"), Dkt. 1).  The parties filed motions for summary judgment in each case and the Court concluded, in relevant part, that: (1) the Court has the authority to hear Plaintiffs' causes of action for violation of Section 253 and Section 332; (2) the Federal Communications Commission's ("FCC") declaratory ruling and report and order entitled *In the Matter of Accelerating Wireless*

---

[1]     Two of the actions involve additional defendants and/or claims.  As to additional defendants, Crown Castle has sued the Mayor of the City of Rochester and the Commissioner of the City of Rochester Department of Environmental Services in their official capacities, as well as the Rochester City Council.  However, it is well-established that "claims against a government employee in his official capacity are treated as a claim against the municipality." *Malay v. City of Syracuse*, 638 F. Supp. 2d 303, 311 (N.D.N.Y. 2009).  Similarly, "[t]he City Council of the City is not a separate entity and lacks the capacity to be sued." *New Rochelle Voter Def. Fund v. City of New Rochelle*, 308 F. Supp. 2d 152, 153 (S.D.N.Y. 2003).  Accordingly, Crown Castle's claims are treated as brought against the City.

Crown Castle and Extenet have brought additional claims, which are discussed later in this Decision and Order.

*Broadband Deployment by Removing Barriers to Infrastructure Inv.*, 33 F.C.C. Rcd. 9088 (2018) (the "Barriers Order")[2] applies to challenges to the Telecom Code brought under the Act, including challenges to the City's fees for linear underground and aerial telecommunications facilities; (3) pursuant to the Barriers Order, the City bears the burden of demonstrating that the fees in the Telecom Code are cost-based; and (4) there were issues of fact regarding whether the fees contained in the Telecom Code are a reasonable approximation of the City's costs. (*See, e.g.,* Extenet Matter, Dkt. 40 at 2-3).

Following issuance of its summary judgment Decisions and Orders, the Court— with the parties' consent—conducted a two-day, partial bench trial addressed specifically to the issue of whether the City could satisfy its burden of demonstrating that the fees contained in the Telecom Code are a reasonable approximation of the City's costs related to telecommunications deployments in its right-of-way. (*See* Extenet Matter, Dkt. 70; Extenet Matter, Dkt. 72; Extenet Matter, Dkt. 73). In advance of the bench trial, Plaintiffs filed a joint motion in limine seeking to preclude a spreadsheet purporting to show the City's telecommunications-related costs (the "Cost Spreadsheet"). (*See* Verizon Matter, Dkt. 79). The Court denied that motion without prejudice to revisiting the issue of the Cost Spreadsheet's admissibility on a more fulsome record. (*See* Verizon Matter, Dkt. 92).

Upon the conclusion of the partial bench trial, Plaintiffs filed a joint motion for judgment on partial findings pursuant to Federal Rule of Federal Procedure 52(c), to

---

[2]     The Court referred to the Barriers Order as the "Small Cell Order" in its Decisions and Orders on the parties' motions for summary judgment. However, the parties have consistently referred to it as the Barriers Order in their current briefing, and so the Court has adopted that naming convention herein.

exclude the Cost Spreadsheet, and for discovery sanctions.  (Verizon Matter, Dkt. 104; Crown Castle Matter, Dkt. 66; Extenet Matter, Dkt. 78).  For the reasons that follow, the Court finds that the Cost Spreadsheet (a copy of which can be found at Docket No. 104-38 in the Verizon Matter) is not admissible.  The Court further concludes that even if the Cost Spreadsheet was admissible, the City still would not have borne its burden of demonstrating that the fees set forth in the Telecom Code are a reasonable approximation of its costs.  As such, the Court finds in favor of Plaintiffs on their claims for violation of Section 253 and Section 332.  The Court denies Crown Castle's motion for judgment in its favor on its claim for violation of Article 78 of the New York Civil Practice Law & Rules and orders supplemental briefing on the additional claims asserted by Crown Castle and Extenet.  The Court further denies Plaintiffs' request for discovery sanctions.

## DISCUSSION

## I.   MOTION TO EXCLUDE COST SPREADSHEET

The Court begins with an analysis of the admissibility of the Cost Spreadsheet.  In connection with its summary judgment Decisions and Orders, the Court rejected Plaintiffs' arguments that the Cost Spreadsheet could not possibly be admitted at trial, finding that it potentially fell within the public record exception to the rule against hearsay found at Federal Rule of Evidence 803(8)(A).  (*See, e.g.,* Verizon Matter, Dkt. 65 at 23-25).

Thereafter, Plaintiffs argued in their pre-trial motions in limine that the Cost Spreadsheet was not admissible under Rule 803(8)(A) because it was not a public record, because it was prepared in anticipation of litigation, and because the circumstances of its creation indicate a lack of trustworthiness.  (*See, e.g.,* Verizon Matter, Dkt. 79-1).  The

Court denied the motions in limine without prejudice, determining that it would be more appropriate to reach a decision on this issue after a more fulsome record was developed at trial. (*See, e.g.,* Verizon Matter, Dkt. 92). Plaintiffs have now reasserted their argument that the Cost Spreadsheet is inadmissible hearsay. (*See* Verizon Matter, Dkt. 104; Crown Castle Matter, Dkt. 66; Extenet Matter, Dkt. 78). The Court agrees, for the reasons that follow.

A.    **Legal Standard**

Hearsay—that is, an out-of-court statement offered for the truth of the matter asserted—is generally not admissible in federal court. *See* Fed. R. Evid. 802. However, the rule against hearsay does not apply to "[a] record or statement of a public office if it sets out the office's activities" or "in a civil case or against the government in a criminal case, factual findings from a legally authorized investigation," unless "the opponent . . . show[s] that the source of information or other circumstances indicate a lack of trustworthiness." Fed. R. Evid. 803(8)(A)(i), (iii), (B). The public record "exception to the hearsay rule is grounded in the presumed reliability of descriptions of agency activities submitted by disinterested government entities." *In re Vitamin C Antitrust Litig.*, No. 05-CV-0453, 2012 WL 4511308, at *2 (E.D.N.Y. Oct. 1, 2012).

### B. **The Cost Spreadsheet Lacks Indicia of Trustworthiness**

Plaintiffs have amply shown in this case that the circumstances under which the Cost Spreadsheet was created indicate a lack of trustworthiness.[3]   Initially, the Second Circuit has stated that documents prepared in anticipation of litigation generally do not qualify for the hearsay exception set forth in Rule 803(8).  *See United States v. James*, 712 F.3d 79, 89 (2d Cir. 2013) ("Rule 803(8)(A)-(B), which defines public records, excludes documents prepared in anticipation of litigation[.]"); *United States v. Feliz*, 467 F.3d 227, 237 (2d Cir. 2006)  ("Rule 803(8) excludes documents prepared for the ultimate purpose of litigation."); *see also In re Vitamin C Antitrust Litig.*, 2012 WL 4511308, at *2 ("Rule 803(8) allows the admission of public records that would otherwise constitute hearsay because of an assumption that government employees are generally reliable and non-biased and, therefore, the records are trustworthy.  Where . . . the records were prepared in connection with litigation, however, the basis for that assumption of trustworthiness vanishes.").

The evidence presented at trial clearly demonstrates that the Cost Spreadsheet was prepared in anticipation of litigation.  It is undisputed that as early as July of 2018, the City knew that Verizon and others in the telecommunications industry were objecting to the proposed fees and that there was a risk of future litigation.  (*See* Verizon Matter, Dkt. 98 at 189-90; Verizon Matter, Dkt. 104-29 at 4).  On January 10, 2019, Verizon sent a letter

---

[3]      Plaintiffs have also argued that the information in the Cost Spreadsheet does not qualify as a public record under Rule 803(8)(A).  (*See* Verizon Matter, Dkt. 104-1 at 57-58).  The Court need not and does not reach this issue, which it views as a much closer question.

to the mayor of the City, stating that the then-proposed telecommunications code was "in direct conflict with applicable law" and would "create ambiguities or inequities likely to generate future litigation." (Verizon Matter, Dkt. 104-19 at 2). This letter discusses the Barriers Order at length (*id*. at 3), and states that the "fees and charges" in the then-proposed telecommunications code "would conflict with federal law" in part because they "cannot possibly correlate with the City's actual costs incurred as the result of [a] small cell attachment" (*id*. at 5-6).

On January 14, 2019, non-party CenturyLink sent a letter to the mayor of the City raising similar concerns. (Verizon Matter, Dkt. 104-21). CenturyLink's letter states that the "fee and compensation provisions" of the then-proposed telecommunications code required "additional discussion to ensure compliance with federal and state law." (*Id*. at 4). CenturyLink advised that the City was limited under federal law to recovering "the costs of managing and administering the rights-of-way" and "should not be generating revenues but should instead be focused on cost recovery." (*Id*.). CenturyLink noted that there was "no documentation to support the rates for underground installations, aerial installations or pole attachments." (*Id*. at 5). CenturyLink's letter warned that the issues created by the then-proposed telecommunications code were "likely to generate future litigation." (*Id*. at 3). The same day the City received CenturyLink's letter, Kabutey Ocansey, the Assistant Commissioner of the City's Department of Environmental Services, sent an email marked high importance to several of the City's employees seeking information "to quantify some of [the City's] operating and capital costs for work in in [the City's] right-of-ways[.]" (Verizon Matter, Dkt. 104-12 at 3-4).

On April 15, 2019, <u>after</u> the Telecom Code had been adopted by the City Council, Verizon sent the mayor another letter, in which it noted that the City had not changed the Telecom Code in response to its prior comments and inquired "whether it is the City's position that the fees and compensation set forth in Article IV of the [Telecom Code] would comply with federal law, including by ensuring recurring fees for use of the City's rights-of-way are cost-based and include only objectively reasonable costs." (Verizon Matter, Dkt. 104-23 at 2). Verizon further requested that the City provide any support it had to show that the fees complied with federal law. (*Id*.). Johanna F. Brennan, a municipal attorney for the City, forwarded this letter to Louie Tobias, the City's Director of Telecommunications, stating that the City "need[ed] to respond to Verizon with a verification of [its] costs." (Verizon Matter, Dkt. 104-24 at 2). The City then began in earnest to undertake an analysis of its right-of-way costs.[4] Two days later, on April 17, 2019, Mr. Tobias created the Cost Spreadsheet, though he continued to work on it for some time thereafter, including after the instant litigation had been commenced. (*See* Verizon Matter, Dkt. 98 at 222-23, 227).

It is thus apparent from the evidence before the Court that the Cost Spreadsheet was created not as a normal part of the City's business, but specifically in response to challenges to the legal basis for the fees contained in the Telecom Code. The City's arguments to the contrary are unavailing. While the City concedes that it "anticipated that litigation [related to the Telecom Code] was a possibility" (Verizon Matter, Dkt. 108 at 17), it argues that

---

[4]    The reliability of the manner in which that analysis was undertaken is considered elsewhere in this Decision and Order.

Verizon did not specifically threaten litigation related to fees (*id.*).  The Court disagrees with this narrow reading of Verizon's communications, which are clear that one of its primary concerns regarding the Telecom Code is its failure to comply with federal law (including specifically the Barriers Order) regarding permissible fees.

Moreover, the City has offered no explanation for why it responded to Verizon's communications by creating the Cost Spreadsheet if it did not anticipate having to support its fees in a future dispute.  To the contrary, internal City communications explicitly state that the purpose of performing the *post hoc* cost analysis memorialized in the Cost Spreadsheet was to "justify [the City's] costs incurred for telecommunications rental fees as prescribed in the new [Telecom Code.]"  (Verizon Matter, Dkt. 104-15 at 2-23).  The City cannot credibly argue that the Cost Spreadsheet was approached in a neutral fashion, as an attempt to accurately assess the City's costs, as opposed to in a way calculated to defend the already enacted Telecom Code from anticipated attacks.

Other circumstances of the Cost Spreadsheet's creation also demonstrate a lack of trustworthiness.  In assessing trustworthiness, courts may consider: "(a) the timeliness of the investigation, (b) the special skills or experience of the official, (c) whether a hearing was held and the level at which it was conducted, and (d) possible motivation problems." *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 143 (2d Cir. 2000).  The motivation problems related to the Cost Spreadsheet's creation have been discussed at length above.  The other factors all support finding a lack of trustworthiness.  As to timeliness, the Cost Spreadsheet was not created until after the Telecom Code had already been enacted.  Further, Mr. Tobias testified at trial that the City had not contemporaneously tracked or documented its costs

related to telecommunications in the right-of-way, and that City employees similarly did not contemporaneously track or document the time they spent on telecommunications issue.  (Dkt. 98 at 225).  In other words, the City waited until after the basis for the fees was called into question to meaningfully look into the matter, and then attempted to perform an after-the-fact assessment without contemporaneous recordkeeping.

As to the special skills or experience of the official who compiled the record, while Mr. Tobias was responsible for the ultimate creation of the Cost Spreadsheet, he incorporated therein information from unidentified City employees who were given unfettered discretion to determine what costs they understood to be associated with telecommunications and/or work in the right-of-way.  (*See* Verizon Matter, Dkt. 98 at 226).  There is nothing before the Court that would support the conclusion that these unidentified City employees were qualified to make such a determination, or that they were provided with appropriate training to do so.

Moreover, as to Mr. Tobias himself, while he testified to having significant experience with public budgeting, he also testified—as previously noted—that the City had no actual records regarding the costs associated with telecommunications installations.  (*See* Verizon Matter, Dkt. 100 at 51).  Mr. Tobias' experience in public budgeting does not qualify him to make qualitative assessments regarding the costs of telecommunications installations, as he was required to do in producing the Cost Spreadsheet.

Finally, the City concedes that no hearing was conducted.  (Verizon Matter, Dkt. 108 at 19).  In sum, the Court concludes that the relevant factors all lead to the conclusion that the Cost Spreadsheet lacks the requisite indicia of trustworthiness to be admissible

under Rule 803(8).  Accordingly, the Court agrees with Plaintiffs that the Cost Spreadsheet is inadmissible hearsay, and cannot be relied upon to satisfy the City's burden of showing that Telecom Code's fee structure is a reasonable approximation of the City's costs.

Because the Court agrees with Plaintiffs that the Cost Spreadsheet is inadmissible hearsay, it need not and does not reach Plaintiffs' alternative arguments that admission of the Cost Spreadsheet would violate either Federal Rule of Evidence 1006 (the summary document rule) or Federal Rule of Evidence 1002 (the best evidence rule), or that Mr. Tobis was impermissibly providing expert testimony.  The Court further need not and does not reach Plaintiffs' argument that trial exhibit 500, a document memorializing a survey of fees charged by other municipalities across the country for telecommunications facilities, is inadmissible hearsay.  (*See* Verizon Matter Dkt. 104-1 at 65-67).  The Court has not relied upon trial exhibit 500 in any fashion in reaching its determinations in these matters.

## II.   <u>RULE 52(c) MOTION</u>

Having determined that the Cost Spreadsheet is inadmissible hearsay, the Court next considers whether Plaintiffs are entitled to judgment on their claims that the City has violated Section 253 and Section 332.  The Court finds that they are, for the reasons that follow.

### A.   <u>Legal Standard</u>

Rule 52(c) provides: "If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue."  Fed. R. Civ. P. 52(c).  A judgment

on partial findings under Rule 52(c) "must be supported by findings of fact and conclusions of law as required by Rule 52(a)." *Id.*

"Unlike at summary judgment, Rule 52(c) authorizes the court to make credibility determinations and resolve disputed issues of fact, applying the same standard of proof and weighing the evidence as it would at the conclusion of the trial." *Aquino v. Alexander Cap., LP*, No. 21-CV-01355 (JSR), 2023 WL 4364449, at *1 (S.D.N.Y. July 6, 2023) (quotation and alteration omitted). "Unlike under Rule 50 which governs judgment as a matter of law in jury trials, under Rule 52(c), the court does not consider the evidence in the light most favorable to the non-moving party." *Wechsler v. Hunt Health Sys.*, Ltd., 330 F. Supp. 2d 383, 433 (S.D.N.Y. 2004). The Court further "does not draw any special inferences in the non movant's favor, or consider the evidence in the light most favorable to the non-moving party. Instead the court acts as both judge and jury, weighing the evidence, resolving any conflicts, and deciding where the preponderance lies." *LaMarca v. United States*, 31 F. Supp. 2d 110, 123-24 (E.D.N.Y. 1998) (citation omitted).[5]

---

[5]     As the court in *Aquino* acknowledged, *see* 2023 WL 4364449, at *2 n.1, in 2022 the Second Circuit issued an unpublished and non-precedential summary order, *Elof Hansson USA Inc. v. Santiago*, No. 20-4235-CV, 2022 WL 2208266, at *2 (2d Cir. June 21, 2022), in which it stated: "A district court must deny a motion for judgment as a matter of law [or a motion for a directed verdict under Rule 52(c)] unless, viewed in the light most favorable to the nonmoving party, the evidence is such that . . . there can be but one conclusion as to the verdict that reasonable persons could have reached." (alterations in original and quoting *Cruz v. Loc. Union No. 3 of Int'l Bhd. of Elec. Workers*, 34 F.3d 1148, 1154-55 (2d Cir. 1994)). The *Aquino* court explained that the *Elof Hansson* case did not "include any discussion or analysis of the correct standard under Rule 52(c), and the authority it cited dealt exclusively with the standard a court should apply when dealing with a motion for judgment as a matter of law under Rule 50(a) at the conclusion of the plaintiff's case in a jury trial." 2023 WL 4364449, at *2 n.1. The Court agrees with the *Aquino* court that it is

B.      **Burden of Proof**

"In a civil case, the plaintiff bears the burden of proving the elements of his claim by a preponderance of the evidence." *Brown v. Lindsay*, Nos. 08-CV-351, 08-CV-2182, 2010 WL 1049571, at *12 (E.D.N.Y. Mar. 19, 2010). "To establish a fact by a preponderance of the evidence means to prove that the fact is more likely true than not true." *Id.* (quoting *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997)). "Under the preponderance of the evidence standard, if the evidence is evenly balanced, the party with the burden of proof loses." *Richardson v. Merritt*, No. 12-CV-5753 (ARR), 2014 WL 2566904, at *5 (E.D.N.Y. June 4, 2014) (citing *Kosakow v. New Rochelle Radiology Assocs.*, 274 F.3d 706, 731 (2d Cir. 2001)). In other words, if the credible evidence on a given issue is evenly divided between the parties—that it is equally probable that one side is right as it is that the other side is right—then the plaintiff has failed to meet his burden. "[A] defendant asserting an affirmative defense bears the burden of proof with respect to that defense." *Barton Grp., Inc. v. NCR Corp.*, 796 F. Supp. 2d 473, 498 (S.D.N.Y. 2011), *aff'd*, 476 F. App'x 275 (2d Cir. 2012); *see also Amerio v. Gray*, No. 5:15-CV-538, 2019 WL 5307248, at *2 (N.D.N.Y. Oct. 21, 2019) ("An affirmative defense, by contrast, is a defense that the defendants must assert and prove, and for which they have the burden.").

Here, as previously noted, the Court determined in connection with the parties' motions for summary judgment that the City bears the burden, under the Barriers Order, of demonstrating that the fees charged by the Telecom Code are a reasonable approximation

---

not bound by the "clearly erroneous" and non-precedential dicta in the *Elof Hansson* summary order, *id.*, and no party has argued to the contrary.

of its costs.  (*See, e.g.,* Verizon Matter, Dkt. 65 at 21 ("[The Barriers Order] unequivocally places the burden of demonstrating that the fees at issue are a reasonable approximation of costs on the municipality.  This is a reasonable interpretation of the statutory language, which is silent on which party bears the burden of proof.")).

### C.   Findings of Fact

The following section constitutes the Court's Findings of Fact pursuant to Federal Rule of Civil Procedure 52(a)(1) and (c).  The Court has made its Findings of Fact based on the testimony and exhibits presented at trial, and has discussed only those issues considered "material to the resolution of the parties' claims."  *Cliffstar Corp. v. Alpine Foods, LLC*, No. 09-CV-00690-JJM, 2016 WL 2640342, at *1 (W.D.N.Y. May 10, 2016) (citing *I.N.S. v. Bagamasbad*, 429 U.S. 24, 25 (1976) ("[C]ourts . . . are not required to make findings on issues the decision of which is unnecessary to the results they reach.")).  Moreover, "the distinction between law and fact is anything but clear-cut" and therefore, "for purposes of appellate review, the labels of fact and law assigned" should not be considered controlling.  *Id.* (quotation marks and citations omitted).

### 1.   Adoption of the Telecom Code

The City was developing a new telecommunications code prior to the FCC's issuance of the Barriers Order.  On January 4, 2018, Meghan McKenna from the City's law department sent to an outside consulting agency a draft ordinance that required the following payments: $10,000 for up to 2,500 linear feet of telecommunications facilities and $1.50 per linear foot thereafter in the first year; $5,000 for up to 2,500 linear feet of telecommunications facilities and $1.00 per linear foot thereafter in years after the first

year; $5,000 for up to 2,500 linear feet and $1.00 per linear foot thereafter for telecommunications facilities not requiring the installation of new conduit and installed in existing facilities; $5,000 for up to 2,500 linear feet and $1.00 per linear foot thereafter of telecommunications facilities installed by horizontal direction boring involving minimal trenching or excavation; and $2,000 for a "pole attachment fee" for the use of any City-owned poles on which facilities were installed.  (Verizon Matter, Dkt. 104-30 at 23-25). The draft ordinance at that time referred to these fees as reflecting "fair market value rental compensation for use of the City's right-of-way[.]"  (*Id*. at 24).

Mr. Tobias joined the City as its Manager of Telecommunications in February of 2018. (Verizon Matter, Dkt. 98 at 21).  That role had the same duties and responsibilities as his current role of Director of Telecommunications.  (*Id*.).  Mr. Tobias immediately became involved in the process of drafting the Telecom Code.  (*Id*. at 22).  In July of 2018, Mr. Tobias assisted the City's law department in outlining a legislative package to present to the mayor regarding the draft ordinance.  (Verizon Matter, Dkt. 98 at 183-84).  This outline identifies "revenue" as an "opportunity" presented by adoption of a telecommunications code, stating that the revenue would be derived from "$2,000 per pole attachment on regular poles per year, $3,000 (or more) per embedded smart pole per year, and per-foot annual rental charges for fiber installed in the right-of-way."  (Verizon Matter, Dkt. 104-29 at 3).  The outline further states that one of the reasons a telecommunications code is needed is "to create revenue opportunities."  (*Id*. at 2).  In discussing how the draft ordinance was developed, this outline makes no mention of an analysis of the City's costs.  (*Id*.).

A revised outline of the legislative package was circulated within the City on September 5, 2018. (Verizon Matter, Dkt. 104-34). The revised outline states that a telecommunications code is needed "to create revenue opportunities from City owned facilities in the ROW" and that "[c]onsidering only existing/approved pole attachments, [the City] will receive an estimated $150,000 annually exclusively of the per-foot fee." (*Id.* at 3-4). The revised outline reiterates that there have been objections from "the industry" (including Verizon) to the right-of-way fees and that there is a risk of litigation. (*Id.* at 5). The revised outline acknowledges (as did the original outline) that "a ruling by the FCC . . . could render portions of the ordinance unenforceable." (*Id.*).

As discussed in more detail below, the FCC issued the Barriers Order on September 27, 2018. On November 26, 2018, the City modified the draft ordinance to delete the words "fair market value rental" from the description of the right-of-way fees, and to instead indicate that the fees would serve as compensation for "the reasonably approximate costs for the maintenance, operation and management of the Right-of-Way related to such use[.]" (Verizon Matter, Dkt. 104-11 at 3). However, the fees to be charged were largely unchanged from the prior draft, except that the registration fee was reduced from $1,500 to $1,000, and the fee for pole attachments was reduced from $2,000 to $1,500 per standard City-owned pole or standard pole purchased by the licensee and dedicated to the City. (*Id.* at 3-4). No evidence was presented at trial to support the conclusion that these minor changes were related to any cost analysis performed by the City.

The Telecom Code was passed into law on February 19, 2019, with an effective date of April 1, 2019. (Verizon Matter, Dkt. 98 at 42). The Telecom Code was enacted as

Chapter 106 of the Code of the City of Rochester (the "City Code").  (Verizon Matter, Dkt. 104-10).  The Telecom Code and Chapter 104 of the City Code set various fees for small cell pole attachments, including a one-time permit fee for work within the ROW at a rate of $2,000 per existing pole and $2,500 per each replacement pole, an annual fee of $1,500 for each small cell pole attachment, and initial and annual fees per linear foot for underground or aerial conduit containing telecommunications facilities such as fiber.  (*Id.*). The City also requires an applicant to enter into a master license agreement with the City. (*Id.*).

**2.**     **The Barriers Order**

"The newest generation of wireless broadband technology is known as 5G and requires the installation of thousands of small cell wireless facilities."  *City of Portland v. United States*, 969 F.3d 1020, 1031 (9th Cir. 2020) (internal quotation marks omitted). "5G technology is so named because it is the fifth generation of cellular wireless technology." *Id*. at 1033.  "Although 5G transmits data at exceptionally fast speeds, it does so over relatively short distances.  For this reason, wireless providers must use smaller power-base stations in more locations, as opposed to the fewer, more powerful base stations used for 4G data transmission." *Id*.

On September 27, 2018, the Federal Communications Commission ("FCC") issued the Barriers Order, which limits "local governments' authority to regulate telecommunications providers" based on the FCC's authority under Sections 253(a) and 332(c)(7) of the Act.  *City of Portland*, 969 F.3d at 1032.  These provisions of the Act "authorize the FCC to preempt any state and local requirements that 'prohibit or have the

effect of prohibiting' any entity from providing telecommunications services." *Id*. (quoting 47 U.S.C. § 253(a), (d)). "Section 253 is, at its core, a preemption statute . . . the purpose of [which] is to impose some limits on the ability of state and local governments to regulate telecommunications." *Crown Castle NG E. Inc. v. Town of Greenburgh, N.Y.*, No. 12-CV-6157(CS), 2013 WL 3357169, at *12 (S.D.N.Y. July 3, 2013) (internal quotations and citations omitted), *aff'd*, 552 F. App'x 47 (2d Cir. 2014).

As relevant to the instant Decision and Order, the Barriers Order concludes that Section 253 and Section 332 "have the same meaning and . . . reflect the same standard, including with respect to preemption of fees that could 'prohibit' or have 'the effect of prohibiting' the provision of covered service." 3 F.C.C. Rcd. at 9124.  The Barriers Order further concludes that:

> ROW access fees, and fees for the use of government property in the ROW, such as light poles, traffic lights, utility poles, and other similar property suitable for hosting Small Wireless Facilities, as well as application or review fees and similar fees imposed by a state or local government as part of their regulation of the deployment of Small Wireless Facilities inside and outside the ROW, violate Sections 253 or 332(c)(7) unless these conditions are met: (1) the fees are a reasonable approximation of the state or local government's costs, (2) only objectively reasonable costs are factored into those fees, and (3) the fees are no higher than the fees charged to similarly-situated competitors in similar situations.

*Id*. at 9112-13.

### 3.    The City's Cost Analysis

Mr. Tobias testified that he began an assessment of the City's telecommunications-related costs shortly after he was hired in February of 2018.  (Verizon Matter, Dkt. 98 at 70-74).  However, his testimony made clear that this was a very broad assessment that

included costs not specifically related to the City's costs for telecommunications deployments in the right-of-way.  (*Id*.).  It was not until late 2018/early 2019 that the City began in earnest to attempt to quantify its costs specifically related to telecommunications activities within the right-of-way.  Specifically, on December 28, 2018, Ms. Brennan (from the City's law department) circulated to Mr. Tobias and others an article written by a law firm recommending that, in light of the Barriers Order, municipalities undertake a cost analysis that could "protect you in the event you are challenged for assessing higher fees than the presumptively reasonable fees specified in the [Barriers] Order." (Verizon Matter, Dkt. 104-36; Verizon Matter, Dkt. 104-37).  A City employee named Anthony Orphe— who Mr. Tobias identified at trial as the Director of Buildings and Parks and an assistant to the Commissioner of the Department of Environmental Services  (Verizon Matter, Dkt. 98 at 200)—replied agreeing that it would "be best to revisit [the City's] cost analysis for the permit fees . . . in light of this article" (Verizon Matter, Dkt. 104-17 at 3).  Mr. Orphe further noted that it had been "a couple of years" since any cost analysis had been conducted.  (*Id*.).

Then, as discussed above, after receiving Verizon and CenturyLink's letters in January of 2019, Mr. Tobias and others began soliciting information from various employees within the City about work performed within the right-of-way.  The information that was gathered from these inquiries went far beyond costs associated with telecommunications deployments.

For example, John Gaudioso, an employee of the City's Operations Department, sent a spreadsheet on January 16, 2019, which he described as "summarizing the ROW

costs for the Telecommunications Code initiative[.]" (Verizon Matter, Dkt. 104-13 at 2). Mr. Gaudioso explained that he had included "all work activities that are involved in the performance of work in the ROW" and had "included capital expense where appropriate." (*Id*.). Where Mr. Gaudioso did not know how much of a work activity was performed in the right of way, he simply estimated and then prorated the expense based on his estimation. (*Id*.). A review of the spreadsheet prepared by Mr. Gaudioso reveals a host of expenses wholly unrelated to telecommunications deployments. (Verizon Matter, Dkt. 104-14).

The City Council adopted the Telecom Code on February 19, 2019, while this information gathering was still ongoing. There was no evidence presented at trial that the obtained information had any impact on the fee structure included in the Telecom Code.

Mr. Tobias created the Cost Spreadsheet in April of 2019, after Verizon requested proof that the fees in the Telecom Code represented a reasonable approximation of the City's costs. The Cost Spreadsheet purports to set forth the City's personnel and non-personnel related costs associated with telecommunications deployments in the right-of-way. (Verizon Matter, Dkt. 104-38). As to personnel costs, Mr. Tobias testified that he had conversations with a "representative sample" of City employees regarding the work they performed related to telecommunications issues. (Verizon Matter, Dkt. 98 at 225-26). Mr. Tobias kept no records of the employees with whom he had spoken or of the conversations, and those employees did not, in the normal course of their business, keep track of how much of their time they spent on telecommunications issues. (*Id*.). Mr. Tobias left it to the discretion of the individual, unidentified employees to determine what costs

they "understood to be somehow associated with telecommunications or work in the right of way[.]"  (*Id*. at 226).

Based on the information provided by these unnamed employees, Mr. Tobias determined a full-time equivalent ("FTE") value that represented the number of employees he believed the City used to perform each specified task.  (*Id*. at 95, 106-107).  He then multiplied that FTE by "the average amount of a city employee's salary plus fringe and indirect [benefits], . . . without taking into consideration their status or their bracket."  (*Id*. at 107-108).

Mr. Tobias split personnel expenses into two tabs within the Cost Spreadsheet.  (*Id*. at 86).  One tab—the "Input Data UG Tab"—purportedly represents the cost associated with linear facilities, while the other tab—the "Input Data Tab"—purportedly represents the cost associated with small cell facilities.  (*Id*.).  Mr. Tobias testified that it was "not an exact science" to split the data in this fashion and that there was "absolutely bleed-over between one and the other[.]"  (*Id*.).  He allocated $954,128 in personnel costs to the Input Data UG Tab and $1,314,218 in personnel costs to the Input Data Tab.   (Verizon Matter, Dkt. 104-38).

The Cost Spreadsheet also includes non-personnel costs from several City departments.  (*Id*.).  All of these costs are allocated to the Input Data UG Tab.  (*Id*.).  Mr. Tobias testified that in his conversations with unidentified City employees, it "came to light . . . that there were other things that were involved in the cost structure that were not necessarily particularly personnel driven" that needed to be included in the analysis. (Verizon Matter, Dkt. 98 at 131).  These costs include, for example, replacing a street light

that had fallen over, "the actual cost of the upgrade of the GIS system," storage of poles, and asphalt costs. (*Id*. at 131-32). Mr. Tobias testified that "the work is done regardless of causality" and that he could not say that these costs were caused by small cell deployments. (*Id*. at 132). Mr. Tobias then took the total amount of these non-personnel costs and used "educated assumptions"—which he described as "more art than science"— to determine what percentage thereof should be allocated to telecommunications deployments. (*Id*. at 140).

### D.   Conclusions of Law

#### 1.   Incorporation of Prior Legal Conclusions

As an initial matter, the Court hereby expressly incorporates by reference the legal conclusions it reached in its summary judgment Decisions and Orders. (Verizon Matter, Dkt. 65; Crown Castle Matter, Dkt. 35; Extenet Matter, Dkt. 40). These legal conclusions include, but are not limited to, the following: (1) the Court has the authority to hear Plaintiffs' claims for violation of Section 253 and Section 332; (2) the Barriers Orders applies to challenges to the Telecom Code brought under the Act, including challenges to the City's fees for linear underground and aerial telecommunications facilities; and (3) in accordance with the Barriers Order, the City bears the burden of demonstrating that its fees are cost-based. The Court's reasoning for reaching these conclusions is set forth in full in its summary judgment Decisions and Orders.

#### 2.   The City Has Violated Section 253 and Section 332

Section 253 "renders unlawful State or local statutes, regulations, or other legal requirements that 'prohibit or have the effect of prohibiting the ability of any entity to

provide any interstate or intrastate telecommunications service.'" *Crown Castle NG E. Inc.*, No. 12-CV-6157 CS, 2013 WL 3357169, at *12 (quoting 47 U.S.C. § 253(a)).  "[A] prohibition does not need to be complete or insurmountable to run afoul of [Section] 253(a)"—it need only "materially inhibit[ ] or limit[ ] the ability of any competitor or potential competitor to compete in a fair and balanced legal and regulatory environment." *TCG N.Y., Inc. v. City of White Plains*, 305 F.3d 67, 76 (2d Cir. 2002) (internal quotation marks omitted).  Similarly, Section 332 provides that no "State or local government or instrumentality thereof" may regulate "the placement, construction, and modification of personal wireless service facilities" in a manner that "prohibit[s] or ha[s] the effect of prohibiting the provision of personal wireless services."  47 U.S.C. § 332(c)(7)(B)(i)(II). The FCC concluded in the Barriers Order that "collectively, Congress intended for [these] two provisions to cover the universe of fees charged by state and local governments in connection with the deployment of telecommunications infrastructure."  33 F.C.C. Rcd. at 9124.

Section 253 permits a State or local government to "require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government."  47 U.S.C. § 253(c). Under the Barriers Order, "[f]ees that cannot ultimately be shown by a state or locality to be a reasonable approximation of its costs, such as high fees designed to subsidize local government costs in another geographic area or accomplish some public policy objective beyond the providers' use of the ROW, are not 'fair and reasonable compensation . . . for

use of the public rights-of-way' under Section 253(c)." 33 F.C.C. Rcd. at 9128.  Moreover,

"fees above a reasonable approximation of cost, even when they may not be perceived as

excessive or likely to prohibit service in isolation, will have the effect of prohibiting

wireless service[.]"  *Id*. at 9123; *see also id*. at 9124 ("fees not reasonably tethered to costs

. . . violate Sections 253(a) or 332(c)(7) in the context of Small Wireless Facility

deployments").  In this context, costs means "those costs specifically related to and caused

by the deployment."  *Id*. at 9088 n.131.

The Barriers Order makes clear that localities are not required to "use any specific

accounting method to document the costs they may incur when determining the fees they

charge for Small Wireless Facilities within the ROW."  *Id*. at 9128.  Fees are also not

required to be developed specifically based on a cost analysis—"a fee not calculated by

reference to costs might nonetheless happen to land at a level that is a reasonable

approximation of objectively reasonable costs, and otherwise constitute fair and reasonable

compensation."  *Id*. at 9124 n.208.

Here, the City relies on the Cost Spreadsheet to demonstrate that the fees charged

in the Telecom Code are a reasonable approximation of its costs.  The Court has

determined, for the reasons set forth in detail above, that the Cost Spreadsheet is

inadmissible hearsay.  For this reason alone the City cannot bear its burden, and Plaintiffs

are entitled to judgment that the City has violated Section 253 and Section 332.

Even assuming that the Cost Spreadsheet was admissible, it still would not be

sufficient to demonstrate by a preponderance of the evidence that the fees at issue are a

reasonable approximation of the City's "actual and direct costs" related to the deployment

of telecommunications facilities.  Barriers Order, 33 F.C.C. Rcd. at 9115.  While the City was not required to follow any particular accounting method in estimating its costs, and while the Court agrees with the City that "the Barriers Order does not require perfection" (Verizon Matter, Dkt. 108 at 15), it is apparent that the Cost Spreadsheet is based virtually entirely on speculation and guesswork, and that it was designed not to be an accurate reflection of the City's actual costs, but as a *post hoc* justification for the fees already enacted into the Telecom Code.

The problems with the methodology applied by Mr. Tobias are numerous and apparent.  With respect to personnel costs, the Court cannot find it reasonable to simply defer to the judgment of unnamed, untrained City employees as to what tasks they perform that are directly attributable to telecommunications deployments.  The internal City communications in the record make it abundantly clear that many of the employees who were asked for such information were unable to make such determinations, or struggled to even understand what information they were being asked to provide.  Moreover, and representative of the motivational problems already discussed above, these employees were encouraged to characterize as much of their work as possible as being performed in the right-of-way, in order to justify the fee structure that had already been passed into law.  A reasonable estimate cannot be produced where the underlying data is wholly unreliable.

The unreliability of the personnel cost analysis is illustrated by examining some of the assumptions made in the Cost Spreadsheet.  As Plaintiffs point out, the Cost Spreadsheet "claims that City employees have spent, and will spend each year, 20,919.6 hours on work related to fiber installations and 28,886 hours on small cell installations.

This amounts to 49,805.6 hours of work on telecom installations in the ROW each year, or 136.5 hours per day, every day, including weekends and holidays." (Verizon Matter, Dkt. 104-1). In other words, the City claims that—assuming an 8-hour work day—it devotes the equivalent of more than 17 full-time employees to telecommunications installations in the right-of-way every single day of the year, including weekends and holidays. This is despite the fact that there were only 88 or 89 such installations in the City at the time the Cost Spreadsheet was prepared. (*See* Verizon Matter, Dkt. 100 at 252-54). These numbers make no sense on their face, and reflect the haphazard manner in which the data underlying the Cost Spreadsheet was gathered.

With respect to non-personnel costs, the Court finds there to be no reasonable explanation for why all of these costs were allocated to the Input Data UG Tab. Moreover, Mr. Tobias' described method of using the "art" of "educated assumptions" in determining what percentage of these costs were attributable to telecommunications deployments is not reasonable or reliable.

Plaintiffs have identified numerous other flaws with the details of the Cost Spreadsheet, many of which the Court finds troubling. However, the Court need not get into these details, because of the fundamental defects discussed above. Accordingly, the Court concludes that the Telecom Code charges fees that are not a reasonable approximation of the City's costs and therefore violates Section 253 and Section 332, as interpreted by FCC in the Barriers Order. The fee provisions of the Telecom Code are accordingly preempted by federal law.

3.   **Remedy**

Plaintiffs do not (and could not) seek damages for the City's violation of Section 253 and Section 332.  Instead, they seek declaratory and injunctive relief.  However, the specifics of the relief sought by each Plaintiff differ.  Verizon asks the Court to declare that an enumerated list of fees set forth in the Telecom Code are preempted by Section 253 and to "[o]rder, direct[], and enjoin[] [the City] from continuing to enforce Section 106-15 of the [Telecom] Code." (Verizon Matter, Dkt. 1 at 26-27).  Crown Castle asks the Court for "a declaratory judgment finding the City's fee structure is illegal, and directing disgorgement of fees, plus interest, paid by Plaintiff to the City pursuant to the fee structure," for "an injunction preventing Rochester from charging future fees in excess of those necessary to cover the City's reasonable nondiscriminatory costs," for "a declaration that the Master License Agreement between the City and Plaintiff executed in May of 2020 does not authorize the City to assess right-of-way use fees for time periods predating its execution, and directing the disgorgement of any fees paid by Plaintiff to the City for those time periods," and for "a declaratory judgment finding that the Telecommunications Code is unlawful because it contains an illegal prohibition on cost pass-through." (Crown Castle Matter, Dkt. 1 at 32).  Finally, Extenet asks the Court for "[d]eclaratory judgment that the City's fee requirements set forth in the Telecommunications Code have the effect of prohibiting the provision of telecommunications services and personal wireless services and are therefore preempted by and in violation of 47 U.S.C. §§ 253 and 332(c)(7)(B)(i)(II)," for "[a]n order in the nature of an injunction prohibiting Rochester from requiring Extenet to enter into the City's new Master License Agreement to continue

providing telecommunications services in Rochester, New York," for "[a]n order in the nature of an injunction prohibiting Rochester from imposing the fees set forth in the Telecommunications Code on Extenet," and for "[a] declaratory judgment that the Telecommunications Code is unconstitutional because it violates the First Amendment of the United States Constitution."  (Extenet Matter, Dkt. 1 at 25).

Of these various forms of requested relief, the Court finds that Plaintiffs, in their joint brief, have demonstrated only that they are entitled to: (1) a declaratory judgment that the fee requirements set forth in the Telecom Code have the effect of prohibiting the provision of telecommunications services and personal wireless services and are therefore preempted by and in violation of Section 253 and Section 332; and (2) an injunction prohibiting the City from continuing to enforce the fee requirements (i.e. Section 106-15) of the Telecom Code.  Plaintiffs' joint brief has not addressed any of the other forms of requested relief, and the Court will not *sua sponte* conduct its own assessment of whether they are warranted.  To the extent any plaintiff believes it is entitled to additional relief based on the Court's findings of fact and conclusions of law, it may file a motion seeking such relief within 14 days of entry of this Decision and Order.  The Court will thereafter set a briefing schedule on any such motion.

III.   **OTHER CAUSES OF ACTION**

In addition to the causes of action discussed above, Crown Castle has asserted the following claims: (1) a claim that the City has violated Section 332(c)(7)(B)(i)(I) of the Act by unreasonably discriminating among providers of functionally equivalent services; (2) a claim under Article 78 of the New York Civil Practice Law & Rules ("Article 78");

(3) a violation of the dormant Commerce Clause; (4) a violation of the Takings Clause; and (5) a violation of the First Amendment right to freedom of speech. (Crown Castle Matter, Dkt. 1). Extenet has asserted a claim for violation of the First Amendment right to freedom of speech. (Extenet Matter, Dkt. 1).

Plaintiffs' joint motion seeks judgment in Crown Castle's favor under Rule 52(c) on its Article 78 claim. (*See* Verizon Matter, Dkt. 104-1 at 73-74). The Court will not enter judgment in Crown Castle's favor on its Article 78 claim at this juncture. The Court has not yet determined that it would be appropriate to exercise supplemental jurisdiction over this claim. Moreover, in supplemental briefing submitted by Crown Castle on that point, Crown Castle took the position that the Court need not determine whether it had supplemental jurisdiction over the Article 78 claim, because "if Crown Castle prevails on its federal claims under the Communications Act . . . the question of whether the Code was adopted or imposed in violation of Article 78" would be moot. (Crown Castle Matter, Dkt. 37 at 24). Crown Castle fails, in the instant joint motion, to explain how its request for judgment on its Article 78 claim is consistent with its prior representation that success on its claim under the Act would render that claim moot. Additionally, the Court agrees with the City that it has not been fully heard on Crown Castle's Article 78 claim. (*See* Verizon Matter, Dkt. 108 at 24).

With respect to the other claims asserted by Crown Castle and Extenet, the only mention of them in Plaintiffs' joint brief is the following footnote: "Crown Castle brought additional claims against the City, including that the fees charged violated its Master License Agreement, that the fees were an unconstitutional taking, and that the City's

prohibition on passing the fees onto consumers violated the dormant Commerce Clause and the First Amendment. (Case No. 6:20-cv-6866, Dkt. 1.)  If this motion is granted, these claims will be moot.  But if the trial proceeds, Crown Castle intends to pursue these claims." (Verizon Matter, Dkt. 104-1 at 75 n.21).  It is unclear to the Court whether Crown Castle will seek to pursue these claims in light of the Court's denial of its motion for judgment on its Article 78 claim.  Further, Plaintiffs' joint motion does not acknowledge Extenet's First Amendment claim.  Accordingly, Crown Castle and Extenet are ordered to submit letters within 14 days of entry of the instant Decision and Order indicating whether they intend to pursue their additional claims in light of the Court's rulings.

## IV.  <u>REQUEST FOR DISCOVERY SANCTIONS</u>

Plaintiffs have also requested discovery sanctions, based on their contention that "at numerous points, the City sought to present testimony that relied upon documents that have either been destroyed or were not produced by the City during discovery, in violation of the City's obligations under the Federal Rules of Civil Procedure." (Verizon Matter, Dkt. 104-1 at 67).  Because of these alleged discovery failures, Plaintiffs ask the Court to: (1) exclude testimony by Mr. Tobias about a project undertaken by the City on State Street, including the telecommunications-specific labor costs associated with that project; (2) exclude any testimony "that tends to support the reasonableness of the fees on the basis of Mr. Tobias' iterative process, which involved making unknown changes to the [Cost] Spreadsheet over time"; and (3) "consider drawing an adverse inference from the City's spoliation of written documentation that apparently informed creation of the" Cost Spreadsheet.  (*Id*. at 68-73).

However, the Court has already determined that the Cost Spreadsheet is inadmissible hearsay and that the City's fees are not a reasonable approximation of its costs, without excluding any evidence or drawing any adverse inferences in Plaintiffs' favor.  Because Plaintiffs' request for discovery sanctions is in the form of evidentiary remedies that would have no impact on the Court's resolution of the instant motions, it is accordingly denied as moot.

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Plaintiffs' joint motion for judgment on partial findings pursuant to Rule 52(c), to exclude the Cost Spreadsheet, and for discovery sanctions (Verizon Matter, Dkt. 104; Crown Castle Matter, Dkt. 66; Extenet Matter, Dkt. 78).   Specifically, the Court finds that the Cost Spreadsheet is inadmissible hearsay and that Plaintiffs are entitled to judgment on their claims that the fee requirements of the City's Telecommunications Code violate and are preempted by Section 253 and Section 332 of the Act.

The Court denies Crown Castle's request for judgment on its Article 78 claim and denies Plaintiffs' request for discovery sanctions.  As discussed above, Crown Castle and Extenet are ordered to file letters within 14 days of entry of this Decision and Order indicating whether they intend to continue to pursue their additional claims.

The Court finds that Plaintiffs are entitled to the following relief: (1) a declaratory judgment that the fee requirements set forth in Section 106-15 of the City of Rochester Telecommunications Code have the effect of prohibiting the provision of telecommunications services and personal wireless services and are therefore preempted

by and in violation of Section 253 and Section 332; and (2) an injunction prohibiting the City from continuing to enforce Section 106-15 of the Telecom Code.  To the extent any plaintiff believes it is entitled to additional relief based on the Court's findings of fact and conclusions of law, it may file a motion seeking such relief within 14 days of entry of this Decision and Order.  The Court will thereafter set a briefing schedule on any such motion.

Because the instant Decision and Order "adjudicates fewer than all the claims" presented in these matters, the Court can direct entry of final judgment at this time only if it "expressly determines that there is no just reason for delay."  Fed. R. Civ. P. 54(b).  No party has asked the Court to make such a finding, nor has the matter been briefed.  Accordingly, the Court will not direct entry of final judgment at this time, but will enter final judgment in each individual action once it is clear whether the plaintiff therein is seeking any additional relief and/or is pursuing any additional claims.

SO ORDERED.

ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated: February 27, 2024
       Rochester, New York